# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL IMMIGRATION PROJECT OF THE
NATIONAL LAWYERS GUILD, *on behalf of its
members,*
2201 Wisconsin Ave NW, Suite 200
Washington, D.C. 20007;

AMERICAN IMMIGRATION LAWYERS
ASSOCIATION, *on behalf of its members,*
1331 G Street, NW, Suite 300
Washington, D.C. 20005-3142;

IMMIGRATION JUSTICE CAMPAIGN, *on behalf
of its members,*
1331 G Street, NW, Suite 200
Washington, D.C. 20005-3142;

ENRIQUE NAPOLES VAILLANT,
La Palma Correctional Center
5501 N. La Palma Road
Eloy, AZ 85131;

ERNESTO RODRIGUEZ CEDENO,
La Palma Correctional Center
5501 N. La Palma Road
Eloy, AZ 85131;

ARLETY ALIAGA-COBAS,
Eloy Detention Center
1705 E Hanna Rd
Eloy, AZ 85131;

REYNALDO GUERRERO-CORNEJO
La Palma Correctional Center
5501 N. La Palma Road
Eloy, AZ 85131;

ROBERTO FAUSTO VELASQUEZ QUIALA
Pine Prairie ICE Processing Center
1133 Hampton Dupre Road
Pine Prairie, LA 70576;

Plaintiffs,

**CIVIL COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Case No. _____

v.

EXECUTIVE OFFICE OF IMMIGRATION
REVIEW

U.S. Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT

500 12th St.,
SW Washington, D.C. 20536;

JAMES MCHENRY, Director of the Executive
Office for Immigration Review, *in his official
capacity,*
5107 Leesburg Pike
Falls Church, VA 22041

MATTHEW ALBENCE, Acting Director for U.S.
Immigration and Customs Enforcement, *in his official
capacity,*
500 12th St.,
SW Washington, D.C. 20536;

Defendants.

## INTRODUCTION

1.      The COVID-19 global pandemic, caused by the novel coronavirus, has been

characterized as the worst the world has seen since 1918. States and countries around the

world have declared a State of Emergency and have shut down nonessential businesses,

restricted public gatherings, and imposed "shelter-in-place" orders in an attempt to control

the spread of the disease. Tens of thousands of people in the United States have tested

positive for COVID-19 and over 2,100 have died in the United States alone. The Centers

for Disease Control ("CDC") has specifically highlighted in-person court appearances as a

risk factor for coronavirus outbreaks, and federal courts and the Bureau of Prisons have

taken measures to implement uniform policies to minimize the health risk. Yet, the

Executive Office for Immigration Review (EOIR) has not taken the same measures, and most immigration courts remain open for in-person business, putting the health and safety of individuals in immigration detention and their attorneys at risk.

2.     Defendant EOIR has failed to put in place a uniform policy suspending in-person appearances and enacting protective measures for detained noncitizens who wish to proceed with their immigration hearings. As a result of EOIR's failure to act, attorneys and detained clients have to appear in court in person for hearings or to file critical case documents, with inconsistent rules about telephonic appearances and no meaningful provisions made for their health or safety. EOIR is effectively forcing attorneys to choose between adequately representing their clients and jeopardizing their health; EOIR is also forcing detained immigrants to choose between their health and safety and their statutory, regulatory, and due process rights.

3.     EOIR's failure to suspend in-person proceedings and to provide meaningful alternatives for those who are detained interferes significantly with detained immigrants' right to counsel and with attorneys' First Amendment right to represent their clients. EOIR's failure to act has significantly aggravated previously existing access issues and has meant that legal representatives must be willing to risk their health and safety to represent their clients in court in many places.

4.     At the same time, Defendant Immigration and Customs Enforcement ("ICE") has adopted measures that make it almost impossible for legal representatives to communicate with their clients. ICE now requires attorneys and other legal visitors to provide and bring their own Personal Protective Equipment (PPE)—including gloves, N-95 masks, and eye protection—before they can have an in-person meeting with their client to prepare them for their ongoing court hearings. Meanwhile in most ICE facilities,

telephonic access is severely limited, scheduling confidential legal calls is extremely difficult, and attorneys cannot call in to access their clients or relay a message without onerous and highly limited prior scheduling requirements. By imposing these requirements in the face of widespread PPE shortages and a lack of adequate remote access in detention facilities, ICE is functionally barring immigration attorneys from meeting with their clients and is depriving detained immigrants of their right to counsel.

5.      Plaintiffs are membership organizations comprised of immigration attorneys and immigrant rights advocates, and individuals detained in ICE custody. They seek relief from this Court because Defendants' actions are placing the health and safety of Plaintiffs' members at risk and depriving the individual Plaintiffs of their right to a meaningful opportunity to present their case and to have access to counsel.

6.      As set forth below, Defendants' inadequate response to the COVID-19 pandemic violates the Immigration and Nationality Act ("INA"), the Administrative Procedures Act ("APA"), the First Amendment, and the Due Process Clause of the Fifth Amendment.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201 and 2202 (declaratory relief), 28 U.S.C. § 2241 (habeas corpus); and 5 U.S.C. § 706 (waiver of sovereign immunity).

8.      Venue is proper under 28 U.S.C. § 1391(e)(1) because all organizational Plaintiffs are located in this District.

9.      An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief, *id.* §§ 1351, 2201, 2202.

**PARTIES**

10.     Plaintiff National Immigration Project of the National Lawyers Guild (NIPNLG) is a national non-profit 501(c)(3) membership organization headquartered in Washington, D.C. NIPNLG is a membership-based organization representing 1,500 immigration attorneys, legal workers and immigration rights advocates.   NIPNLG members provide immigration representation to, among others, detained individuals who are in removal proceedings. NIPNLG specializes in defending the rights of immigrants facing incarceration and deportation. It provides technical assistance and support to community-based immigrant organizations, legal practitioners, and advocates seeking and working to advance the rights of noncitizens.

11.     Plaintiff American Immigration Lawyers Association (AILA) is a national membership association of more than 15,000 attorneys and law professors who practice and teach immigration law. AILA members provide legal representation to, among others, individuals in removal and rescission proceedings, and individuals seeking humanitarian relief under our nation's immigration laws. AILA promotes the delivery of competent, ethical, and lawful immigration services, and increases the knowledge and professionalism of its members by providing continuing legal education and technical support.

12.     Plaintiff Immigration Justice Campaign (IJC) is a non-profit national organization which facilitates pro bono representation for detained individuals by recruiting, training and mentoring those attorneys and connecting them with the individuals who need their legal services. In partnership with local legal service providers, the Justice Campaign facilitates this legal representation for individuals detained in Aurora, Colorado; El Paso, Texas; Newark, New Jersey; San Diego, California; and in various locations throughout the southeastern United States.

13.     Plaintiffs NIPNLG, AILA, and IJC generally oppose the use of video teleconferencing (VTC) and telephonic hearings as an alternative to in-person hearings, and any endorsement of those alternative hearing methods through the filing of this lawsuit is limited to the duration of the COVID-19 pandemic.

14.     Plaintiff Enrique Napoles Vaillant is a Cuban national detained at the La Palma Correctional Center in Eloy, Arizona. He is an asylum seeker who has been granted withholding of removal to Cuba. He is currently detained while awaiting resolution of his immigration case. He has an immigration court hearing scheduled in June. He is currently unrepresented because the Florence Immigrant and Refugee Rights Project ("FIRRP"), which was in the process of obtaining pro bono representation for him and his husband Plaintiff Ernesto Rodriguez Cedeno, had to suspend those efforts due to the significant restrictions Defendants have placed on attorney access to the facility and the highly limited and inadequate telephone access with individuals detained in those facilities. He is afraid that being forced to appear at his hearing unrepresented will result in a worse outcome for his case.

15.     Plaintiff Ernesto Rodriguez Cedeno is a Cuban national detained at the La Palma Correctional Center in Eloy, Arizona. He is an asylum seeker whose hearing is currently scheduled for April 2, 2020. He is currently unrepresented because FIRRP, which was in the process of obtaining pro bono representation for him and his husband Plaintiff Enrique Napoles, had to suspend those efforts due to the significant restrictions Defendants have placed on attorney access to the facility and the highly limited and inadequate telephone access with individuals detained in those facilities. Although he requested a continuance in order to obtain representation, the continuance request was denied. Plaintiff Cedeno has asthma and is at high risk of severe illness or death were he to contract COVID-

19. He is concerned about his ability to represent himself in complicated immigration proceedings during this time. He also has very limited phone access within the facility; even if he were able to obtain representation, it would be very difficult for him to communicate with an attorney to prepare for his hearing. To make a phone call recently, he had to stand in line with about ten people for almost three hours.

16.     Plaintiff Arlety Aliaga-Cobas is a Cuban national detained at the Eloy Detention Center in Eloy, Arizona. She is an asylum seeker who has recently won an appeal before the Board of Immigration Appeals, with the assistance of FIRRP who placed her case with pro bono counsel. Her case has now been remanded for further proceedings and her hearing is scheduled for June. Although FIRRP was working to place her case with counsel for the remanded proceedings, they have had to suspend those efforts because of the significant restrictions Defendants have placed on attorney access to the facility and the highly limited and inadequate telephone access with individuals detained at those facilities. She is terrified of proceeding without an attorney in her case, because at her first removal hearing where she was unrepresented, the Immigration Judge misunderstood or ignored her clear statement that she still wished to proceed with her asylum application and wrongly found that she had abandoned her asylum application. Her ability to find representation is being significantly hindered by Defendants' policies.

17.     Plaintiff Reynaldo Guerrero-Cornejo is a 53-year-old Mexican national who has been a Lawful Permanent Resident since 1989. He has a Lawful Permanent Resident wife and three U.S. citizen children. He is detained at the La Palma Correctional Center in Eloy, Arizona while awaiting resolution of his removal proceedings. He currently has a hearing scheduled for April 24, 2020, which requires intensive preparation with his attorney. He is currently unable to see his attorney in person because of the policies

Defendants have put in place restricting access to the facilities, and his phone access is not sufficient to fully prepare him for the hearing.

18.     Plaintiff Roberto Fausto Velasquez Quiala is a Cuban national who received a positive credible fear determination. He is currently detained pending resolution of his immigration court proceedings at the Pine Prairie ICE Processing Center in Pine Prairie, Louisiana. His immigration court hearing is scheduled for the end of April 2020. He is currently unable to see his attorney in order to prepare for the hearing, and he is limited to 30 minutes a day for attorney calls.

19.     Defendant Executive Office for Immigration Review ("EOIR") is a federal government agency within the Department of Justice that includes the immigration courts and the Board of Immigration Appeals ("BIA"). It is responsible for directing and managing the immigration court system.

20.     Defendant Immigration and Customs Enforcement ("ICE") is a component of Department of Homeland Security ("DHS"), an executive department of the United States. Defendant ICE carries out removal orders and oversees immigration detention.

21.     Defendant James McHenry is the Director of EOIR, and is sued in his official capacity only.

22.     Defendant Matthew Albence is the Acting Director of ICE, and is sued in his official capacity only.

## FACTUAL ALLEGATIONS

**A. COVID-19 Poses Grave Risk of Harm, Including Serious Illness or Death.**

23.     COVID-19 is a coronavirus that has reached pandemic status. As of March 30, 2020, more than 690,000 individuals worldwide have confirmed diagnoses, including

more than 120,000, in the United States.[1] More than 33,000 individuals worldwide have died as a result of COVID-19, including more than 2,100 in the United States alone.[2] Those numbers are growing exponentially, with more than 58,000 new cases worldwide in the past day alone.[3]

24.     Nationally, CDC projections indicate that over 200 million individuals in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention, with as many as 1.5 million deaths in the worst projections.[4]

25.     COVID-19 is a highly contagious disease that is easily transmitted through respiratory droplets, especially when one is within six feet of an infected individual. Completely asymptomatic individuals can transmit the coronavirus to others who can then become infected with COVID-19.

26.     COVID-19 can result in respiratory failure, kidney failure, and death. Infected individuals who do not die from the disease can face serious damage to the lungs, heart, liver, or other organs, resulting in prolonged recovery periods, including extensive rehabilitation from neurological damage and loss of respiratory capacity.

27.     Older individuals and those with certain medical conditions, including many of the organizational plaintiffs' members, face greater chances of serious illness or death from COVID-19. Certain underlying medical conditions increase the risk of serious

---

[1] Coronavirus disease 2019 (COVID-19) Situation Report – 70, World Health Organization (Mar. 30, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200330-sitrep-70-covid-19.pdf?sfvrsn=7e0fe3f8_2.

[2] *Id.*

[3] *Id.*

[4] James Glanz, et al., *Coronavirus Could Overwhelm U.S. without Urgent Action, Estimates Say,* New York Times (Mar. 20, 2020), *available at* https://www.nytimes.com/interactive/2020/03/20/us/coronavirus-model-us-outbreak.html.

COVID-19 disease for individuals of any age, including lung disease, chronic liver or kidney disease, diabetes, epilepsy, hypertension, compromised immune systems, blood disorders, inherited metabolic disorders, stroke, and pregnancy.

28.     COVID-19 can also severely damage lung tissue, affect cardiac functions, and cause widespread damage to other organs. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

29.     Even some younger and healthier individuals who contract COVID-19 may require supportive care. The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality of people infected with the coronavirus is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.

30.     There is no vaccine against COVID-19, nor is there any known medication to prevent or cure infection from the virus.

31.     The only known effective measures to reduce the spread of coronavirus are social distancing or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water.

**B. COVID-19 Has Spread in Immigration Courts and In U.S. Jails and Prisons, Including ICE Detention Facilities**

32.     Within a mere ten days of the World Health Organization (WHO) declaring a COVID-19 pandemic,[5] the virus had made its way into detention facilities and

---

[5] WHO Director-General's Opening Remarks at the Media briefing on COVID-19, World Health Organization (Mar. 11, 2020), *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-

immigration courts nationwide.

33.    To date, positive COVID-19 cases have appeared among staff or incarcerated individuals in detention facilities in California,[6] Georgia,[7] Wisconsin,[8] Louisiana,[9] and New York.[10] COVID-19 cases have also emerged among ICE detainees and employees in ICE facilities,[11] and have been confirmed in several immigration courts.[12]

34.    Given the shortage of testing capacity nationwide, COVID-19 cases in immigration courts and detention facilities are likely far more widespread than reported. In early March, health experts had warned that serious outbreaks of the virus in detention

---

opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[6] *See* Paige St. John, *First Inmate in California's Prison System Tests Positive for Coronavirus*, Los Angeles Times (Mar. 22, 2020), *available at* https://www.latimes.com/california/story/2020-03-22/coronavirus-first-california-prisoner-tests-positive-los-angeles-county; Michael Barba, *SF Deputy Sherriff Assigned to Hall of Justice Jail Test Positive for Coronavirus*, San Francisco Examiner (Mar. 22, 2020), *available at* https://www.sfexaminer.com/news/sf-deputy-sheriff-assigned-to-hall-of-justice-jail-tests-positive-for-coronavirus/

[7] Max Blau, et al., 3 Georgia Prison Inmates Test Positive for COVID-19, Others Monitored, Atlanta Journal Constitution (Mar. 21, 2020), *available at* https://www.ajc.com/news/local/breaking-georgia-prison-inmate-tests-positive-for-covid/2U3hE09fRS6WG9SMHOYZ7I/

[8] *Second Wisconsin Prison Worker Tests Positive for Coronavirus*, ABC-WBAY-TV (Mar. 23, 2020), *available at* https://www.wbay.com/content/news/Second-Wisconsin-prison-worker-tests-positive-for-coronavirus-569024661.html

[9] *Federal Prison in Allen Parish Confirms Two Coronavirus Cases*, ABC-WBRZ-2 (Mar 23, 2020), *available at* https://www.wbrz.com/news/federal-prison-in-allen-parish-confirms-two-coronavirus-cases-monday.

[10] Daniel Gross, "*It Spreads Like Wildfire*": The Coronavirus Comes to New York's Prisons, The New Yorker (Mar. 24, 2020), *available at* https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons

[11] *ICE Guidance on COVID-19: Confirmed Cases*, U.S. Immigration and Customs Enforcement (Mar. 24, 2020), *available at* https://www.ice.gov/covid19

[12] See, *e.g.*, EOIR (@DOJ_EOIR), Twitter (Mar. 24, 2020, 11:36 AM), https://twitter.com/DOJ_EOIR/status/1242520585420394497 (reporting on coronavirus positive individual in Elizabeth Immigration Court in New Jersey); EOIR (@DOJ_EOIR), Twitter (Mar. 23, 2020, 7:50 PM), https://twitter.com/DOJ_EOIR/status/1242282632337068035 (same with respect to Varick Immigration Court in New York)

facilities were imminent,[13] and on March 17, health experts warned of the dangers of the

virus if the immigration courts remain open for in-person hearings.[14] As of March 30, 2020,

more than 120,000 people in the United States have tested positive for COVID-19 and

more than 2100 have died, with nearly 19,000 new cases in the past day alone.[15] These

number are rising exponentially.

35.     The CDC has warned that courthouses are especially susceptible to spread

of the virus, and both the CDC and the WHO have warned that detention centers are

especially vulnerable to rapid spread of COVID-19.[16] WHO experts have sounded the

alarm warning that outbreaks in detention facilities would lead to "huge mortality rates."[17]

Under these circumstances, continuing to require detained immigrants and their attorneys

to appear in court, and continuing to hold hearings without appropriate accommodations,

is an invitation for a massive outbreak among immigration attorneys, their clients, and the

detention centers in which those clients are housed.

**C. EOIR's Failure to Issue a Uniform Policy Adequately Addressing the COVID-19 Pandemic Has Led to Incoherent, Chaotic, and Inadequate Policies.**

---

[13] Rich Schapiro, *Coronavirus Could 'Wreak Havoc' on U.S. Jails, Experts Warn,* NBC News (Mar. 12, 2020) *available at* https://www.nbcnews.com/news/us-news/coronavirus-could-wreak-havoc-u-s-jails-experts-warn-n1156586

[14] Charles Davis, *Immigration Judges, ICE Attorneys, and Experts are Calling on the Trump Administration to Close the Courts to Stop the Novel Coronavirus from Spreading*, Business Insider (Mar. 17, 2020) *available at* https://www.businessinsider.com/coronavirus-ice-and-immigration-judges-call-for-delay-in-hearings-2020-3

[15] Coronavirus disease 2019 (COVID-19) Situation Report – 70, World Health Organization (Mar. 30, 2020), *available at https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200330-sitrep-70-covid-19.pdf?sfvrsn=7e0fe3f8_2*

[16] *See Preparedness, Prevention and Control of COVID-19 in Prisons and Other Places of Detention*, World Health Organization (Mar. 15, 2020) at 2; *Interim Guidance on Management of Coronavirus Disease 201 (COVID-19) in Correctional and Detention Facilities*, CDC (Mar. 23, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

[17] Hannah Summers, *'Everyone Will be Contaminated' Prisons Face Strict Coronavirus Controls*, The Guardian (Mar. 23, 2020), *available at* https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls

36.     In response to the pandemic, EOIR issued a memo on March 18, 2020 postponing all hearings for non-detained individuals scheduled through April 10, 2020, but not detained hearings. The memo provided merely optional recommendations to immigration courts on how to address the COVID-19 outbreak. On March 26, 2020, EOIR followed up with an email to stakeholders that did not provide any meaningful requirements for closing down in-person interactions in court. Despite the public health crisis unfolding in detention facilities and in immigration courts, the detained docket remains operating, and the vast majority of immigration courts remain open.

37.     EOIR has not issued any nationwide policy providing for rescheduling or remote access accommodations of hearings for detained individuals. Instead, EOIR has deferred to individual immigration courts to address the public health crisis in the detained docket. This has resulted in haphazard and wildly inconsistent responses. Some courts have standing orders related to COVID-19, others do not. As of today, thirty-three immigration courts have issued COVID-19 standing orders, some of which are specific to individual judges rather than the entire court. The standing orders vary drastically in their scope and adopt conflicting procedures as described more fully below.

38.     Amidst this chaos, EOIR has adopted the practice of communicating key announcements, sometimes exclusively, through social media such as Twitter and Facebook. This includes court closures and changes to filing deadlines. The official EOIR Twitter account has issued midnight tweets declaring next day court closures. In at least one case, the announced court closures never occurred. EOIR also tweeted next day new filing deadlines at 6 pm the evening before. The tweet was later deleted, but not before

sowing confusion and panic among immigration attorneys and their clients.[18]

## D. Defendants' Response to COVID-19 Endangers the Health of Detained Noncitizens and Their Legal Representatives

39.     Although ICE and EOIR have telephonic and video teleconferencing (VTC) capabilities, immigration courts are still needlessly holding in-person immigration hearings, imperiling the health of both detainees and their legal representatives.[19] In contrast, other courts and court systems around the country, including the U.S. Supreme Court, have taken actions to address the pandemic such as closing to the public, waiving requirements for paper filings, and extending deadlines and hearings.[20]

40.     Meanwhile, EOIR has not only continued to hold in-person hearings, it has also continued to require paper filings to be made at the physical court locations, has failed to extend filing deadlines, has not routinely authorized telephonic or video appearances, and has taken no uniform measures to protect attorneys and detained immigrants from harm. EOIR also has not directed its courts to facilitate rescheduling for detained immigrants who do not wish to proceed with their hearings under these circumstances.

41.     Unlike federal courts and most government agencies, immigration courts do not accept filing by email, fax, or any other electronic filing methods. EOIR has not

---

[18] Suzanne Monyak, *Chaos, Confusion Reign As Immigration Courts Stay Open*, Law360 (Mar. 28, 2020), *available at* https://www.law360.com/articles/1257798/chaos-confusion-reign-as-immigration-courts-stay-open

[19] The organizational plaintiffs fundamentally oppose routine or mandated use of VTC and telephonic hearings in place of in-person hearings under ordinary circumstances, and present them as alternatives in this case only for detained immigrants who wish to proceed with their hearings and have no safe options for in-person appearance.

[20] *See, e.g.*, Supreme Court, https://www.supremecourt.gov/ (last visited Mar. 27, 2020) (announcing that the court will be closed until further notice due to COVID-19); Order - General Docket No. 2020-3 (5th Cir. 2020), *available at* http://www.ca5.uscourts.gov/docs/default-source/default-document-library/order-1-clerks-office-covid-19.pdf?sfvrsn=def8cb2d_2 (waiving the requirement for paper filing in the Fifth Circuit).

modified this policy in light of the crisis.[21] Legal representatives must either deliver filings in person or send them by mail or courier. Not only is this a risk to their health, but in places like New York or California, where there are "shelter-in-place" orders, this policy requires attorneys to defy the law. In dense urban settings like New York City, it also requires attorneys to take crowded and unsanitary public transportation, further exposing them to risk of contracting COVID-19.

42.     Attending an in-person hearing in immigration court generally entails having to interact with many individuals and touch objects that have been used by hundreds of people, whether during the security clearance procedures, in the waiting rooms, or at the hearing itself. Requiring in-person appearances thus endangers the health of detained immigrants, their legal representatives and the public. As previously noted, the CDC has specifically highlighted in-person court appearances as risk factors that make detention facilities especially vulnerable to COVID-19 outbreaks.[22]

43.     Even where there are reports of positive COVID-19 individuals in immigration courts, EOIR has not been consistent about closing all in-person operations.

44.     On March 24, 2020, the official EOIR Twitter account tweeted that an individual in the Elizabeth Immigration Court in New Jersey had tested positive for COVID-19. EOIR decided to close the court for one day only.[23] This is especially alarming because of the sanitary conditions in that court. The court is housed in the Elizabeth Detention Center (EDC). Legal representatives must go through a security screening area

---

[21] *See*, *e.g.*, Courts' Reponses to the Covid-19 Crisis, The Brennan Center (Mar. 27, 2020), *available at* https://www.brennancenter.org/our-work/research-reports/courts-responses-covid-19-crisis

[22] *See Interim Guidance on Management of Coronavirus Disease 201 (COVID-19) in Correctional and Detention Facilities*, CDC (Mar. 23, 2020)

[23] EOIR (@DOJ_EOIR), Twitter (Mar. 24, 2020, 11:36 AM), https://twitter.com/DOJ_EOIR/status/1242520585420394497

that is used by all visitors to the detention center and the court but have no access to a sink or bathroom once inside. At a minimum, by the time attorneys get to court, they would have had to have touched door handles, trays for security scanners, and a visitor ID badge without an opportunity to wash their hands.

45.     Similarly, after a report of a positive COVID-19 case amongst its staff on March 23, the New York City immigration court on Varick Street closed on March 24 but reopened for detained hearings a day later.[24] On March 27, that court announced that going forward, all hearings will be overseen remotely by judges in Fort Worth Texas and that immigration attorneys may appear in person either at Varick Street or in Fort Worth Texas.[25] But attorneys attempting to obtain information about the schedule of their telephonic hearings or to ensure that their clients' files are available to the Fort Worth Texas judges have been unable to obtain a response or confirmation. The Varick Street Immigration Court does not have a court-wide standing order waiving motion requirements to appear telephonically. These patently absurd policies demonstrate a complete disregard for the health and safety of detained noncitizens and their representatives.

46.     These dangerous practices are not limited to COVID-19 geographical hotspots. In Denver, an immigration judge is currently in self-quarantine after a doctor deemed her presumptively positive for COVID-19. That court remains open for in-person

---

[24] Mazin Sidahmed, *Varick St. Immigration Court Reopened Despite Court Staffer Testing Positive for COVID-19*, Documented NY (March 25, 2020), *available at* https://documentedny.com/2020/03/25/varick-st-immigration-court-reopened-despite-court-staffer-testing-positive-for-covid-19/

[25] Mazin Sidahmed, *The Varick St. Immigration Court Has Moved All of Its Hearings to Fort Worth*, Documented NY (March 27, 2020), *available at* https://documentedny.com/2020/03/27/the-varick-st-immigration-court-has-moved-all-of-its-hearings-to-fort-worth/

detained hearings.[26]

47.     ICE detention facilities are also inadequately protecting detained noncitizens and counsel during visitation. Although ICE now requires all visitors, including legal visitors, to wear Personal Protective Equipment (PPE) for in-person meetings, it does not provide PPE to legal visitors and does not provide alternative access for attorneys who are not able to secure the required PPE amidst a nationwide shortage of such supplies. Alarmingly, ICE also does not appear to have a policy requiring its own staff in detention facilities to wear PPE.

48.     ICE also continues to transport detained immigrants to court hearings in crowded buses. This is especially harmful to those who are representing themselves *pro se* in immigration proceedings, as they have no option not to appear at their hearing, and immigration courts have continued to issue *in absentia* orders of removal for individual who do not appear, even when the likely cause is COVID-19.

49.     EOIR has failed to put in place a policy suspending in-person appearances in court, facilitating remote access and filing, enabling rescheduling, or providing robust remote access alternatives for detained immigrants who wish to proceed with their cases.

50.     ICE has also failed to uniformly implement or improve remote access between attorneys and their clients in their detention facilities.

**E. Defendants' Response to COVID-19 Impedes Detained Immigrants' Right to Counsel and Attorneys' Ability to Represent their Clients.**

51.     The persistent requirement of in-person proceedings not only jeopardizes the health of detained immigrants and their representatives, it also severely curtails

---

[26] Ed Pilkington, *Trump Keeps Immigration Courts Open Despite Coronavirus Risks*, The Guardian (Mar. 16, 2020) *available at*  https://www.theguardian.com/us-news/2020/mar/19/us-immigration-courts-open-coronavirus-risks

detained immigrants' access to counsel.

52.     Although noncitizens have a statutory and regulatory right to retained counsel in immigration proceedings, noncitizens in immigration detention face serious barriers to representation. Many detained immigrants lack financial resources and their ability to locate an attorney is severely diminished in detention.[27] Even before the pandemic, only thirty-six percent of noncitizens in detention who sought a lawyer were able to find one and only fourteen percent of detainees ultimately secured counsel.[28]

53.     EOIR's decision to continue to require in-person proceedings for detained noncitizens further diminishes detained immigrants' ability to access counsel. They must now also find legal representatives willing to put their lives at risk by going to court.

54.     EOIR and ICE have made it almost impossible for attorneys to access their detained clients and for detained immigrants to fully realize their right to counsel.

55.      While EOIR has seemingly encouraged telephonic appearances, there is currently no consistent policy or practice in immigration courts across the country of allowing legal representatives to appear on behalf of their clients telephonically or providing remote access alternatives to detained immigrants who wish to proceed with their hearings. It also has not uniformly allowed the rescheduling of detained hearings. Detained immigrants in many locations are being transported to their court hearings despite the significant danger to their health and the health of others from such movement and exposure. As of March 27, 2020, less than half of immigration courts had adopted standing orders related to COVID-19.  Of those that have, only twenty-three orders allow for

---

[27]  Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. PA. L. REV. 1, 34 (2015).

[28] *Id*. at 32, 34-35

telephonic appearances without a need to file a motion.[29] Only five immigration judges have issued standing orders specific to their courtrooms authorizing telephonic appearances without a prior motion.[30]

56.     Many of these standing orders also include restrictions that render effective representation by counsel extremely challenging. Some orders limit such telephonic hearings only to master calendar and bond hearings but not to individual hearings.[31] Many orders adopt onerous conditions to telephonic hearings such as requiring waiver of certain evidentiary objections or barring any filings during a hearing.[32] Some standing orders state that where a court is unable to reach counsel by phone for a hearing, "counsel will thereafter be required to appear in-person at any rescheduled hearing."[33] Given these conditions, when counsel appropriately request a telephonic hearing, they may be doing it at the cost of effectively representing their clients.

57.     Attorneys who have made motions for a telephonic appearance in other courts have frequently not received a ruling on their motion prior to the hearing date and time, and have therefore had to appear in court in person. In addition, some Immigration Judges have denied timely-submitted motions for telephonic appearances.

58.     Moreover, ICE detention facilities have adopted practices that seriously

---

[29] *See* EOIR Operational Status During Coronavirus Pandemic, EOIR, https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic (last visited Mar. 27, 2020).

[30] *Id.*

[31] *See, e.g., Standing Order of the Eloy Immigration Court*, U.S. Dep't of Justice, Exec. Office for Immig. Rev., Immigration Court Practice Manual ("Practice Manual"), Appendix R at R-15.

[32] *See, e.g., Standing Order of the Las Vegas Immigration Court,* Practice Manual at R-22; *Standing Order of the Atlanta Immigration Court-Ted Turner Drive*, Practice Manual at R-3.

[33] *See, e.g., Standing Order of the Boston Immigration Court*, Practice Manual at R-6; *Standing Order of the Conroe Immigration Court  Immigration Court*, Practice Manual at R-10.

diminish attorneys' ability to represent their client.

59.     ICE adopted a nationwide policy requiring attorneys and other legal visitors, including providers of Legal Orientation Programs (LOPs), to bring their own Personal Protective Equipment (PPE)—gloves, N-95 masks, and eye protection—for any in-person meeting at a detention facility.[34] Some facilities have been denying legal representatives any access without the required PPEs.[35]

60.     In some cases, ICE's PPE policy is also barring attorneys from physical access to court. In Aurora, Colorado, where the detained court is located inside a detention facility, ICE informed attorneys that PPE is required to walk through the detention center to the detained court.

61.     Given the widespread unavailability of PPE and the woefully inadequate or completely unavailable remote access between attorneys and their detained clients, this policy is outrageous. International, federal, state and local guidelines instruct all persons to avoid obtaining PPE unless medically necessary due to the critical shortages in the healthcare sphere. And given the unavailability of PPEs, this policy functionally bars immigration attorneys from meeting their clients at a time when it is necessary for them to do so in order to prepare them for their hearings. Where attorneys are able to secure PPE, many are forced to reuse the equipment in contravention of public health guidelines.

62.     Additionally, most detention facilities used by ICE do not have meaningful ways for legal representatives to speak with detained clients remotely. Many of those in detention have to use prohibitively expensive calling services that are monitored by jail

---

[34] See ICE Guidance on COVID-19: Visitation at Detention Facilities, U.S. Immigration and Customs Enforcement (Mar. 24, 2020), available at https://www.ice.gov/covid19

[35] See Letter from AILA Arizona Chapter to EOIR, AILA (Mar. 23, 2020) available at https://www.aila.org/File/Related/20030201x.pdf

staff (and therefore not confidential) in order to reach their legal representatives.  When facilities do allow confidential legal calls, their capacity is limited to one or two phones at any given time for the entire ICE population, making calls nearly impossible to schedule. The lack of uniform EOIR and ICE guidance to remedy this is leading to a patchwork of conflicting and insufficient responses.

63.     For example, in the Elizbeth Detention Center (EDC) in New Jersey, ICE has prohibited all in-person visits (with or without PPE) but has not provided meaningful alternatives for attorneys to remotely meet with their clients to prepare the case. Telephone meetings must be pre-arranged, are limited to one hour, and the timeslot is assigned by the detention center. Interpretation services are not provided.  Detained immigrants and attorneys are having to rely on other bilingual detained individuals for interpretation. A one-hour telephonic meeting is not sufficient to prepare clients for a hearing in immigration court. Attorneys cannot show clients photos or documents that will be evidence at a hearing, and do not have sufficient time to discuss the issues they need to cover with their clients.

64.     Similarly in Arizona, the La Palma detention center has 3,000 beds and only one telephone available for legal calls for only eight hours each day. Attorney calls are limited to 30 minutes in that facility. In Eloy, a facility with 1,500 beds, there are only five telephones available from 4pm – 6pm each day for legal calls, and legal calls are also limited to 30 minutes. Under these circumstances, detained immigrants and attorneys cannot possibly have the necessary amount of contact or time to adequately prepare for their hearings. Similar restrictions exist across ICE detention facilities nationwide.

65.     Defendants' failure to issue and implement uniform, reasonable policies are significantly interfering with access to counsel and curtailing the due process rights of

those who are detained.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
#### (All Plaintiffs Against All Defendants)

66.    All the foregoing allegations are re-alleged and incorporated by reference.

67.    The Administrative Procedure Act creates a right of judicial review of "final agency action for which there is no other adequate remedy in court," 5 U.S.C. § 704, and of agency action "unlawfully withheld or unreasonably denied," 5 U.S.C. § 701(1).

68.    Defendants are subject to the provisions of the APA.

69.    Agency action includes the failure to act. *Id*. § 551(13).

70.    Defendants have failed to issue uniform guidance for immigration court proceedings and attorney-client visits in detention facilities that conforms with public health requirements to contain the spread of COVID-19 and that preserves Plaintiffs' statutory, regulatory, and constitutional rights.

71.    Defendants' failure to act in order to protect the statutory, regulatory, and constitutional rights of Plaintiffs constitutes agency action that is "arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A).

72.    Defendants' failure to act constitutes agency action "unlawfully withheld or unreasonably denied." 5 U.S.C. § 701(1).

### SECOND CLAIM FOR RELIEF: VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT AND THE ADMINISTRATIVE PROCEDURE ACT (ACCESS TO COUNSEL)
#### (Detained Plaintiffs Against All Defendants)

73.    All the foregoing allegations are re-alleged and incorporated by reference.

74.    The Immigration and Nationality Act, 8 U.S.C. § 1362, provides that "[i]n

any removal proceedings before an immigration judge," the individual "shall have the privilege of being represented . . . ." *See also* 8 C.F.R. § 1240.3. The INA further provides that "[removal] proceedings may take place (i) in person . . . (iii) through video conference, or (iv) … through telephone conference [with the noncitizen's consent and upon advisement of the right to proceed in person or through video conference in certain cases]."

75.     The APA, 5 U.S.C. § 555(b), provides that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding." Individuals subjected to removal procedures are compelled to appear in person before agency representatives.

76.     Federal courts repeatedly have recognized the importance of this right. *See, e.g. Orantes Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990) (finding that immigrants have a due process right to obtain counsel of their choice at their own expense); *Iavorski v. INS*, 232 F.3d 124, 128 (2d Cir. 2000) (describing the statutory right to be represented by counsel as "an integral part of the procedural due process to which the alien is entitled.").

77.     Defendants' failure to act in order to protect the statutory, regulatory, and constitutional rights of Plaintiffs violates 8 U.S.C. § 1362 and the APA, 5 U.S.C. § 555(b).

**THIRD CLAIM FOR RELIEF: VIOLATION OF THE FIFTH
AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS
(ACCESS TO COUNSEL)
(Detained Plaintiffs Against All Defendants)**

78.     All of the foregoing allegations are re-alleged and incorporated by reference.

79.     The Fifth Amendment to the U.S. Constitution provides that "[n]o person

shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

80.     Noncitizens in removal proceedings are entitled to procedural due process including the right to be represented by counsel. *See Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings."); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) ("The right to counsel in immigration proceedings is rooted in the Due Process Clause.").

81.     Defendants are violating procedural due process by implementing policies that deprive noncitizens of their ability to retain counsel, communicate confidentially with their legal representation, and have counsel able to competently represent them in immigration court.

82.     As a result of Defendants' violations, Plaintiffs are suffering and will continue to suffer a significant deprivation of their right to counsel.

## FOURTH CLAIM FOR RELIEF: VIOLATION OF THE FIRST AMENDMENT
### (Organizational Plaintiffs Against All Defendants)

83.     All of the foregoing allegations are re-alleged and incorporated by reference.

84.     The First Amendment to the U.S. Constitution protects legal services providers from government interference when they are "advocating lawful means of vindicating legal rights." *NAACP v. Button*, 371 U.S. 415, 437 (1963).

85.      Defendants' policies have impeded Organizational Plaintiffs' and Attorney Plaintiffs' access to their clients, thereby restricting their ability to communicate with and advise their clients. Defendants have therefore violated the Organizational Plaintiffs' and

Attorney Plaintiffs' First Amendment rights.

### FIFTH CLAIM FOR RELIEF: VIOLATION OF THE FIRST AMENDMENT
#### (Detained Plaintiffs Against All Defendants)

86.   All of the foregoing allegations are re-alleged and incorporated by reference.

87.   The First Amendment to the U.S. Constitution guarantees the freedom of speech to all persons—including detainees.

88.   The right to retain and consult with an attorney is protected by the First Amendment. "[R]estrictions on speech between attorneys and their clients directly undermine the ability of attorneys to offer sound legal advice" and can violate the First Amendment. *Martin v. Lauer*, 686 F.2d 24, 32 (D.C. Cir. 1982).

89.   Immigrant detainees held in ICE custody possess a First Amendment right to receive legal advice from their retained counsel.

90.   "[T]he scope of the First Amendment's right is determined by balancing the [plaintiff's] interests in communication with the government's interest in preventing communication." *Jacobs v. Schiffer*, 204 F.3d 259, 265 (D.C. Cir. 2000).

91.   Defendants' policy of continuing to require in-person immigration court hearings and failing to provide secure, confidential remote means of communication between attorneys and their clients are not narrowly tailored to any compelling governmental interest. Defendants have no legitimate, let alone compelling, interest in having Detained Plaintiffs' immigration hearings be conducted in person or in depriving Detained Plaintiffs of the ability to communicate remotely with their attorneys, especially in light of the fact that reasonable alternatives are readily available.

92.   Defendants' policy of continuing to require in-person immigration court

hearings violate the Detained Plaintiffs' First Amendment right to receive their counsel's legal advice.

93.     Defendants' policy of preventing attorneys from meeting with Detained Plaintiffs without providing them with PPE or alternative methods of communication denies Detained Plaintiffs access to their retained counsel and violates Detained Plaintiffs' First Amendment right to receive their counsel's legal advice.

**SIXTH CLAIM FOR RELIEF: VIOLATION OF THE FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS (STATE-CREATED DANGER)**
**(Organizational Plaintiffs Against All Defendants)**

94.     All of the of the foregoing allegations are re-alleged and incorporated by reference.

95.     The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V.

96.     In some circumstances, "the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 (1989).

97.     The government has a duty to protect an individual from harm "when [government] officials affirmatively act to increase or create the danger that ultimately results in the individual's harm." *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001).

98.     Defendants have acted or failed to act in a manner that increases the danger members of the Organizational Plaintiffs face from COVID-19. Defendants have failed to suspend in-person proceedings and in-person filing requirements and have failed to provide access to meaningful remote alternatives, thereby exposing members of the Organizational

Plaintiffs to increased risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure.

99.     Defendants' conduct with respect to members of the Organizational Plaintiffs' health and safety shocks the conscience. In spite of the clear risk of continuing to have in-person proceedings and to require in-person filings in the midst of a pandemic, Defendants have made deliberate decisions to risk the health and safety of members of the Organizational Plaintiffs.

100.    Defendants' practice of holding in-person proceedings violates the Due Process Clause.

## SEVENTH CLAIM FOR RELIEF: VIOLATION OF THE FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS (UNLAWFUL PUNISHMENT) (Detained Plaintiffs Against All Defendants)

101.    All of the of the foregoing allegations are re-alleged and incorporated by reference.

102.    The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V.

103.    The Fifth Amendment guarantees detained immigrants the right to be free from unlawful punishment. The government violates this guarantee when conditions of confinement lack a reasonable relationship to any legitimate governmental purpose, *i.e.* when a custodian's actions are excessive in relation to their purpose.

104.    Conditions of confinement lack a reasonable relationship to any legitimate governmental purpose when the government acts with deliberate indifference in failing to safeguard the health and safety of those in custody. The government acts with deliberate indifference when it exposes detained immigrants to a substantial risk of serious harm, and

when it knows of or disregards that substantial risk to the detainee's health or safety.

105.     Defendants' policies of holding in-person proceedings lack a reasonable relationship to any governmental purpose.

106.     Defendants have exposed Detained Plaintiffs to a substantial risk of serious harm. These policies fail to adequately protect Detained Plaintiffs from the risks of contracting COVID-19. By forcing immigrants to appear in person for their proceedings in the midst of a pandemic, Detained Plaintiffs are subjected to conditions that increase their risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure.

107.     Defendants have known or disregarded the substantial risk of harm to Plaintiffs' health and safety. Defendants are therefore subjecting Detained Plaintiffs to an unreasonable risk of serious harm and punitive conditions, in violation of their rights under the Due Process Clause.

108.     Defendants have acted with deliberate indifference to Detained Plaintiffs' health and safety.

109.     Defendants' practice of continuing to hold in-person proceedings violates the Due Process Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that this Court:

(a) Issue injunctive relief ordering Defendants, for the duration of the COVID-19 pandemic, to suspend in-person immigration hearings for detained individuals and to provide robust remote access alternatives for detained individuals who wish to proceed with their hearings;

(b) Issue injunctive relief ordering Defendants to guarantee secure and reliable remote

communication between noncitizens in detention and their legal representatives;

(c) Issue injunctive relief ordering that if Defendants are to require PPE, they must provide it for detainees and legal representatives;

(d) In the alternative, issue injunctive relief ordering temporary release for detained immigrants who have inadequate access to alternative means of remote communication with legal representatives or the immigration court;

(e) Award Plaintiffs all costs incurred in maintaining this action, including reasonable attorneys' fees under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified by law; and

(f) Grant Plaintiffs any other and further relief this Court deems just and proper.


Respectfully submitted,


  /s/Sirine Shebaya
Sirine Shebaya (D.C. Bar No. 1019748)
Khaled Alrabe*
Amber Qureshi*
Cristina Velez*
**NATIONAL IMMIGRATION PROJECT OF**
**THE NATIONAL LAWYERS GUILD**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788
sirine@nipnlg.org
khaled@nipnlg.org
amber@nipnlg.org
cristina@nipnlg.org

*Attorneys for Plaintiffs*

*Pro hac vice motions forthcoming

March 30, 2020
Washington, D.C.