## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> EXECUTIVE OFFICE OF IMMIGRATION REVIEW, *et al.*, <br><br> Defendants. | Civil Action No. 1:20-cv-00852 (CJN) |

## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND REQUEST FOR HEARING

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiffs, by and through undersigned counsel, respectfully move the Court for a Temporary Restraining Order against Defendants Executive Office For Immigration Review ("EOIR"), James McHenry in his official capacity, U.S. Immigration and Customs Enforcement ("ICE"), and Matthew Albence in his official capacity, to halt and restrain ongoing irreparable injury to the health of Plaintiffs being caused by Defendant EOIR's arbitrary and capricious decision to continue to hold in-person immigration court hearings for detained individuals, and conditions associated with such hearings, during the COVID-19 pandemic and to conduct remote hearings and Defendant ICE's conditions of confinement during the COVID-19 pandemic that deprive detained Plaintiffs of their Constitutional and statutory right to counsel.  The specific relief requested is set out in Plaintiffs' Proposed Temporary Restraining Order that accompanies this Motion.  The grounds for the Motion are set forth in the accompanying Memorandum of Law

and supported by the declarations being filed therewith.  An emergency hearing is respectfully requested.

Pursuant to Local Civil Rule 65.1(a), Plaintiffs hereby certify that on April 7, 2020, Plaintiffs' counsel emailed the Chief of the Civil Division of the U.S. Attorney's Office for the District of Columbia to provide a courtesy copy of the Complaint and to seek the identity of the Assistant U.S. Attorney or other government attorneys to whom the case had been assigned so that Plaintiffs could communicate with them about scheduling and exchange of papers for their anticipated Temporary Restraining Order.  Mr. Daniel Van Horn, Chief of the Civil Division, informed Plaintiffs that the Department of Justice's Office of Immigration Litigation ("OIL") will take the lead on this case.  Plaintiffs then corresponded with Mr. Brian C. Ward, Senior Litigation Counsel in OIL, to provide a courtesy copy of the Complaint and to seek the identity of who would be handling the case so that Plaintiffs could confer regarding scheduling.  Mr. Ward responded that his office was still determining who would be handling the case, but conferred with Plaintiffs regarding a briefing schedule.  The parties agreed that Defendants would file its opposition by the end of the day on Monday, April 13, 2020, Plaintiffs would file their reply by the end of the day on Tuesday, April 14, 2020, and a Hearing should then be scheduled as expeditiously thereafter as the Court may permit.

Plaintiffs accordingly respectfully request the Court enter a scheduling order providing for the following expedited briefing schedule, as set out in Plaintiff's Proposed Scheduling Order:

1.  Defendants shall file a Memorandum of Law in Opposition to Plaintiffs' Motion for Temporary Restraining Order on Monday, April 13;

2.  Plaintiffs shall file a Reply on Tuesday, April 14; and

3. A hearing on Plaintiffs' Motion for Temporary Restraining Order shall be set for April 15, 2020, or as soon as possible thereafter, at a time set by the Court, to occur by audio teleconference or video teleconference to be initiated either by the Court or by Plaintiffs.

If the Court is unable to hear this Motion expeditiously, Plaintiffs respectfully request that the Court enter emergency relief without a hearing in the form of Paragraphs 1(a), 2, and 3(a) of the Proposed Order until such time as this Motion may be heard and further order of the Court.

Plaintiffs provided true and correct copies of Plaintiffs' Complaint, Emergency Motion for Temporary Restraining Order, Memorandum of Law in Support of Emergency Motion for Temporary Restraining Order, Proposed Temporary Restraining Order, and all other papers filed with the Court on or before April 8, 2020 to Mr. Ward and Mr. Van Horn. Plaintiffs have also filed this Motion and all supporting and accompanying papers through the Court's ECF electronic filing system and on April 8, 2020, will mail the above-listed documents by overnight Priority Express Mail to:

- Executive Office for Immigration Review, Board of Immigration Appeals, Office of the Chief Clerk, 5107 Leesburg Pike, Suite 2000, Falls Church, VA 22041.

- Immigration and Customs Enforcement, 500 12th St, S.W., Washington, D.C. 20536

- Civil Process Clerk, United States Attorney's Office, 555 Fourth Street, N.W., Washington, D.C. 20530.

- Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, DC 20530.

Dated: April 8, 2020
       Washington, D.C.

Respectfully submitted,

/s/ Sirine Shebaya
Sirine Shebaya (D.C. Bar No. 1019748)
Khaled Alrabe*
Amber Qureshi*
Cristina Velez*
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788
sirine@nipnlg.org
khaled@nipnlg.org
amber@nipnlg.org
cristina@nipnlg.org

*Pro hac vice motions forthcoming

/s/ Matthew D. Slater
Matthew D. Slater (D.C. Bar No. 386986)
Elsbeth Bennett (D.C. Bar No. 1021393)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, N.W.
Washington, D.C.  20037-3229
T: 202-974-1500
F: 202-974-1999
mslater@cgsh.com
ebennett@cgsh.com

Jennifer Kennedy Park*
Lina Bensman*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999
jkpark@cgsh.com
lbensman@cgsh.com

Attorneys for Plaintiffs

*Pro hac vice motions forthcoming

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, *et al.*,<br><br>Plaintiffs,<br><br>-against-<br><br>EXECUTIVE OFFICE OF IMMIGRATION REVIEW, *et al.*,<br><br>Defendants. | Civil Action No. 1:20-cv-00852 (CJN) |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND..................................................................................................3

     A.   COVID-19 Has Caused A Global Pandemic That Requires Immediate Action To Preserve Life ...................................................................................................5

     B.   In-Person Hearings Contribute To The Spread Of COVID-19 And Put Countless Lives At Risk................................................................................................8

     C.   In The Absence Of Uniform, Reasonable EOIR Policies, Inconsistent And Chaotic Responses By Individual Immigration Courts Continue To Put Lives At Risk .....................................................................................................16

     D.   Reasonable Measures To Protect Public Health Have Already Been Implemented By Non-Immigration Courts And Can Be Quickly Adopted By Immigration Courts..................................................................................................20

     E.   In Addition To Imperiling Public Health, ICE And EOIR Policies Impermissibly Interfere With Detained Persons' Right To Counsel......................22

     F.   In The Face Of Repeated Requests For Action, ICE and EOIR Have Refused To Correct These Failures ..................................................................................26

LEGAL STANDARD............................................................................................................28

ARGUMENT.........................................................................................................................29

I.     Plaintiffs Are Likely To Succeed On The Merits .........................................................30

     A.   Plaintiffs Are Likely To Succeed On Their Claims That Defendants' Agency Actions Violate The APA ......................................................................................30

     B.   Plaintiffs Are Likely To Succeed On Their Claim That Defendants' Policies Restrict Access To Counsel In Violation Of Constitutional And Statutory Rights ...........................................................................................................34

II.    Failure To Implement The Requested Relief Will Immediately And Irreparably Injure Plaintiffs........................................................................................................................37

III.   The Balance Of Equities Weighs In Plaintiffs' Favor....................................................41

IV.   The Requested Relief Is In The Public Interest .............................................................42

CONCLUSION......................................................................................................................45

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                    **<u>Page(s)</u>**

*Basank v. Decker,*
   No. 20-cv-2518 2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ................................. 40

*Biwot v. Gonzales,*
   403 F.3d 1094 (9th Cir. 2005) ........................................................................................... 35

*Castillo v. Barr,*
   No. 20-cv-00605, 2020 WL 1502864, (C.D. Cal. Mar. 27, 2020) ............................ 39-40, 43

*Castillo v. Nielsen,*
   No. 5:18-cv-01317, 2018 WL 6131172 (C.D. Cal. June 21, 2018) ...................................... 36

*Chhoeun v. Marin,*
   306 F.Supp.3d 1147 (C.D. Cal. 2018) ................................................................................ 36

*Citizens for Resp. & Ethics in Wash. v. Cheney,*
   577 F. Supp. 2d 328 (D.D.C. 2008) .............................................................................. 28, 29

*Coronel v. Decker,*
   No. 20-cv-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) ...................................... 38, 43

*Cty. of Los Angeles v. Shalala,*
   192 F.3d 1005 (D.C. Cir. 1999) ......................................................................................... 34

*Davenport v. Int'l Bhd. of Teamsters,*
   166 F.3d 356 (D.C. Cir. 1999) ........................................................................................... 41

*Dist. Hosp. Partners, L.P. v. Burwell,*
   786 F.3d 46 (D.C. Cir. 2015) ............................................................................................. 34

*F.T.C. v. Dean Foods Co.,*
   384 U.S. 597 (1966) .......................................................................................................... 29

*Federal Defenders of New York, Inc. v. Federal Bureau of Prisons,*
   No. 19-1778, 2020 WL 1320886 (2d. Cir. Mar. 20, 2020) ................................................. 33

*Gomez v. Kelly,*
   237 F. Supp. 3d 13 (D.D.C 2017) ...................................................................................... 28

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ......................................................................... 40, 44

*Iavorski v. I.N.S.*,
  232 F.3d 124 (2d Cir. 2000) .................................................................................45

*Innovation Law Lab v. Nielsen*,
  310 F. Supp. 3d 1150 (D. Ore. 2018) ..................................... 33, 35-36, 36, 40, 42

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ..................................................................................45

*Leslie v. Attorney General*,
  611 F.3d 171 (3d Cir. 2010) .................................................................................35

*Louis v. Meissner*,
  530 F. Supp. 924 (S.D. Fla. 1981) .......................................................................36

*Make the Road N.Y. v. McAleenan*,
  405 F. Supp. 3d 1 (D.D.C. 2019) .........................................................................33

*Maldanado-Perez v. INS*,
  865 F.2d 328 (D.C. Cir. 1989) .............................................................................35

*Martinez v. Nielsen*,
  341 F. Supp. 3d 400 (D.N.J. 2018) ......................................................................33

*Mills v. D.C.*,
  571 F.3d 1304 (D.C. Cir. 2009) ...........................................................................40

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...............................................................................................34

*Nunez v. Boldin*,
  537 F. Supp. 578 (S.D. Tex. 1982) ......................................................................36

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) .....................................................................33

*O.M.G. v. Wolf,*
  No. 20-cv-00786 (D.D.C. Mar. 30, 2020) ........................................... 11, 34, 39, 42

*Open Communities All. v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) .....................................................................41

*Orantes–Hernandez v. Thornburgh*,
  919 F.2d 549 (9th Cir. 1990) ............................................................36

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ............................................41-42, 45

*Reno v. Flores*,
  507 U.S. 292 (1993) ............................................................34

*Rios-Berrios v. INS*,
  776 F.2d 859 (9th Cir. 1985) ............................................................36

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ............................................................44

*S.E.C. v. Whitman*,
  613 F. Supp. 48 (D.D.C. 1985) ............................................................35

*Torres v. United States Dep't of Homeland Sec.*,
  411 F. Supp. 3d 1036 (C.D. Cal. 2019) ............................................36

*Trump v. Committee on Ways and Means*,
  415 F. Supp. 3d 38 (D.D.C. 2019) ............................................................29

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977) ............................................................29

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305. (1982) ............................................................37

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ............................................................34

## Rules and Statutes

8 C.F.R. § 1240.3 ............................................................35

5 U.S.C. § 551(13) ............................................................33

5 U.S.C. § 555(b) ............................................................35

5 U.S.C. § 702 ............................................................33

5 U.S.C. § 704 ............................................................33

5 U.S.C. § 706(2) ................................................................................................................ 33, 33-34

8 U.S.C. § 1252(f) .......................................................................................................................... 33

8 U.S.C. § 1362 ............................................................................................................................... 35

28 U.S.C. § 1651(a) ........................................................................................................................ 29

## INTRODUCTION

Because of the immediate and grave risks to public health arising from the COVID-19 pandemic, this motion for a temporary restraining order seeks a brief pause of in-person hearings in immigration courts for detained persons, during which time Defendants Executive Office for Immigration Review ("EOIR") and Immigration and Customs Enforcement ("ICE") would implement policies, practices, and procedures to enable hearings to proceed remotely and safely, and in a manner consistent with due process and protective of attorney-client privilege.

Urgent relief is required because, in the absence of a uniform EOIR and ICE policy, Plaintiffs face *ad hoc* practices and orders implemented by individual immigration courts, including the possibility of in-person hearings in 58 of the nation's 69 immigration courts,[1] and remote hearing participation is not reasonably available to them. This unnecessarily endangers all participants in the immigration system, including detained immigrants, their counsel, court and detention personnel, and all members of the public with whom they cross paths. In addition, attorney-client communications have been so obstructed as to effectively deny detained immigrants their right to counsel.

Plaintiffs are individuals detained in ICE facilities and several organizations whose members include attorneys representing current and prospective clients detained in ICE facilities. *See* Ex. 15, Greenstein Decl. ¶ 2, Ex. 24, Voigt Decl. at 1, Ex. 29, Tolchin Decl. ¶¶ 3–6. Their health, the health of every person with whom they have contact, and thus the health of the general public, is imperiled by the continuation of in-person hearings. As documented in the

---

[1] *See* Appendix A;. Appendix A summarizes the various standing orders available on EOIR's website. *See* Executive Office for Immigration Review, *EOIR Operational Status During Coronavirus Pandemic*, https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic (last updated Apr. 3, 2020). Statistics cited in this filing, unless otherwise noted, are valid as of 6:30 p.m. EDT on April 6, 2020.

accompanying declarations of detained individuals and attorneys who represent them, the unavailability of adequate facilities for remote hearings and for remote consultation with counsel deprives detained immigrants of their rights to due process and assistance of counsel and prevents counsel from performing their duties as provided by law and consistent with public health.

Over the past month, Plaintiffs have sought, and Defendants have declined to adopt, policies to address these deprivations. Plaintiffs are thus likely to prevail on their claims under the Administrative Procedure Act ("APA"), as well as on their claims as to important statutory and constitutional rights. The evidence Plaintiffs are submitting also demonstrates that they have suffered and will continue to suffer irreparable injuries, the gravity of which cannot be overstated given the current public health emergency, outweighing any harm to Defendants from the temporary injunction requested. The public interest demands this relief to help mitigate the risk of rampant infection in detention facilities and the propagation of infection through the court system to the general public.

To address the unique threat posed by the COVID-19 pandemic, the proposed Temporary Restraining Order would suspend in-person hearings during the health emergency and require EOIR and ICE to adopt policies and procedures to enable the conduct of remote hearings consistent with Plaintiffs' constitutional and statutory rights. The injunction has two complementary components:

First, Defendant EOIR, would be required to:

- Suspend all in-person non-bond hearings and immediately convert all in-person bond hearings to remote hearings;

- Promulgate policies and procedures that, at a minimum, permit remote court appearances by all necessary participants (*e.g.*, court and court personnel, detained persons, counsel, interpreters, transcription); and

- Permit continuances as of right due to COVID-19.

Second, to make such relief effective, Defendant ICE would be required to:

- Promulgate policies and procedures enabling remote interconnection by and with all necessary participants in court appearances;

- Facilitate communications between detained persons and immigration courts to enable the submission of requests for rescheduling and for continuance; and

- Develop policies, procedures, and facilities that will enable those who are detained to obtain, and counsel to provide, legal advice remotely and without monitoring, and with adequate protection of human health.

## FACTUAL BACKGROUND

The United States is in the midst of a public health crisis caused by the COVID-19 pandemic. The Trump Administration has estimated that, *if* there is active mitigation, between 100,000 and 240,000 people may die.[2] Given the gravity of the threat, nationwide, 311 million people across more than 40 states have been directed to stay at home, and the operation of non-essential businesses has been widely suspended.[3] To reduce the rate of new infections, President Donald J. Trump's Coronavirus Task Force and the Centers for Disease Control and Prevention ("CDC") have recommended social distancing (maintaining at least six feet of separation between individuals) and specifically urged "alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of COVID-19 transmission."[4]

---

[2] Alex Leary, et al., *White House Projects 100,000 to 240,000 U.S. Coronavirus Deaths*, The Wall Street Journal (Apr. 1, 2020), https://www.wsj.com/articles/chinas-coronavirus-count-excluded-infected-people-with-no-symptoms-11585650226.

[3] Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, The New York Times (Apr. 3, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[4] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 201 (COVID-19) in Correctional and Detention Facilities*(Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf;

Consistent with these guidelines, state and federal courts across the country—including the United States Court of Appeals for the District of Columbia and the United States District Court for the District of Columbia—have issued clear policies postponing in-person hearings due to the pandemic and allowing for hearings to proceed remotely.[5]

In the face of all this, and notwithstanding a number of confirmed COVID-19 cases among detained persons and staff members at detention centers and immigration courts,[6] federal immigration authorities have not taken consistent and sufficient action to decrease the risk to detained persons, counsel, and the public.  Defendant EOIR has refused to issue a policy postponing in-person appearances for detained individuals in immigration courts or providing meaningful remote access alternatives.  Only about half of the open immigration courts have a uniform policy allowing for remote hearings.  The inconsistent and often inadequate responses of individual immigration courts have already had devastating consequences.  For example, a New York-based immigration attorney tested positive for COVID-19 on April 2, 2020, after appearing at the Federal Plaza Immigration Court on March 11; her symptoms began within two weeks of that appearance.  *See* Ex. 1, Arce Decl. at 1–2.  Her eighty-year old mother, whom she believes she likely exposed to the virus, fell seriously ill, has since been hospitalized, and is awaiting COVID-19 test results.  *Id.* at 1–2 ("My mother's health continues to spiral downward. This week she was diagnosed with pneumonia and was tested for the virus; her results are not in yet,

U.S. Immigrations and Customs Enforcement, *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (accessed Apr. 6, 2020).

[5] *See* The Brennan Center for Justice, *Courts' Reponses to the Covid-19 Crisis* (Apr. 2, 2020), https://www.brennancenter.org/our-work/research-reports/courts-responses-covid-19-crisis.

[6] Reuters, *As Pandemic Rages, U.S. Immigrants Detained in Areas With Few Hospitals*, The New York Times (Apr. 3, 2020), https://www.nytimes.com/reuters/2020/04/03/us/03reuters-health-coronavirus-usa-detention-insight.html.

but I can't help but blame myself for her illness.  If perhaps I had not been at 26 Federal Plaza on March 11th, I would have not exposed my family to the virus.").

Likewise, ICE has failed to provide individuals detained in its facilities adequate means to communicate remotely (and safely) with current and prospective counsel, and has effectively prevented in-person meetings with counsel at some facilities by requiring counsel to comply with impossible requirements regarding the wearing of scarce personal protective equipment.  The result is that even if EOIR uniformly allowed remote hearings, persons in ICE detention could not avail themselves of them, and would, as a practical matter, be deprived of their constitutional and statutory right to counsel.

## A. COVID-19 Has Caused A Global Pandemic That Requires Immediate Action To Preserve Life

COVID-19 is a highly contagious novel coronavirus that has reached pandemic proportions.[7]  It is transmitted through respiratory droplets, has a long incubation period, and can be spread even by persons who are completely asymptomatic.[8]  It may also be transmitted through contact with contaminated surfaces or objects, which can remain contaminated for days.[9]

---

[7] Dr. Tedros Adhanom Ghebreyesus, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, World Health Organization (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[8] The director of the CDC recently stated that as many as 25% of people infected with COVID-19 may not show symptoms.  Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, The New York Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html; Centers for Disease Control and Prevention, *Healthcare Professionals: Frequently Asked Questions and Answers* (Mar. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (describing up to a 14 day incubation period).

[9] Centers for Disease Control and Prevention, *Person-to-person Spread* (Apr. 2, 2020) https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

Creating sustained distance between people has therefore been a major focus of public health efforts to slow the rate of transmission.

On March 13, 2020, President Trump declared a national emergency concerning COVID-19.[10]  Many states have likewise declared state emergencies.[11]  At least 44 states and the District of Columbia have implemented stay-at-home orders.[12]  As of April 6, 2020, COVID-19 has infected more than 1.2 million individuals worldwide and killed more than 69,000.[13]  In the United States alone, there have been over 364,000 confirmed cases and over 10,700 deaths.[14] The numbers continue to grow exponentially.[15]  Faithful implementation of CDC social distancing guidelines is necessary to prevent the  number of deaths from running dramatically higher.[16]

---

[10] Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, The White House (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[11] *See, e.g.*, Office of the Governor of Kansas, *Governor Issues Emergency Declaration on COVID-19* (Mar. 12, 2020), https://governor.kansas.gov/governor-issues-emergency-declaration-for-covid-19/.

[12] Alicia Lee, *These states have implemented stay-at-home orders. Here's what that means for you*, CNN (Apr. 3, 2020), https://www.cnn.com/2020/03/23/us/coronavirus-which-states-stay-at-home-order-trnd/index.html.

[13] Regan et al., *Coronavirus Pandemic Upends Daily Life*, CNN (Apr. 6, 2020), https://www.cnn.com/world/live-news/coronavirus-pandemic-04-06-20/index.html.

[14] Sergio Hernandez, et al., *Tracking Covid-19 Cases in the US*, CNN (Apr. 6, 2020), https://www.cnn.com/interactive/2020/health/coronavirus-us-maps-and-cases/.

[15] Alan Suderman et al., *Trump Defends Extending Virus Guidelines as Spread Continues,* The New York Times (Mar. 30, 2020), https://www.nytimes.com/aponline/2020/03/30/us/politics/ap-us-virus-outbreak-washington.html?searchResultPosition=1.

[16] Ex. 27, Jha Decl. ¶ 7; Bobby Allyn, *Fauci Estimates that 100,000 to 200,000 Americans Could*

COVID-19 can result in respiratory failure, kidney failure, and death.  Infected

individuals who survive the disease may still suffer severe damage to their lungs, heart, liver, and

other organs, resulting in protracted recovery periods, including extensive rehabilitation from

possible neurological damage and loss of respiratory capacity.[17]  Older individuals and those

with certain medical conditions (e.g., asthma, diabetes, heart or lung conditions),[18] including a

number of Organizational Plaintiffs' members, their family members, and their clients, and

including some of the Detained Plaintiffs, face the greatest risk of serious illness or death from

COVID-19; the CDC has specifically advised such individuals to stay at home.[19]  Thus, members

of the Organizational Plaintiffs who wish to visit detained clients are unable to do so.  *See, e.g.*,

Ex. 2, Ehrlich Decl. ¶ 1 ("I feel unable to visit the [Elizabeth Detention Center ("EDC")], even if

the EDC would again permit such visits, since my age places me in the high risk group for death

from COVID-19"); Ex. 3, Church Decl. ¶¶ 8–9 (describing clients with asthma and her personal

reluctance to appear in court because she lives with an immunosuppressed family member); Ex. 4,

Lopez Decl. ¶ 19 (describing clients with HIV and severe asthma); Ex. 5, Rodriguez Cedeno

---

*Die from Coronavirus*, NPR (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus.

[17] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)* (Mar. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

[18] Certain underlying medical conditions increase the risk of serious COVID-19 disease for individuals of any age. *See* Centers for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness* (Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[19] Centers for Disease Control and Prevention, *Older Adults* (Mar. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

Decl. ¶ 9 (describing asthma and respiratory conditions); Ex. 34, Sud-Deveraj Decl. ¶ 7 (describing concerns over appearing in court due to diabetes).

Even young and healthy individuals who contract COVID-19 face significant health risks, and many require hospital care. The public health concerns are compounded by potential overburdening of existing healthcare infrastructure and personnel; many localities do not have sufficient medical capabilities to handle significant surges in patient numbers (with ripple effects even for non-COVID-19 patients).[20]

## B. In-Person Hearings Contribute To The Spread Of COVID-19 And Put Countless Lives At Risk

In response to the pandemic, EOIR has postponed all hearings for non-detained individuals scheduled through May 1, 2020,[21] but has not done the same for those who are detained.[22] Despite the spread of COVID-19 in detention facilities and in immigration courts, and notwithstanding the CDC's warning that courthouses are especially vulnerable to spread of the virus,[23] as of April 6, 2020, 58 of the 69 immigration courts were open for detained hearings, and only 39 locations had court-wide standing orders allowing hearings to occur telephonically.

---

[20] *See, e.g.*, Somini Sengupta, *With Virus Surge, Dermatologists and Orthopedists Are Drafted for the E.R.*, The New York Times (Apr. 3, 2020), https://www.nytimes.com/2020/04/03/nyregion/new-york-coronavirus-doctors.html.

[21] Executive Office for Immigration Review, *EOIR Operational Status During Coronavirus Pandemic*, https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic (last updated Apr. 6, 2020).

[22] Among those who are "detained" for this purpose are young children. Ex. 30, Gahng Decl. ¶¶ 4–8.

[23] *See* Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 201 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

*See* Appendix A.[24]

Proceeding with in-person hearings at this time creates unnecessary risks of virus transmission for all who are involved (court personnel, detained persons, transporters, counsel, interpreters, etc.), which in turn poses a risk of transmission both within detention facilities and to the general population—precisely what social distancing guidelines are intended to prevent. Moreover, because EOIR has not provided for COVID-19-related continuances as of right, counsel are forced to meet in person with their clients (including because ICE has failed to enable adequate remote contact between attorneys and detained persons) in unsterile and unsafe conditions in order to prepare for hearings and motions.  There have also been reports of ICE bringing individuals with COVID-19 symptoms into detention centers.  *See, e.g.*, Ex. 6, Rivera Decl. ¶ 10; Ex. 7, Saenz Decl. ¶¶ 1–5.

Both the CDC and the World Health Organization ("WHO") have warned that detention centers are tinderboxes in which COVID-19 can spread like wildfire.[25]  WHO experts have warned that outbreaks in detention facilities would lead to "huge mortality rates."[26]  According

---

[24] An additional four locations have some, but not all, judges allowing telephonic hearings pursuant to a standing order.

[25] World Health Organization, *Preparedness, Prevention and Control of COVID-19 in Prisons and Other Places of Detention* (Mar. 15, 2020) at 2, http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf; Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 201 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[26] Hannah Summers, *'Everyone Will be Contaminated' Prisons Face Strict Coronavirus Controls*, The Guardian (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls.

to ICE's website, as of April 6, 2020, there were 13 confirmed cases among those in ICE custody and 7 confirmed cases among ICE employees and personnel working in ICE detention facilities, spread across 13 detention facilities.[27]  These ICE numbers do not include more recent cases, such as employees who tested positive at Stewart Detention Facility in Georgia[28] and at Otay Mesa Detention Center in California.[29]

Detention facilities have a history of failing to contain disease outbreaks; so far, COVID-19 appears to be no different.[30]  According to a statement from the National Association of Immigration Judges ("NAIJ"), a voluntary organization of U.S. Immigration Judges, "[f]rom West Coast to East Coast, court after court has had to grapple with incident reports of COVID-19 exposure or positive test results of staff and the public.  Examples include the Los Angeles, San Francisco, Aurora (Colorado), Elizabeth (New Jersey), Varick (New York), Krome (South Florida), Seattle, Conroe (Texas), LaSalle (Louisiana), Fishkill (New York), Ulster (New York), Boston, Newark, and San Antonio Immigration Courts."  Ex. 32, NAIJ Statement Re

---

[27] U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19,* https://www.ice.gov/coronavirus.

[28] Jeremy Redmon, *Georgia Immigration Detention Employee Tests Positive for Coronavirus*, The Atlanta Journal-Constitution (Mar. 31, 2020), https://www.ajc.com/news/breaking-news/georgia-immigration-detention-employee-tests-positive-for-coronavirus/scDYEmROtOSowK2ULLPt5K/.

[29] Kate Morrissey & Andrea Lopez-Villafaña, *Employee at Otay Mesa Detention Center tests positive for COVID-19*, The San Diego Union Tribune (Mar. 31, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-03-31/employee-at-otay-mesa-detention-center-being-tested-for-covid-19-after-showing-symptoms.

[30] For example, a recent outbreak of mumps among individuals in ICE custody grew from 5 cases in two facilities to 898 cases in 57 facilities within a year.  Leung et al., *Notes from the Field: Mumps in Detention Facilities that House Detained Migrants - United States, September 2018-August 2019*, Centers for Disease Control and Prevention (Aug. 30, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6834a4.htm?s_cid=mm6834a4_x.

Coronavirus Detained Dockets ("NAIJ Statement"), Mar. 30, 2020.  At least one court has already had to order the Government to take necessary measures to protect detained persons from the spread of COVID-19.[31]

Furthermore, the amount of movement and human interaction required to conduct an in-person hearing is enormous, and it puts not only those directly involved at serious risk, but those who later come in contact with those direct participants, and those who come in contact with the indirect contacts, and so on.  The following routinely occurs in connection with any given in-person immigration hearing:

- The judge, courthouse staff, interpreters, witnesses, attorneys, security officers, the detained person's family members, and others all travel to the immigration court, sometimes on public transportation.  *See* Ex. 9, Terezakis Decl. ¶¶ 10, 14, 39–45; Ex. 10, Morgan Decl. ¶ 5.

- The detained person is transported to the immigration court by ICE employees in conditions that do not allow for social distancing.  *See* Ex. 10, Morgan Decl. ¶ 5 (client was transported to court along with four other detained persons and three guards).

- Groups of detained persons and others, including attorneys and witnesses, often wait in large groups and in close proximity for their hearings to begin.  *See* Ex. 3, Church Decl. ¶¶ 10–11; Ex. 10, Morgan Decl. ¶ 5 ("The [five] detainees were all seated together on a bench at the back of the courtroom" before their hearings); Ex. 30, Gahng Decl. ¶ 9.

- During hearings, participants—including detained persons, attorneys, witnesses, security officers, and judges—are often in close proximity to one another.  *See* Ex. 3, Church Decl. ¶ 11; Ex. 23, Brown Decl. ¶ 33; Ex. 10, Morgan Decl. ¶ 8. Papers are passed back and forth among participants in a hearing.[32]  *See* Church

---

[31] Minute Order, *O.M.G. v. Wolf*, 1:20-cv-00786 (D.D.C. Mar. 30, 2020) (granting temporary restraining requiring Government to provide detained persons "CDC-compliant protocols and protections for congregate settings in civil-detention facilities" to prevent the spread of COVID-19).

[32] Studies have shown that the virus that causes COVID-19 can remain on porous surfaces like cardboard for up to 24 hours.  National Institutes of Health, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces.

Decl. ¶ 17; Ex. 32, NAIJ Statement at 2.

The potential consequences for those forced to attend immigration hearings in person are devastating.  For example, one immigration attorney found out three days after attending a hearing in immigration court in Boston that a family member who lives with her tested positive for COVID-19.  *See* Ex. 3, Church Decl. ¶ 17.  She reported the results to the immigration court the same day, but not before having unknowingly potentially exposed not only two detained persons, but also judges, court staff, and other people in the building while attending four different hearings.[33]  At 5:27 p.m. the same day, EOIR reported via Twitter that the Boston Immigration Court would be closed on Friday, April 3, 2020; it reopened the following Monday.[34]  Given the shortage of testing capacity nationwide, COVID-19 cases in immigration courts and among participants at in-person hearings are likely far more widespread than has been reported.[35]

Not only does every in-person hearing increase the risk to public health, but the work required to prepare for any hearing also increases that risk; yet under current conditions, immigration attorneys are unable to mitigate that risk without sacrificing their ability to effectively represent their client, which puts them in an impossible position.  For example,

---

[33] Shannon Dooling, *Boston Immigration Court Closes for 1st Time During Crisis After Attorney Reports COVID-19 Contact*, WBUR (Apr. 3, 2020), https://www.wbur.org/news/2020/04/03/boston-immigration-court-closes-coronavirus.

[34] *See* EOIR (@DOJ_EOIR), Twitter (Apr. 2, 8:27 P.M.), https://twitter.com/DOJ_EOIR/status/1245870544651554816.

[35] Donald Judd & Daniella Diaz, *America Is Ramping Up Covid-19 Testing, But a Shortage of Supplies Is Limiting Capabilities*, CNN (Mar. 28, 2020), https://www.cnn.com/2020/03/28/politics/coronavirus-swabs-supplies-shortage-states/index.html; *see also* Ex. 12, Lelli Decl. ¶ 4 (describing lack of testing at clients' detention centers).

immigration attorney Mary Jane Miller filed a motion in Otay Mesa Immigration Court on
March 18, 2020 to appear telephonically for a hearing scheduled for March 26.[36]  Ms. Miller's
client has an underlying autoimmune disorder, and prior to filing her motion, Ms. Miller had
visited her client on March 10 to prepare for the upcoming hearing and learned her client was ill
with what appeared to be a bad cold and fever.  Ex. 11, Miller Decl. ¶ 6.  On March 16, 2020,
San Diego County issued a health order (effective March 17) prohibiting all public or private
gatherings of 50 or more people, closing all restaurants for on-site dining and encouraging all
businesses to implement social distancing, increased sanitation standards, and to make every
effort to use telecommuting for their workforces.  Ms. Miller "no longer felt it prudent to visit
her client at Otay Mesa, for both her health and safety and mine." *Id*. ¶ 7.  Without in-person
visits, Ms. Miller's communication with her client broke down.  At Otay Mesa, it is not possible
to have confidential calls with detained persons, and all calls must be initiated by the detained
person and at the detained person's expense.  At least twice, Ms. Miller has been unable to even
get a message through to her client.  *Id*. ¶ 10.  Ms. Miller mailed relevant briefing to her client,
after determining in-person visits were unsafe, only to have a properly addressed envelope (i.e.,
addressed to the detention center and including her client's name and Alien number) returned to
her marked "RETURN TO SENDER NOT DELIVERABLE AS ADDRESSED UNABLE TO
FORWARD." *Id*. ¶ 11; *see also* Ex. 13, Bittner Decl. ¶¶ 12–26 (describing need to travel long
distances to visit clients in person to prepare for hearings); Ex. 23, Brown Decl. ¶¶ 17–18
("Filings are expected to be completed . . . in all cases before the [Denver Immigration C]ourt.");

---

[36] On March 30, the day the Complaint in this case was filed, Otay Mesa Immigration Court
voluntarily adopted a standing order permitting telephonic appearances without prior approval
and without filing a motion in advance.  On March 31, 2020 it was reported that an employee at
Otay Mesa tested positive for COVID-19.  *See* Morrissey & Lopez-Villafaña, *Employee at Otay
Mesa Detention Center tests positive for COVID-19.*

Ex. 30, Gahng Decl. ¶ 12–14.

Moreover, attorneys have experienced significant impediments to submitting and receiving decisions on motions for telephonic appearances and continuances, further limiting their ability to address COVID-19 risks on their own and creating serious risk that detained persons, their counsel, and others will continue to appear at courthouses for in-person hearings. For example, immigration attorney George Terezakis represented a detained client with a master calendar hearing scheduled for Friday, March 20, 2020 at 8:30 a.m. at the Varick Street Immigration Court in New York City, Ex. 9, Terezakis Decl. ¶ 36, a court that continues not to have a court-wide standing order permitting remote participation in hearings.[37]  (New York City is the nation's epicenter of the outbreak, with a death from the virus occurring approximately every two and a half minutes.[38])  Mr. Terezakis's client's relief application and his request for a telephonic hearing were delivered at approximately noon on March 18, 2020.  Calls to the clerk's office seeking a ruling on the request for a telephonic hearing went unanswered.  *Id.*  Mr. Terezakis met with his client's mother on March 19, 2020, to prepare for the hearing the following day.  His client's mother insisted on attending the hearing in person.  Mr. Terezakis gave her a letter to deliver to the judge, reiterating Mr. Terezakis's request to appear telephonically and stating he was on standby to appear telephonically.  *Id.* ¶ 37.  (Mr. Terezakis

---

[37] And the only judge to have a standing order, Judge Mart, only permits telephonic appearances for master calendar hearings (*i.e.,* the first hearing in removal proceedings). United States Department of Justice, *Standing Order of Immigration Judge H. Kevin Mart Relating to Telephonic Appearances at Master Calendar Hearings*, (Mar. 21, 2020), https://www.justice.gov/eoir/page/file/1260276/download.

[38] Alan Feuer, *Coronavirus in N.Y.: Toll Soars to Nearly 3,000 as State Pleads for Aid*, The New York Times (Apr. 3, 2020), https://www.nytimes.com/2020/04/03/nyregion/coronavirus-new-york-death-toll.html.

had determined that for health reasons he should not attend in person, out of a need to minimize his potential exposure or unknowing exposure of others. *Id.* ¶ 38.)  His client's mother took public transportation to the court, including light rail and the subway, and waited in the waiting room with other family members of detained individuals and attorneys,[39] only to learn that visitors would be denied entry to the courtroom; the hearing was ultimately conducted telephonically. *Id.* ¶¶ 39–41.  His client's mother returned home, again using public transportation. *Id.* ¶ 41.  On March 28, 2020, his client's mother sought medical attention for difficulty breathing, and was told she had COVID-19. *Id.* ¶ 42; *see also* Ex. 9, Terezakis Decl. ¶¶ 32–33 (describing Mr. Terezakis's experience representing another detained client where the court repeatedly refused to grant a continuance despite Mr. Terezakis's explanation that he was living with a family member recently returned from Spain, an epicenter of the virus, and ultimately granting it only after his client had already been transported to court).

Additionally, Nick Steiner, a Staff Attorney for the American Civil Liberties Union, filed an administrative office complaint with the Office of the Chief Immigration Judge on behalf of two immigration attorneys because a judge in Baltimore Immigration Court had refused to grant motions for continuances due to COVID-19 and penalized a respondent for failure to appear by granting an order of removal *in absentia*. *See* Ex. 31, Steiner Decl. ¶ 3.  One of these attorneys was told by the immigration judge's clerk that the judge was "inclined to deny **all motions** for continuance made on the basis of COVID-19." *See id*. ¶ 5 (emphasis added).  This attorney was especially concerned about appearing in-person for the immigration proceeding since the attorney is "at higher risk of severe illness if they contract COVID-19." *See id.*  Apparently lacking any concern for this attorney's predicament, the immigration judge cited the fact that he

---

[39] The chairs are connected to one another in the waiting room.  Ex. 9, Terezakis Decl. ¶ 40.

himself is older than the attorney in denying the motion to continue. *See id.* These attorneys did not want to reveal their names for fear of retribution. *Id.* ¶ 4. Mr. Steiner has received complaints of similar denials of motions to continue at the immigration court in Arlington, including an instance where an attorney was "required to physically come to the [court], despite being sick with a cough and a fever" since her request to postpone the hearing and appear telephonically was denied. *See id.* ¶ 10.

The experiences of these immigration attorneys are not unique. *See, e.g.*, Ex. 12, Lelli Decl. ¶¶ 5–7; Ex. 13, Bittner Decl. ¶¶4–7, 12–13; Ex. 10, Morgan Decl. ¶ 4; Ex. 4, Lopez Decl. ¶¶12–13, 16–17. The continuation of in-person hearings and the lack of a uniform policy enabling postponement of all hearings prejudices detained persons' rights and causes avoidable social contact.

### C. In The Absence Of Uniform, Reasonable EOIR Policies, Inconsistent And Chaotic Responses By Individual Immigration Courts Continue To Put Lives At Risk

EOIR has not issued any nationwide policy providing for remote hearings, facilitating the rescheduling of hearings for detained individuals, or permitting continuances as of right, which has resulted in varying responses by individual immigration courts. Some remain open, some are open for filings and for detained hearings only, others are open for filings only, and a minority are closed. Fifty-eight (of sixty-nine) immigration courts are still holding in-person hearings. And while some courts (or individual judges) have entered standing orders related to COVID-19, almost half have not.[40] These court and individual orders vary, and at least some of them impose unreasonable restrictions.

The result is that even when counsel are able to participate in hearings remotely, they do

---

[40] As of today, 39 immigration court locations have issued court-wide COVID-19 standing orders. *See* Appendix A.

so under conditions that can preclude adequate representation.  For example, certain standing orders require attorneys to waive their clients' right to object to the admission of documentary evidence on the sole basis that the party has not had the opportunity to examine it, even where the document has not previously been served on the detained person or, if represented, on his or her counsel.  *See* Ex. 6, Rivera Decl. ¶ 23; Ex. 17, Manzanarez Decl. ¶ 19; Ex. 26, Mendez Decl. ¶ 19; Standing Order of the York Immigration Court Relating to Telephonic Appearances at Master Calendar Hearings (York Immigration Ct., Mar. 17, 2020); Standing Order: Telephonic Appearances in Cases Before the San Diego Immigration Court Due to COVID-19 (San Diego Immigration Ct. Mar. 30, 2020); Standing Order of Immigration Judge H. Kevin Mart Relating to Telephonic Appearances at Master Calendar Hearings (N.Y., Varick Street Immigration Ct. Mar. 21, 2020).  As a consequence, the detained person and counsel are deprived of any meaningful right to see or read new documents presented at the hearing.  Confronted with such an order, at least one attorney "concluded that the standing order would have required her to breach her ethical obligation to zealously represent her client by appearing telephonically," and, consequently, made the difficult decision to attend a hearing in person, risking contracting COVID-19 and potentially exposing her client and others in the courthouse (and general population) to the virus.  Ex. 6, Rivera Decl. ¶ 23; Ex. 10, Morgan Decl. ¶ 4.

In another example, the only judge from the Detroit Immigration Court to issue an order about remote appearances in response to COVID-19 has stated that because "the Court can only accommodate two telephonic appearances at one time," if a respondent requests a non-Spanish interpreter, "the respondent will have to appear in person to allow" room on the line for a

telephonic interpreter.[41]  Yet the NAIJ has explained that telephonic immigration hearings with

multiple participants "can readily be accomplished," since the "judge, the attorney for DHS, the

respondent and his attorney, and an interpreter can easily be connected by telephone." Ex. 32,

NAIJ Statement at 3.

In yet another example, the Immigration Court in Baltimore issued a standing order on

April 2, 2020 allowing attorneys to appear telephonically, but not making the same option

available to respondents.[42]  Many other courts' orders are silent on respondents' ability to appear

remotely and/or the court's ability to have several people participating remotely, which, as the

Detroit order makes clear, apparently cannot be assumed.  And in a final example, one attorney

even recounted that the Cleveland Immigration Court has required attorneys to waive their

clients' right to interpretation of the hearing if the court's technology does not support

simultaneous interpretation.  Ex. 13, Bittner Decl. ¶¶ 27–28.[43]

Furthermore, in the absence of a nationwide policy providing for remote hearings or

facilitating rescheduling, attorneys who seek remote hearings face significant obstacles.  For

instance, at least one attorney attempted to request a telephonic appearance for a hearing, but

---

[41] Standing Order: Telephonic Appearance due to COVID-19 in detained cases before Judge
Mark Jebson in the Detroit Immigration Court (Detroit Immigration Ct. Mar. 26, 2020).

[42] Standing Order of the Immigration Court (Baltimore Immigration Ct. Apr. 2, 2020).

[43] To the extent EOIR and ICE detention centers currently have some capacity for remote
hearings, it is often not capable of fulfilling the purpose.  For instance, attorney Amy Bittner has
stated that she made a telephonic appearance at a hearing on March 20, 2020 during which she
heard loud screeching feedback on about four occasions and had to wait until this feedback
receded before she could participate in the hearing, interfering with her ability to adequately
represent her client.  Ex. 13, Bittner Decl. ¶ 26; *see also* Ex. 3, Church Decl. ¶ 13 (describing
difficulties hearing the judge and having the judge hear her on a recent telephonic hearing); Ex.
18, Estrada Fernandez Decl.  ¶ 11 (expressing concern that if the hearing connection is like his
connection at the detention center, he is worried about his attorney's ability to represent him.

when she attempted to deliver her motions via FedEx and UPS, the "delivery persons were not allowed to deliver the motions to the court" and "were both turned away from the building multiple times." *See* Ex. 14, Ziesemer Decl. ¶ 8.  Another attorney stated that after a judge denied his motion to appear telephonically, the court clerk called the attorney and asked him to email a motion to continue to the court, which he was reluctant to do because it would delay his client's case, but ultimately did so to protect "[his] family[], [his]clients[], the court staff, and others." *See* Ex. 4, Lopez Decl. ¶ 17; *see also supra* pgs. 14–21 (recounting obstacles to appearing remotely or obtaining a continuance).

Even when EOIR has acted, it has often communicated its actions belatedly and in limited forums, leading to confusion and depriving its actions of some of their protective effect. In particular, EOIR has adopted the practice of communicating key announcements through social media such as Twitter and Facebook, sometimes exclusively.  This includes court closures and changes to filing deadlines.

For example, at 7:10 p.m. on April 1, 2020, EOIR tweeted that "Due to a report of secondhand exposure to coronavirus, the Conroe Immigration Court is closed tomorrow, April 2, 2020," and at 8:51 p.m. on April 1, 2020, EOIR tweeted that "Due to a report of the presence of an individual with a test-confirmed coronavirus diagnosis, the New Orleans Immigration Court will be closed tomorrow [April 2, 2020]."  Until these tweets were published (if they were even seen in time by those planning to attend in person), everyone involved in the cases scheduled for April 2 had to undertake countless unnecessary actions that put their health and safety and the health and safety of others at risk.[44]  Family members may have already traveled to the hearing

---

[44] EOIR has also deleted tweets, making social media an unreliable source.  EOIR sent a tweet on March 24, 2020 at 6:00 p.m. stating that all filings which had been due during a week-long

location, which outside of large cities is typically in a remote location that can require extensive public transportation to visit, and counsel may have already spent substantial time visiting their clients in detention centers, putting themselves at unnecessary risk. *See, e.g.*, Ex. 25, Garcia Decl. ¶¶ 5–10; Ex. 6, Rivera Decl. ¶ 24; Ex. 4, Lopez Decl. ¶ 18; Ex. 33, Scott Decl. ¶ 6; Ex. 9, Terezakis Decl. ¶¶ 36, 39, 41–44; Ex. 13, Bittner Decl. ¶ 6.

### D. Reasonable Measures To Protect Public Health Have Already Been Implemented By Non-Immigration Courts And Can Be Quickly Adopted By Immigration Courts

On March 31, 2020, "[i]n order to address health and safety concerns in federal courthouses and courtrooms, the Judicial Conference of the United States temporarily approved the use of video and teleconferencing for certain criminal proceedings and access via teleconferencing for civil proceedings during the COVID-19 national emergency."[45]  Even before this approval by the Judicial Conference, many federal courts had altered their operations on an emergency basis to address the risks of COVID-19.  For example, on March 16, the District Court for the District of Columbia excluded in-person proceedings and limited

---

closure to last until April 10 would instead be due the following day, March 25.  After facing backlash from attorneys and social media, EOIR deleted the tweet and set a different deadline. Suzanne Monyak*, Chaos, Confusion Reign As Immigration Courts Stay Open*, Law360 (Mar. 27, 2020), https://www.law360.com/articles/1257798/chaos-confusion-reign-as-immigration-courts-stay-open

[45] United States Courts, *Judiciary Authorizes Video/Audio Access During COVID-19 Pandemic*, (Mar. 31, 2020), https://www.uscourts.gov/news/2020/03/31/judiciary-authorizes-videoaudio-access-during-covid-19-pandemic.

operations to only "essential functions."[46]   Several federal courts also suspended jury trials,[47]

non-emergency civil proceedings,[48] and non-emergency criminal proceedings.[49]   Others

embraced video teleconferencing.   The Southern District of New York implemented procedures

to "convert[] to a remote arraignment system, whereby the participants, including the presiding

Magistrate Judge, [are] present *via* teleconferencing."[50]

State courts have also adapted to the exigencies of the global health crisis.   The New

York state court system has shut down all but "essential and emergency matters"; even for these,

the courts have transitioned to a "virtual court model" where hearings are conducted by Skype, in

a process Chief Judge DiFiore described as "working well overall."[51]   Other state courts have

similarly transitioned to videoconferencing in civil and criminal proceedings.[52]

---

[46] Standing Order No. 20-9, In re: Court Operations in Exigent Circumstances created by the COVID-19 Pandemic (D.D.C. Mar. 16, 2020).  All cited U.S. District Court standing orders are available at U.S. Courts, *Court Orders and Updated During COVID-19 Pandemic*, https://www.uscourts.gov/about-federal-courts/court-website-links/court-orders-and-updates-during-covid19-pandemic (accessed Apr. 6, 2020).

[47] *See, e.g.*, Amended General Order No. 20-02, In re: Coronavirus Public Emergency Order Concerning Jury Trials and Other Proceedings (C.D. Cal. Mar. 17, 2020); General Order No. 72, In re: Coronavirus Disease Public Health Emergency (N.D. Cal. Mar. 16, 2020).

[48] Amended General Order 20-0012, In re: Coronavirus COVID-19 Public Emergency (N.D. Ill. Mar. 17, 2020); Administrative Order 20-AO-021, In re: Court Operations Under the Exigent Circumstances Created by COVID-19 and Related Coronavirus Health Conditions (E.D. Mich. Mar. 13, 2020).

[49] *Id*.

[50] Standing Order M-10-468, In re: Coronavirus/COVID-19 (Criminal Proceedings) (S.D.N.Y. Mar. 27, 2020); *see also* Administrative Order No. 262, In re: Handling of Criminal Cases under the Exigent Circumstances Created by the COVID-19 Virus (S.D. Ill. Mar. 23, 2020).

[51]*Message from Chief Judge DiFiore* (Mar. 30, 2020), https://www.nycourts.gov/whatsnew/pdf/Message330-v6.pdf.

**E.   In Addition To Imperiling Public Health, ICE And EOIR Policies Impermissibly Interfere With Detained Persons' Right To Counsel**

Because ICE detention centers so restrict access to telephones and videoconferencing as to render adequate remote communication between detained persons and counsel next to impossible, attorneys are forced to choose between risking infection (and the public health) by meeting with detained clients in person (violating federal and state directives that seek to limit person to person contact) or failing to provide their detained clients with adequate legal representation.

First, videoconferencing is not always made available to persons detained by ICE, *see, e.g.,* Ex. 13, Bittner Decl. ¶ 11 (describing that non-ICE detained persons at Butler County Jail have access to videoconferencing, but ICE detained persons at the same facility do not); Ex. 8, Saenz Decl. ¶ 10, and where it is available, it is not always sufficiently reliable to allow meaningful consultation.[53]   Second, with respect to telephone calls, it is common for detained persons to encounter the following: to be unable to receive calls; to have no free option for placing calls; to experience substantial delays in scheduling call times; to have scheduled call times canceled; to have to wait hours in line to make calls; to have calls monitored or overheard by others; to have calls limited to as few as 30 minutes; and/or to have calls be of such poor sound quality that they are effectively useless.

---

[52] Superior Court of California, County of Los Angeles, *Public Notice: COVID-19* (Mar. 20, 2020), http://www.lacourt.org/newsmedia/uploads/142020330112924PN_PRClerksOffices_03_20_20.pdf; Stuart Jeff Rabner, Supreme Court of New Jersey (Mar. 27, 2020), https://www.njcourts.gov/notices/2020/n200327a.pdf.

[53]*See* Ex. 15, Greenstein Decl. ¶ 8; Ex. 4, Lopez Decl. ¶ 6; *see also* Ex. 16, Lunn Decl. ¶ 4, 6 ("[Videoconferencing] has been extremely difficult to set up . . . within the facility, due to technology challenges for both attorneys and detained clients trying to navigate the system software. . . . There is only one tablet available for a facility that has a capacity of over 1,500 people.").

Attorneys have experienced significant difficulties reaching clients in detention.  For example, to reach clients at La Palma Correctional Center, attorney Juliana Manzanarez must email the detention facilities to ask clients to call her at a specified time.  Ex. 17, Manzanarez Decl. ¶ 15.  When seeking a phone appointment with her client on Wednesday, March 25, 2020, she was told no appointments were available until March 27, 2020.  *Id.*  Then, at the scheduled time, her client was unable to call because the facility was running behind, and Ms. Manzanarez was instructed that she would have to speak with her client later.  *Id.*  When attempting to contact her client at Eloy Detention Center, the calls, which are not confidential and for which the client must pay, last for only 3-5 minutes at a time before cutting off and requiring the client to re-dial.  Ex. 17, Manzanarez Decl. ¶ 16; *see also* Ex. 18, Estrada Fernandez Decl. ¶¶ 9–11 (explaining he had to borrow 10 minutes of phone time credit from another detained person to review his asylum application with his attorney); Ex. 11, Miller Decl. ¶ 10; Ex. 8, Saenz Decl. ¶ 11.

In other cases, attorneys have reported attempting to contact persons at ICE detention centers repeatedly, often to be rerouted to voicemail that is never returned or returned after more than 24 hours.  *See* Ex. 19, Robbins Decl. at 1; Ex. 14, Ziesemer ¶ 4; Ex. 11, Miller Decl. ¶ 10; Ex. 15, Greenstein Decl. ¶ 7.  Other attorneys have reported being routed to several different detention center officials simply to schedule a private legal call with their client, only ultimately to be unsuccessful.  *See* Ex. 20, Pengilley Decl. ¶¶ 7–11; Ex. 11, Miller Decl. ¶ 10.  For example, as of March 25, 2020, Attorney Stephanie Pengilley had been trying to schedule a private call with her client for over a week without success.  Ms. Pengilley made several calls to various officials, each one directing her to someone else.  *See* Ex. 20, Pengilley Decl. ¶¶ 7–11.

Some facilities have not provided sufficient telephones to meet the increased demand for remote communication between detained persons and their counsel under the current

circumstances. For example, La Palma Correctional Center, which now has a confirmed case of COVID-19, reportedly has only one phone available for detained persons' use; Detained Plaintiff Mr. Rodriguez Cedeno had to stand in line with 10 people for almost three hours to use it. Ex. 5, Rodriguez Cedeno Decl. ¶ 10; *see also* Ex, 21, Napoles Vaillant Decl. ¶ 9; Ex. 22, Hollithron Decl. ¶ 11; Ex. 16, Lunn Decl. ¶ 6.

Then, even when attorneys are successful in scheduling a call with their clients, additional restrictions further block effective communication. Calls are often canceled at the last minute. *See* Ex. 14, Ziesemer Decl. ¶ 9; Ex. 17, Manzanarez Decl. ¶ 15. Calls are also limited, often to half an hour or an hour. *See* Ex. 2, Ehrlich Decl. ¶ 1; Ex. 16, Lunn Decl. ¶ 6; Ex. 4, Lopez Decl. ¶ 5. This is insufficient to prepare a client for a hearing. *See* Ex. 2, Ehrlich Decl. ¶ 1; Ex. 9, Terezakis Decl. ¶ 7. Attorneys and detained persons have also reported major technological issues, such as difficulty hearing the speakers and dropped calls, that render these calls inadequate for engaging in effective communication with their clients. *See* Ex. 16, Lunn Decl. ¶¶ 4, 6; Ex. 18, Estrada Fernandez Decl. ¶¶ 11–12; Ex. 15, Greenstein Decl. ¶ 8. Additionally, these conversations are not confidential and must often be conducted in the presence of several other individuals, including detention center employees and ICE officials. *See* Ex. 9, Terezakis Decl. ¶ 30; Ex. 13, Bittner Decl. ¶ 17; Ex. 22, Hollithron Decl. ¶ 6; Ex. 16, Lunn Decl. ¶ 5; Ex. 14, Ziesemer Decl. ¶ 5; Ex. 17, Manzanarez Decl. ¶ 17; Ex. 15, Greenstein Decl. ¶ 8; Ex. 18, Estrada Fernandez Decl. ¶¶ 9–11 (explaining he had to review his asylum application crowded in a room with 35 other people where it was difficult to hear his attorney). Knowing that a phone call or videoconference is not confidential further hampers attorneys' ability to adequately provide counsel to their clients. *See* Ex. 9, Terezakis Decl. ¶ 19; Ex. 15, Greenstein Decl. ¶ 8. It is also difficult to review the documents and evidence that would be

used at the hearing when speaking over the phone.  *See* Ex. 2, Ehrlich Decl. ¶ 1.  For example, Detained Plaintiff Mr. Estrada Fernandez has stated that he was unable to adequately review his asylum application over the phone with his attorney.  *See* Ex. 18, Estrada Fernandez Decl. ¶¶ 10– 11.

Even when detained persons and counsel make the risky choice to continue in-person meetings, in some instances ICE has required that attorneys must personally provide and wear specific and widely unavailable personal protective equipment ("PPE") in order to enter detention centers and courthouses housed in detention centers.  *See* Ex. 23, Brown Decl. ¶ 33 ("ICE at the Aurora, Colorado detention center has informed us that PPE will be required for legal visitation, and to walk through the detention center to the detained court."); Ex. 4, Lopez Decl. ¶ 7 (Warden informed attorneys that "as per ICE instructions, all attorneys must wear gloves and N-95 mask when conducting visits" but that due to the inability to locate PPE with the shortage, coupled with unavailability to teleconference with client, he was "forced to submit motions to continue merit hearings, prolonging our clients' unnecessary detention."); Ex. 12, Lelli Decl. ¶ 3; Ex. 24, Voigt Decl. at 4–5.  This policy is in place even though ICE employees and detained persons are not wearing PPE, and it is nearly impossible for counsel to obtain the PPE due to the nationwide PPE shortage and public health officials' guidance to preserve PPE for health care workers.[54]  *See* Ex. 10, Morgan Decl. ¶ 7; Ex. 25, Garcia Decl. ¶ 3–6; Ex. 6, Rivera Decl. ¶ 16; Ex. 24, Voigt Decl. at 4–5.

Finally, the failure of immigration courts to grant continuances as a matter of course

---

[54] Centers for Disease Control and Prevention, *Use of Cloth Face Coverings to Help Slow the Spread of COVID-19* (Apr. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html ("[S]urgical masks [and] N-95 respirators . . . are critical supplies that must continue to be reserved for healthcare workers and other medical first responders.")

under the present circumstances also impedes the ability of detained persons to even obtain

counsel in the first place.  For example, Detained Plaintiffs Messrs. Napoles Vaillant and

Rodriguez Cedeno have had difficulty obtaining legal counsel during the crisis; despite their

efforts to obtain legal counsel and the efforts on their behalf of the Florence Immigrant &

Refugee Rights Project, they have been unable to obtain legal representation due to the outbreak

of COVID-19 and the government's response to this outbreak.  *See* Ex. 21, Napoles Vaillant

Decl. ¶¶ 7–8; Ex. 5, Rodriguez Cedeno Decl. ¶¶ 7–8.  Yet Mr. Rodriguez Cedeno's request for a

continuance of his final merits hearing on his asylum application was denied.  *Id.*

The COVID-19 pandemic, and restrictions and risks associated with it, severely limit the

ability of detained persons to obtain counsel, prepare for hearings, and participate in hearings.

Yet EOIR has no policy directing the routine grant of continuances to address these severe

issues.

### F.  In The Face Of Repeated Requests For Action, ICE and EOIR Have Refused To Correct These Failures

Before filing this action, Plaintiff AILA, along with numerous co-signatories, including

Plaintiff NIPNLG, sent five requests to Defendants in March 2020, requesting agency action

addressing COVID-19 risks at immigration courts and detention facilities, in light of "the

tremendous disparity in the way local offices were responding to the pandemic and

implementing the directives from ICE's national leadership."  Ex. 24, Voigt Decl. at 3.  Each

letter contained specific recommendations for Defendants to take to mitigate risk.

On March 12, 2020, AILA sent a letter to Defendant Matthew Albence, Acting Director

for ICE, regarding procedures in detention facilities.  Ex. 24, Voigt Decl. at 3 & Ex. A thereto.

On March 15, 2020, AILA, the NAIJ, and the ICE Professionals Union issued a statement calling

for the emergency closure of the nation's immigration courts, which was sent to Defendants.  Ex.

24, Voigt Decl. at 3 & Ex. C thereto.  On March 16, 2020, AILA sent a follow-up letter to

Defendant Matthew Albence, Defendant James McHenry, and Attorney General William Barr

regarding closing immigration courts and offering telephonic hearings.  *See* Ex. 24, Voigt Decl.

at 3 & Ex. B thereto.

ICE's Office of Partnership and Engagement sent AILA a written response to their letters

via email, which directed AILA to review ICE's website on COVID-19.  Ex. 24, Voigt Decl. at 3

& Ex. D thereto.  But ICE's COVID-19 website lacks information regarding immigration court

proceedings and access to attorneys.  The website contains a section titled "Immigration Court,"

which contains only two sentences of text: "Is immigration court still taking place in-person at

ICE detention facilities?  Individuals attending immigration court in-person are encouraged to

contact the Executive Office for Immigration Review for any additional requirements or changes

to procedures."[55]  In a section titled "Detention," the website states "All detainees are afforded

telephone access and can make calls to the ICE-provided list of free legal service providers and

consulates at no charge to the detainee or the receiving party."[56]  The website does not address

availability of teleconferencing or videoconferencing for court hearings.  The website also does

not address the frequency of telephone availability for legal communications, the duration of

time for which an individual is permitted to use the telephone, or provide any guarantee of a

confidential line for communication.

On March 23, 2020, AILA, along with nearly one hundred partners, including law firms,

legal non-profits, universities, and Plaintiff NIPNLG, sent a letter to Defendants Matthew

Albence and James McHenry imploring them to authorize use of telephonic and video

---

[55] U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19*.

[56] *Id.*

conferencing technology for immigration court appearances and attorney-client meetings to "protect public health and ensure basic due process rights." Ex. 24, Voigt Decl. at 3–4 & Ex. E thereto. The March 23 letter also stated that "[t]he lack of federal direction . . . is leading to a patchwork of conflicting and insufficient responses regionally and locally." Ex. 24, Voigt Decl. Ex. E. On March 26, 2020, AILA along with nearly seventy partners, sent a letter to Defendant James McHenry and Attorney General Barr expressing concern that court personnel, litigants, and community members were endangered by the policies. Ex. 24, Voigt Decl. at 4 & Ex. F. The letter went on to say "DOJ and EOIR decision-making has been opaque, with inadequate information being released, causing confusion and leading to litigants showing up at hearings that are cancelled without notice" and that "DOJ's current response to the COVID-19 pandemic and its spread is frighteningly disconnected from the realities of our communities, and the advice of local leaders and scientific experts." *Id.*

To date, ICE and EOIR have refused to implement uniform policies suspending in-person hearings, implementing video or teleconferencing capabilities in detention centers, or providing for continuances as of right due to circumstances related to COVID-19.

## LEGAL STANDARD

"The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established." *Gomez v. Kelly*, 237 F. Supp. 3d 13, 14 (D.D.C. 2017). In assessing whether to grant such relief, a court must balance four factors: "(1) whether the movant is substantially likely to succeed on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction." *Citizens for Resp. & Ethics in Wash. v. Cheney*, 577 F. Supp. 2d 328, 334 (D.D.C. 2008).

"In applying this four-factored standard, district courts employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another." *Id.* at 334–35 (explaining that a strong probability of irreparable injury may warrant issuance of an injunction even where likelihood of success on the merits is "remote"). Accordingly, as the D.C. Circuit has explained,

> to justify a temporary injunction it is not necessary that the plaintiff's right to a final decision . . . be absolutely certain . . . if the other elements are present . . . [I]t will ordinarily be enough that the plaintiff has raised substantial questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). "[S]uch relief is preventative, or protective; it seeks to maintain the status quo pending a final determination of the merits of the suit." *Id.* The Court also has power under the All Writs Act to enter this injunction to protect its ability to adjudicate this dispute and afford effective relief.[57]

## ARGUMENT

In order to address the dire risk to life and health posed by the COVID-19 pandemic, countless institutions across the country have implemented drastic measures designed to slow the spread of the virus, even when those measures entailed great sacrifice; in many respects, the

---

[57] Given the rapidity with which COVID-19 spreads, especially in close quarters and institutional settings, a delay of weeks or even days could deprive the Court of the ability to adjudicate and redress the harms that Plaintiffs seek to prevent through this TRO, which would have irretrievably materialized. The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). That includes the "express authority . . . to issue such temporary injunctions as may be necessary to protect its own jurisdiction." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 608 (1966). Here, the relief sought in Plaintiffs' current motion is the same relief sought in the Complaint, which provides clear jurisdictional nexus. Due to the urgency caused by the COVID-19 outbreak, relief from the Court is necessary to preserve the Court's jurisdiction and therefore this Court has authority to alternatively grant Plaintiffs' motion under the All Writs Act. *See Trump v. Committee on Ways and Means*, 415 F. Supp. 3d 38, 44 (D.D.C. 2019) (Nichols, J.).

29

normal functioning of our society and economy have been upended.  Yet Defendants have failed—indeed, refused—to take urgently necessary action to safeguard the lives of detained persons, decrease the associated risk to the public, and ensure that detained persons are not deprived of their constitutional and statutory rights.  Consequently, without temporary injunctive relief, Plaintiffs will continue to suffer legal injury, and Plaintiffs (as well as the public) will continue to be exposed to avoidable and unacceptable risk of illness and death.  Plaintiffs are likely to succeed on their claims, and the injuries they face are irreparable.  In the current public health emergency, the public interest also weighs strongly in favor of granting the temporary relief that Plaintiffs seek.  Moreover, there is no hardship associated with implementing that relief that compares to the hardships that Plaintiffs are undergoing without it.  For all of these reasons, Plaintiffs are entitled to the relief that they seek, and their application for a temporary restraining order should be granted.

## I.      Plaintiffs Are Likely To Succeed On The Merits

Defendants have violated the APA by refusing to direct immigration courts to conduct proceedings in a manner consistent with the public health and protection of detained persons' rights to counsel.  Defendants have also violated constitutional and statutory rights to counsel and to due process.  Plaintiffs are likely to succeed on their claims based on these violations, which supports entry of a temporary restraining order.[58]

### A.    Plaintiffs Are Likely To Succeed On Their Claims That Defendants' Agency Actions Violate The APA

Defendants have failed to issue uniform instructions for immigration court proceedings

---

[58] Plaintiffs focus on the First through Third Claims of the Complaint in recognition of the urgency of the situation and should not be construed as having abandoned the other claims, which also support injunctive relief.

and attorney-client visits in detention facilities that (1) conform with public health requirements to contain the spread of COVID-19 and that (2) preserve Plaintiffs' statutory, regulatory, and constitutional rights.

As detailed above, government and medical experts, including the CDC and WHO, consistently instruct that it is a public health imperative to decrease physical interactions between people in order to slow the spread of COVID-19 as much as possible.  Because detention facilities are particularly vulnerable to rapid spread of COVID-19, the CDC issued guidance on practices to implement in correctional and detention facilities, specifically calling for "alternatives to in-person court appearances" and decreasing "operational entrances and exits to the facility" (e.g., for attorney visits and to attend hearings).[59]

Despite the public health emergency and authoritative instruction on how to mitigate health risks in an incarcerated population for whom proceedings may be required, which state and federal court systems have followed, EOIR has not suspended non-essential in-person hearings and has refused to issue any uniform policy designed to minimize the COVID-19 health risks, instead leaving individual immigration judges and courts to muddle along with inconsistent and often harmful practices.  Most immigration courts continue to be open for in-person hearings, remote alternatives are limited, and in many courts where remote access is available on paper, the remote facilities are inadequate to meet the requirements of due process and access to counsel.  Nor is there any apparent relationship between the practices of immigration courts and the severity of the COVID-19 outbreak in the courts' locations.  For example, according to

---

[59] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease*.  The guidance was most recently updated on March 23, 2020 and expressly states that it is directed to ICE, among others.

recent data, New York City has about one hundred times the incidence of COVID-19 as does Memphis,[60] yet in-person hearings are being conducted at all three New York City immigration courts, while the immigration court in Memphis is open only for filings.  *See* Appendix A. Likewise, ICE has refused to implement policies that are consistent with federal health mandates to facilitate limitations on unnecessary transfer of detained persons or on operational entrances and exits to detention facilities.  Detained persons are thus endangered every time a lawyer is required to visit in person or they are transferred on a crowded bus to a courthouse because of the absence of adequate remote access facilities.

Despite repeated requests for agency action from many direct participants in the immigration court system who are harmed by the current practices—associations of judges, ICE employees, attorneys, and detained individuals—EOIR and ICE have neither explained nor changed their policies.[61]  Based on the available data and facts, there is no rational explanation for EOIR's and ICE's policies and failures to act.  Without offering any explanation for their actions, EOIR and ICE have implemented chaotic policies that run counter to the evidence before them.

Defendants' failure to implement a uniform policy adequately addressing the COVID-19 pandemic and related federal guidelines, despite multiple requests from multiple constituencies, is an agency action that is "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as "[c]ontrary to constitutional right, power, privilege or

---

[60] The New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#states, (accessed Apr. 6, 2020) (citing 57,160 COVID-19 cases and 1,867 deaths in New York and 640 cases and 7 deaths in Memphis).

[61] Defendants effectively denied the numerous requests by sending nothing more than a cursory email response directing Plaintiff AILA to review the COVID-19 page on ICE's website.

immunity."  It thus violates the APA and is subject to judicial review by this Court.  *See* 5 U.S.C.

§§ 706(2), 704.

The APA entitles "[a] person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action" to "judicial review thereof."  5 U.S.C. § 702.[62]

For purposes of the APA, "agency action includes the whole or a part of an agency rule, order,

license, sanction, relief, or the equivalent denial thereof, or failure to act." 5 U.S.C. § 551(13).

Where a court finds that an agency action is arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law, and that the party suffered a legal wrong due to that

agency action, the court shall "hold unlawful and set aside [the] agency action, findings, and

conclusions."  5 U.S.C. § 706(2).

While courts generally defer to an agency's expertise, the court must still satisfy itself

that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for

---

[62] This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  That jurisdiction is
not limited by 8 U.S.C. §§ 1252(a)(5) or (b)(9) because this action is not arising from removal
proceedings.  *See O.A. v. Trump*, 404 F. Supp. 3d 109, 126-–38 (D.D.C. 2019); *Martinez v.
Nielsen*, 341 F. Supp. 3d 400, 406-–08 (D.N.J. 2018) (finding Sections 1252(a)(5) and (b)(9)
inapplicable where TRO does not "directly implicate the order of removal").  Nor does 8 U.S.C.
§ 1252(f) preclude relief here because Plaintiffs do not seek to enjoin "the operation of the
provisions of part IV [removal provisions] of this subchapter."  The government would also be
wrong to argue that the Organizational Plaintiffs lack a cause of action.  *See Federal Defenders
of New York, Inc. v. Federal Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *5-–11 (2d.
Cir. Mar. 20, 2020) (holding Federal Defenders could challenge limitations on access to counsel
under the APA and "raised serious arguments in favor of allowing" equitable claim for violation
of the Sixth Amendment to proceed); *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 32-–
35 (D.D.C. 2019) (holding immigration rights advocacy group had associational standing to
pursue action where "at least one identified member faces an injury that is 'concerted and
particularized,'" that "interests Plaintiffs seek to protect are germane to the organizations'
purposes," and the matter "does not require individual members' participation."); *Innovation
Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1161-62 (D. Ore. 2018) (holding organizational
plaintiff had standing to pursue action where "stated mission is to advocate on behalf of and
provide legal representation to noncitizens in the United States.").

its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When, as here, the agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion," the court "must undo its action." *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999). "Moreover, an agency cannot fail to consider an important aspect of the problem or offer an explanation for its decision that runs counter to the evidence before it." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015). EOIR and ICE have offered no justifications for their decisions not to act, nor are there any that would withstand judicial review.[63]  The Court is therefore justified in providing temporary injunctive relief. *See* Minute Order, *O.M.G. v. Wolf*, 1:20-cv-00786 (D.D.C. Mar. 30, 2020).

### B. Plaintiffs Are Likely To Succeed On Their Claim That Defendants' Policies Restrict Access To Counsel In Violation Of Constitutional And Statutory Rights

It is well established that the Fifth Amendment entitles non-citizens to due process in immigration proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993). The Fifth Amendment guarantees that "[n]o person . . . shall be deprived of life, liberty, or property" without due process of law, and removal proceedings implicate a non-citizen's liberty interest, especially when the non-citizen is being detained. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Due process for immigration proceedings includes the right to counsel. *See, e.g.*, *Leslie v. Attorney General*, 611 F.3d 171, 181 (3d Cir. 2010) ("[A]lthough the Fifth Amendment does not mandate government-appointed counsel for aliens at removal proceedings, it indisputably affords an alien the right to counsel of his or her own choice at his or her own expense."); *Biwot v. Gonzales*, 403

---

[63] If EOIR's and ICE's decisions are instead construed as a failure to act rather than agency action, their failures to act are also reviewable under 5 U.S.C. § 706(1), and should be set aside because the agencies failed to act so as to afford the effective right to counsel required by law, as discussed infra in I.B.

F.3d 1094, 1098 (9th Cir. 2005) ("The right to counsel in immigration proceedings is rooted in the Due Process Clause.").

The INA provides that "[i]n any removal proceeding before an immigration judge," the individual "shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose." 8 U.S.C. § 1362; *Maldanado-Perez v. INS*, 865 F.2d 328, 333 (D.C. Cir. 1989) (noting that non-citizens have a statutory right to counsel at deportation proceedings but not at government expense); s*ee also* 8 C.F.R. § 1240.3 ("The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 1292.").[64]

Unreasonable infringements on detained persons' ability to obtain and consult with counsel accordingly violate their constitutional and statutory rights. As one court has explained:

> The right to counsel in immigration proceedings, including asylum proceedings, requires that an alien be provided "reasonable time to locate counsel and permit counsel to prepare for the hearing." *Biwot v. Gonzales*, 403 F.3d 1094, 1098-99 (9th Cir. 2005). The Ninth Circuit has upheld mandatory injunctions designed to remedy government practices when the "cumulative effect" of such practices "was to prevent aliens from contacting counsel and receiving any legal advice." *Orantes–Hernandez v. Thornburgh*, 919 F.2d 549, 565 (9th Cir. 1990). Government practices that ***effectively deny*** access to counsel include the detention of aliens far from where potential or existing counsel was located, limited attorney visitation hours, and the processing of aliens at locations where telephones were not available to them.

*Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1162 (D. Or. 2018) (emphasis added). The detention facility in that case "repeatedly denied access" to attorneys and gave "conflicting and nearly-impossible-to-follow instructions on the availability of legal visitation hours." *See id.*

---

[64] *See also* 5 U.S.C. § 555(b) ("[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative"); *S.E.C. v. Whitman*, 613 F. Supp. 48, 50 (D.D.C. 1985) (emphasizing that there must be "veritable meaning" to the witness' right to counsel under 5 U.S.C. § 555(b)).

at 1162.  The court granted a temporary restraining order requiring the government to guarantee adequate attorney visitation and install additional telephone lines at the detention facility since the plaintiffs established a likelihood of success on their due process right to counsel claim.  *See id*. at 1162–163, 1165.[65]

As described above, *supra* pgs. 24–28, in the face of the COVID-19 pandemic, Defendants' actions have unreasonably restricted detained persons' right to counsel by impairing (1) their ability to retain counsel, (2) their ability to communicate confidentially with their counsel, and (3) their counsel's ability to competently represent them in immigration court.

---

[65] *See also Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565-66 (9th Cir. 1990) (granting permanent injunction when agents restricted detained persons' ability to contact and retain counsel, and there were "limited attorney visitation hours" at facilities, "long delays" in allowing detained persons to contact attorneys, "inadequate efforts to ensure the privacy of both in-person and telephonic attorney-client interviews," and "severely limited" detained persons' access to telephones "due to time restrictions, the number of functioning telephones and . . . an [un]reliable system of informing detainees of attorneys' phone calls"); *Rios-Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985) (vacating deportation order when the "unexplained haste" of the proceedings, including immigration judge's refusal to grant reasonable continuances, effectively deprived detained person of his access to counsel); *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1045, 1060 (C.D. Cal. 2019) (denying motion to dismiss INA and due process right to counsel claims when detained person and organizational plaintiffs alleged "restrictions on telephone access [such as limited duration of calls with attorneys, imposition of costs, and failure to maintain phone connectivity in facilities] as well as difficulty with legal mail, in-person meetings, and numerous other obstacles"); *Chhoeun v. Marin*, 306 F.Supp.3d 1147, 1156, 1160 (C.D. Cal. 2018) (granting stay of removal of detained persons where ICE officials initially denied attorneys access to visit detained persons; refused to provide attorneys information about when detained persons would be available for consultations; and then made the attorneys wait two to three hours before allowing them to meet with detained persons); *Castillo v. Nielsen*, No. 5:18-cv-01317, 2018 WL 6131172, at *1–4 (C.D. Cal. June 21, 2018) (granting temporary restraining order requiring the government to allow detained persons at detention facility to "communicate, both in person and by phone, with other immigration attorneys who wish to communicate with them," when facility only allowed for a "limited time" for in-person legal visitation while also failing to guarantee adequate phone access); *Nunez v. Boldin*, 537 F. Supp. 578, 582 (S.D. Tex. 1982) (granting injunctive relief when detention facility unreasonably restricted attorney visitation after 3:30 p.m.); *Louis v. Meissner*, 530 F. Supp. 924, 927 (S.D. Fla. 1981) (granting injunctive relief when there was a "general unavailability of telephones" in detention facilities, restricting detained persons' access to counsel).

Practices that restrict access to counsel under normal conditions (such as limitations on telephone use, number of functioning telephones, and monitored telephone lines)[66] have an even greater detrimental effect during the COVID-19 pandemic, when in-person visits by attorneys to detention centers put themselves, their families, detained persons, ICE employees, and the public at risk.

ICE's failure to act to increase detained persons' access to robust remote communication and EOIR's failure to suspend in-person hearings and grant continuances as a matter of course together deprive detained persons of their right of access to counsel. The actions and inactions by Defendants, individually and collectively, therefore directly result in a deprivation of Plaintiffs' due process rights, for which this Court may grant relief.

## II.      Failure To Implement The Requested Relief Will Immediately And Irreparably Injure Plaintiffs

The "basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312. (1982). Here, Defendants' failures to implement uniform, reasonable policies that protect Plaintiffs' constitutional and statutory rights to counsel and that conform with public health requirements have already irreparably injured Plaintiffs (and the public) and will continue to do so absent immediate relief.

EOIR's failure to uniformly postpone in-person court proceedings and other deadlines as appropriate, and ICE's failure to allow adequate remote access to counsel, is causing irreparable harm to Plaintiffs' health and safety from increased and unnecessary exposure to COVID-19 and depriving detained persons of any meaningful ability to communicate with counsel. Without relief, in-person hearings will continue to occur, requiring travel and social contact for many

---

[66] *See supra* note 64.

people, any one of whom could be ill, could have been exposed to an infected individual, or

could encounter an infected individual during the travel and contact required to attend a hearing.

At least one attorney has already contracted COVID-19 after attending immigration court where

she believes she might have been infected (and her mother is now seriously ill and hospitalized),

Ex. 1, Arce Decl. at 1–2; one government attorney is reportedly in a medically induced coma

after appearing in immigration court, Liz Robbins, *As Coronavirus Spreads, So Does Panic and*

*Confusion At Immigration Courts Across the U.S.*, The Appeal (Apr. 3, 2020),

https://theappeal.org/as-coronavirus-spreads-so-does-panic-and-confusion-at-immigration-

courts-across-the-u-s/; and another detained person's attorney, who attended an in-person

hearing in immigration court—believing that staying home (and protecting her own health and

the health of others) would mean failing in her duty to her client—days before learning a

member of her household, which also includes a person living with leukemia, tested positive for

COVID-19, Ex. 3, Church Decl. ¶¶ 9–17.   Detained persons and their attorneys will thus

continue to be forced into the crosshairs of this highly contagious and potentially devastating

virus absent immediate relief. *See* Ex. 27, Jha Decl. ¶ 16 (immigration court hearings, which

require "the participation of a multitude of people," put attendees—including detained persons

and counsel—"at substantial risk for further transmission of this deadly disease, furthering this

public health crisis"); Ex. 31, Steiner Decl. ¶¶ 5, 10; *see also, e.g.*, *Coronel v. Decker*, No. 20-cv-

2472, 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) (granting temporary restraining order

because "irreparable harm exists where, as here, petitioners face imminent risk to their health,

safety, and lives" from exposure to COVID-19 (internal quotations omitted)).

Failure to implement the requested relief will also needlessly contribute to community

spread of the virus.  COVID-19 will continue to be contracted and transmitted at immigration

courts.  *See, e.g.*, Ex. 27, Jha Decl. ¶¶ 16–17 ("[A]nyone needing to access the immigration courts may need to utilize mass public transportation, wait in long security lines to enter the immigration court building, and wait in cramped waiting rooms prior to the start of the immigration hearing."); Ex. 3, Church Decl. ¶ 17; Ex. 31, Steiner Decl. ¶ 10.  And individuals who contract the virus at immigration courts will then transmit the virus to their families and communities.  *See, e.g.*, Ex. 9, Terezakis Decl. ¶¶ 39–42 (describing how client's mother tested positive for COVID-19 after attending in-person proceeding using public transportation).  The risk of a cascading spread of COVID-19, which has been growing exponentially nationwide,[67] is especially acute at detention facilities, and transporting detained persons to and from immigration courts will continue to recklessly place detention facilities at significant risk of widespread transmission of the virus.[68]  Recognizing this risk, Judge Boasberg has recently ordered the Government to provide detained persons "CDC-compliant protocols and protections for congregate settings in civil-detention facilities."  *See* Minute Order, *O.M.G. v. Wolf*, 1:20-cv-00786 (D.D.C. March 30, 2020); *see also, e.g.*, *Castillo v. Barr*, No. 20-cv-00605, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020) ("Civil detainees must be protected by the Government.  Petitioners have not been protected. . . .  [T]he Government cannot deny the fact that the risk of infection [from COVID-19] is particularly high . . . ."); *Basank v. Decker*, 20-cv-2518, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (finding irreparable harm from risk of

---

[67] *See supra* p. 6.

[68] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf; Rosenberg et al., *As Pandemic Rages, U.S. Immigrants Detained in Areas With Few Hospitals*, The New York Times (Apr. 3, 2020), https://www.nytimes.com/reuters/2020/04/03/us/03reuters-health-coronavirus-usa-detention-insight.html.

exposure to COVID-19, especially where the "nature of detention facilities makes exposure and spread of the virus particularly harmful."). Every day that goes by without reasonable procedures places not only Plaintiffs but also the public at large at unnecessary and substantial health risk.

Detained Plaintiffs also have a constitutional and statutory right to access to counsel. *See supra* I.B. EOIR's failure to uniformly postpone in-person court proceedings and other deadlines as necessary, and ICE's failure to allow adequate remote access to counsel, significantly curtails detained persons' ability to obtain counsel, and, when counsel is obtained, to be adequately represented by such counsel.

It is axiomatic that "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("Suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.") (citation omitted). Accordingly, the current restriction of the Detained Plaintiffs' due process right to counsel constitutes an irreparable injury that will continue to occur absent immediate relief. *See, e.g.*, *Innovation Law Lab*, 310 F.Supp.3d at 1163 (finding irreparable harm when "Defendants are likely violating the immigrant detainees' constitutional rights," including "denial of access to legal representation").

For example, the following irreparable infringements of Plaintiffs' right of access to counsel will continue to occur every day without relief:

- Unrepresented detained persons will continue to be forced to proceed in their cases without a reasonable opportunity to obtain counsel. *See* Ex. 21, Napoles Vaillant Decl. ¶¶ 7–8; *see also* Ex. 5, Rodriguez Cedeno Decl. ¶¶ 7–8. Absent swift relief, such individuals may be removed before such an opportunity is

eventually provided to them, or the crisis abates.

- Motions for continuance will continue to be denied notwithstanding the unavailability of counsel, or, if counsel has been obtained, without adequate access to their clients and facilities to prepare the case and zealously—or even adequately—represent their client. *See, e.g.*, *supra* pgs. 16–18, 24–28.

- Witnesses will continue to be fearful of attending any in-person hearings, consequently hindering counsel in their ability to adequately represent their clients. *See, e.g.*, Ex. 28, Edstrom Decl. ¶ 6 (describing witnesses' reluctance to appear at in-person proceeding).

These risks of constitutional injury and physical injury require this court to act immediately to maintain the status quo pending a determination on the merits.

## III.   **The Balance Of Equities Weighs In Plaintiffs' Favor**

The third factor—the balance of equities—tips strongly in favor of the requested injunctive relief, because the Defendants would suffer no harm from the cessation of unlawful practices that endanger public health, and any theoretical costs Defendants might incur would be significantly outweighed by the likelihood of irreparable harm to Plaintiffs (and the public). *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999) (the injunctive relief factors "interrelate on a sliding scale and must be balanced against each other").

As established above, the Plaintiffs face immediate and irreparable harm to their health and constitutional rights. Conversely, it is well established that Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (Housing and Urban Development could not suffer harm from injunction requiring it to implement federal rule) (citation omitted); *see R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (Department of Homeland Security could not suffer harm from injunction that ended likely unlawful policy of considering deterrence of mass immigration in making detention determinations). Like in *Open Communities All.* and *R.I.L-R*, Plaintiffs here seek to enjoin government agencies from continuing to act unlawfully by failing

41

to issue uniform policies that conform with public health guidelines to prevent the spread of COVID-19 and that protect detained persons' constitutional and statutory rights to counsel. Defendants would suffer no harm being required to comply with the law.

Moreover, demonstrating that the relief Plaintiffs seek is feasible, federal courts around the country have implemented protective measures to prevent the spread of COVID-19. Requiring EOIR to follow suit would not impose unreasonable burdens or harms. *Cf.* Minute Order, *O.M.G. v. Wolf*, 1:20-cv-00786 (D.D.C. March 30, 2020). Indeed, current immigration judges have affirmed that conducting proceedings remotely during this crisis "can readily be accomplished," and proposed that EOIR implement uniform procedures that accord with the relief Plaintiffs seek here. *See* Ex. 32, NAIJ Statement at 3–4. And courts elsewhere, even in non-emergency times, have required detention facilities to take affirmative actions to facilitate detained persons' access to counsel, including installing telephone lines, since "any [possible] burden on Defendants is more than justified by the need to ensure the fulfillment of Plaintiffs' constitutional rights." *See Innovation Law Lab*, 310 F. Supp. 3d at 1163, 1165–66.

## IV.     The Requested Relief Is In The Public Interest

The injunctive relief sought here is also indisputably in the public interest. The requested relief follows the mitigation measures urged by the President's Coronavirus Task Force, which its members have repeatedly stated will immediately help save lives.

Federal, state, and local governments have undertaken unprecedented measures to slow the spread of COVID-19 and prevent serious illness and death. President Trump, supported by doctors and infectious disease specialists, has held nearly daily press conferences explaining the importance of the CDC's guidance, the need to slow transmission, and the need to protect healthcare facilities from being inundated with patients they lack resources to help. It is hard to imagine a greater public interest than that, as numerous courts have already held. *See, e.g.,*

*Castillo*, 2020 WL 1502864, at *6 ("Finally, the emergency injunctive relief sought, here, is absolutely in the public's best interest.  The public has a critical interest in preventing the further spread of the coronavirus.  An outbreak at Adelanto [Detention Center] would, further, endanger all of us – Adelanto detainees, Adelanto employees, residents of San Bernardino County, residents of the State of California, and our nation as a whole."); *Coronel v. Decker*, No. 20-cv-2472, 2020 WL 1487274, at *7 (S.D.N.Y. Mar. 27, 2020) ("[B]oth Petitioners and the public benefit from ensuring public health and safety," as a COVID-19 outbreak at a detention facility could "place strain on the surrounding community hospitals.").

An order requiring Defendants to postpone all in-person detained hearings, while also ensuring meaningful remote access procedures, is necessary to protect not only Plaintiffs, but also immigration judges,[69] the staff at immigration courts,[70] government attorneys, ICE employees, other detained persons in facilities, and members of the public at large.[71]  The president of the American Federation of Government Employees Local 511, which represents ICE employees, stated "Our primary concern here today is the Department of Justice's refusal to either close or postpone immigration court in-person hearings during this global health crisis"

---

[69] *See* NAIJ, *The National Association of Immigration Judges Urgently Calls for Immediate Implementation of Required Health and Safety Measures for the Immigration Courts During the Coronavirus Pandemic*; Monique O. Madan, *White House itself is choosing which immigration courts get to close amid COVID-19*, Miami Herald (Mar. 19, 2020), https://www.miamiherald.com/news/local/immigration/article241335126.html ("Back at the courthouses, immigration judges are doing all they can to try to keep away from crowds and other people in general — that includes calling in sick.").

[70] *See* Dara Lind, *Immigration Courts Are Telling Employees to Come to Work — Ignoring Health Risks and Local Shelter-in-Place Orders,* ProPublica (Mar. 20, 2020), https://www.propublica.org/article/immigration-courts-are-telling-employees-to-come-to-work-ignoring-health-risks-and-local-shelter-in-place-orders.
[71] *See* Ex. 27, Jha Decl. ¶ 17.

and that "[l]ike most government employees, ICE attorneys are concerned about the risk to their health and the health of their families."[72]

Slowing the spread of COVID-19 is also in the public's economic interest. There is no doubt that the severe restrictions imposed on daily life are having a correspondingly severe economic impact. But Federal Reserve economists have concluded that social distancing measures and slowing the spread of the virus is the fastest and best way to return to business as usual and improve the economic situation.[73]

Finally, there is also a clear public interest in the protection of constitutional rights. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.") (internal quotation marks and citation omitted); *see also Gordon*, 721 F.3d at 653 ("[E]nforcement of an unconstitutional law is always contrary to the public interest"). The public therefore has a significant interest in the preservation of detained persons' right to counsel, which "right is 'an integral part of the procedural due process to which the [detained person] is entitled." *See Iavorski v. I.N.S.*, 232 F.3d 124, 128 (2d Cir. 2000) (quoting *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993). Similarly, there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," which includes the APA and INA. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks omitted); *see also R.I.L-R*, 8 F. Supp.

---

[72] *See* Charles Davis, *Immigration Judges, ICE Attorneys, and Experts are Calling on the Trump Administration to Close the Courts to Stop the Novel Coronavirus from Spreading*, Business Insider (Mar. 1, 2020), https://www.businessinsider.com/coronavirus-ice-and-immigration-judges-call-for-delay-in-hearings-2020-3.

[73] *See* Sergio Correia et al., *Pandemics Depress the Economy, Public Health Interventions Do Not: Evidence from the 1918 Flu* (Mar. 30, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3561560.

3d at 191 ("The public interest is served when administrative agencies comply with their

obligations under the APA.") (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, this Court should GRANT Plaintiffs' Motion for a Temporary

Restraining Order.


Dated: April 8, 2020
      Washington, D.C.

Respectfully submitted,

*/s/ Sirine Shebaya*
Sirine Shebaya (D.C. Bar No. 1019748)
Khaled Alrabe*
Amber Qureshi*
Cristina Velez*
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788
sirine@nipnlg.org
khaled@nipnlg.org
amber@nipnlg.org
cristina@nipnlg.org

*Pro hac vice motions forthcoming

*/s/ Matthew D. Slater*
Matthew D. Slater (D.C. Bar No. 386986)
Elsbeth Bennett (D.C. Bar No. 1021393)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, N.W.
Washington, D.C.  20037-3229
T: 202-974-1500
F: 202-974-1999
mslater@cgsh.com
ebennett@cgsh.com

Jennifer Kennedy Park*
Lina Bensman*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999
jkpark@cgsh.com
lbensman@cgsh.com

45

*Attorneys for Plaintiffs*

*Pro hac vice motions forthcoming

Appendix A*

| | Immigration Court | Operational Status | Status of Standing Order | Date of Order's Entry | Permits Hearings Telephon ically? | Permits Hearings Telephonically Without Prior Motion? | Method to Inform Court |
|---|---|---|---|---|---|---|---|
| 1. | Adelanto | Open | Courtwide | 3/25/20 | Yes | Yes | Provide telephone number to court |
| 2. | Arlington | Open For Filings And For Detained Hearings Only | Courtwide | 3/24/20 | Yes | Yes | Call in advance to ascertain operational status, provide telephone number to court |
| 3. | Atlanta – Ted Turner Drive | Open For Filings And For Detained Hearings Only | Courtwide | 3/20/20 | Yes | Yes | Call in advance and provide client's Alien number, name of judge, date of hearing, and telephone number to court |
| 4. | Atlanta - W. Peachtree Street | Open For Filings Only | No Order | n/a | n/a | n/a | |
| 5. | Aurora | Open For Filings And For Detained Hearings Only | Courtwide | 3/30/20 | Yes | Yes | Call judge's legal assistant 48 hours in advance of hearing to receive conference line number |
| 6. | Baltimore | Open For Filings And For Detained Hearings Only | Courtwide | 4/2/20 | Yes | Yes | Call in advance to ascertain operational status, provide telephone number to court |
| 7. | Batavia | Open | Courtwide | 3/24/20 | Yes | Yes | |
| 8. | Boston | Open For Filings And For Detained Hearings Only | Courtwide | 3/30/20 | Yes | Yes | Call in advance and provide client's Alien number, name of judge, date of hearing, and telephone number to court |
| 9. | Buffalo | Open For Filings And For Detained Hearings Only | Courtwide | 3/24/20 | Yes | Yes | |
| 10. | Charlotte | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |

1

| | Immigration Court | Operational Status | Status of Standing Order | Date of Order's Entry | Permits Hearings Telephonically? | Permits Hearings Telephonically Without Prior Motion? | Method to Inform Court |
|---|---|---|---|---|---|---|---|
| 11. | Chicago | Open For Filings And For Detained Hearings Only | Courtwide | 3/19/20 | Yes | Yes | Call in advance and provide client's Alien number, name of judge, date of hearing, and telephone number to court |
| 12. | Cleveland | Open For Filings And For Detained Hearings Only | Courtwide | 4/1/20 | Yes | Yes | Email 24 hours in advance of the hearing and provide telephone number to the court |
| 13. | Conroe | Open For Filings And For Detained Hearings Only | Courtwide | 3/24/20 | Yes | Yes | Call in advance and provide client's Alien number, name of judge, and telephone number to court |
| 14. | Dallas | Open For Filings And For Detained Hearings Only | Judge-by-Judge | 3/24/20 (Judge Weiss) 3/25/20 (Judge Davis-Gumbs) 3/30/20 (Judge Sims) | Yes (only Judges Weiss, Davis-Gumbs, and Sims) | Yes (only Judges Weiss, Davis-Gumbs, and Sims) | |
| 15. | Denver | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |
| 16. | Detroit | Open For Filings And For Detained Hearings Only | Judge-by-Judge | 3/26/20 (Judge Jebson) | Yes (only Judge Jebson) | Yes (only Judge Jebson) | Provide telephone number to court |
| 17. | El Paso | Open For Filings And For Detained Hearings Only | Courtwide | 3/25/20 | Yes | Yes | Call 15 minutes in advance of hearing and provide telephone number to court |
| 18. | El Paso SPC | Open | No Order | n/a | | | |

|  | Immigration Court | Operational Status | Status of Standing Order | Date of Order's Entry | Permits Hearings Telephonically? | Permits Hearings Telephonically Without Prior Motion? | Method to Inform Court |
|---|---|---|---|---|---|---|---|
| 19. | Elizabeth | Open For Filings And For Detained Hearings Only | Courtwide | 3/19/20 | Yes | Yes | Call at least one business day in advance and provide telephone number to court |
| 20. | Eloy | Open | Courtwide & Judge-by-Judge | 3/18/20 4/3/20 (Judge Gaz) 4/2/20 (Judge Habich) | Yes | Yes | Provide telephone number to court |
| 21. | Falls Church IAC | Open | No Order | n/a | | | |
| 22. | Fishkill | Open | No Order | n/a | | | |
| 23. | Florence | Closed – Hearings continuing at Phoenix | Courtwide | 4/6/20 | Yes | Yes | Call Phoenix Court in advance and provide client's Alien number, name of judge, and telephone number to court |
| 24. | Fort Snelling (Bloomington) | Open For Filings And For Detained Hearings Only | Courtwide | 3/26/20 | | | Email in advance of hearing and provide Alien number, date and time of hearing, and phone number to court |
| 25. | Fort Worth IAC | Open | No Order | n/a | | | |
| 26. | Guaynabo (San Juan) | Closed | Courtwide | 3/25/20 | Yes | Yes | Call in advance and provide client's Alien number, name of judge, date of hearing, and telephone number to court |
| 27. | Harlingen | Open For Filings And For Detained Hearings Only | Courtwide | 4/1/20 | Yes | No | Provide notice to the court at by email in advance of the hearing and in accordance with instructions attached to the order |

| | Immigration Court | Operational Status | Status of Standing Order | Date of Order's Entry | Permits Hearings Telephonically? | Permits Hearings Telephonically Without Prior Motion? | Method to Inform Court |
|---|---|---|---|---|---|---|---|
| 28. | Hartford | Open For Filings And For Detained Hearings Only | Courtwide | 3/30/20 | Yes | Yes | Call in advance and provide client's Alien number, time/date of hearing, and telephone number to court |
| 29. | Honolulu | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |
| 30. | Houston | Open For Filings And For Detained Hearings Only | Courtwide | 4/1/20 | Yes | No | Make motion by calling at least one day in advance by calling court and providing client's Alien number, name of judge, date of hearing, and telephone number |
| 31. | Houston – S. Gessner Road | Open For Filings Only | No Order | n/a | | | |
| 32. | Imperial | Open For Filings And For Detained Hearings Only | Courtwide | 4/2/20 | Yes | Yes | Contact court in advance and provide telephone number |
| 33. | Kansas City | Open For Filings And For Detained Hearings Only | Courtwide | 3/24/20 | Yes | Yes | Call in advance and provide client's Alien number, time/date of hearing, and telephone number to court |
| 34. | Las Vegas | Open For Filings And For Detained Hearings Only | Courtwide | 4/2/20 | Yes | Yes | Call in advance and provide client's Alien number, name of judge, and telephone number to court |
| 35. | LaSalle | Open | Courtwide | 3/25/20 | Yes | Yes, except for individual merit hearings which must be requested by motion | Provide to court telephone number at least 2 business days prior to hearing |

| | Immigration Court | Operational Status | Status of Standing Order | Date of Order's Entry | Permits Hearings Telephonically? | Permits Hearings Telephonically Without Prior Motion? | Method to Inform Court |
|---|---|---|---|---|---|---|---|
| 36. | Los Angeles – N. Los Angeles Street | Open For Filings And For Detained Hearings Only | Courtwide | 3/25/20 | Yes | Yes | Provide telephone number to court |
| 37. | Los Angeles - Olive Street | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |
| 38. | Los Angeles - Van Nuys Boulevard | Open For Filings Only | No Order | n/a | | | |
| 39. | Louisville | Closed | No Order | n/a | | | |
| 40. | Memphis | Open For Filings Only | No Order | n/a | | | |
| 41. | Miami | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |
| 42. | Miami Krome (Detained) | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |
| 43. | New Orleans | Closed | No Order | n/a | | | |
| 44. | New York - Broadway | Open For Filings Only | No Order | n/a | | | |
| 45. | New York - Federal Plaza | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |
| 46. | New York - Varick | Open For Filings And For Detained Hearings Only | Judge-by-Judge | 3/21/20 (Judge Mart) | Yes (only Judge Mart) | Yes (only Judge Mart) | |
| 47. | Newark | Open For Filings Only | No Order | n/a | | | |
| 48. | Oakdale | Open | No Order | n/a | | | |

| | Immigration Court | Operational Status | Status of Standing Order | Date of Order's Entry | Permits Hearings Telephonically? | Permits Hearings Telephonically Without Prior Motion? | Method to Inform Court |
|---|---|---|---|---|---|---|---|
| 49. | Omaha | Open For Filings And For Detained Hearings Only | Courtwide | 3/18/20 | Yes | No | |
| 50. | Orlando | Open For Filings And For Detained Hearings Only | Courtwide | 3/25/20 | Yes | Yes | Call in advance and provide client's Alien number, name of judge, date of hearing, and telephone number to court |
| 51. | Otay Mesa | Open | Courtwide | 3/30/20 | Yes | Yes | Provide telephone number to court |
| 52. | Otero | Open | Judge-by-Judge | 3/27/20 (Judge Taylor) | Yes (only Judge Taylor) | Yes (only Judge Taylor) | Call at least 15 minutes in advance of hearing and provide landline telephone number to court |
| 53. | Pearsall | Open | Courtwide | 4/2/20 | Yes | No | Send email in advance of the hearing and provide telephone number |
| 54. | Philadelphia | Open For Filings And For Detained Hearings Only | Courtwide (master calendar hearings only) | 4/3/20 | Yes | Yes | Call in advance and provide client's Alien number, date of hearing, and telephone number |
| 55. | Phoenix | Open For Filings And For Detained Hearings Only | Courtwide | 4/3/20 | Yes | Yes | Call in advance and provide Alien number, name of judge, and telephone number |
| 56. | Port Isabel | Open | Courtwide | 4/1/20 | Yes | No | Provide notice to the court at by email in advance of the hearing and in accordance with instructions attached to the order |
| 57. | Portland | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |

| | Immigration Court | Operational Status | Status of Standing Order | Date of Order's Entry | Permits Hearings Telephonically? | Permits Hearings Telephonically Without Prior Motion? | Method to Inform Court |
|---|---|---|---|---|---|---|---|
| 58. | Sacramento | Open For Filings Only | No Order | n/a | | | |
| 59. | Saipan | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |
| 60. | Salt Lake City | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |
| 61. | San Antonio | Open For Filings And For Detained Hearings Only | Courtwide | 4/2/20 | Yes | No | Email court in advance of hearing and provide telephone number |
| 62. | San Diego | Open For Filings And For Detained Hearings Only | Courtwide | 3/30/20 | Yes | Yes | Provide telephone number to court |
| 63. | San Francisco | Open For Filings And For Detained Hearings Only | Courtwide | 4/3/20 | Yes | Yes | Email court in advance to provide telephone number, Alien number, respondent's name, and date of hearing |
| 64. | Seattle | Open For Filings And For Detained Hearings Only | No Order | n/a | | | |
| 65. | Stewart | Open | Courtwide | 3/24/20 | Yes | Yes | Call in advance and provide client's Alien number, name of judge, and telephone number to court |
| 66. | Tacoma | Open | Courtwide | 3/20/20 | Yes | Yes | Court will call attorney if none is present in the in-court video conference room; attorney should provide telephone number at least two days prior to hearing to court |

| | Immigration Court | Operational Status | Status of Standing Order | Date of Order's Entry | Permits Hearings Telephonically? | Permits Hearings Telephonically Without Prior Motion? | Method to Inform Court |
|---|---|---|---|---|---|---|---|
| 67. | Tucson | Open | Courtwide | 3/24/20 | Yes | Yes | Provide telephone number to court |
| 68. | Ulster | Open | No Order | n/a | | | |
| 69. | York | Open | Courtwide | 3/17/20 | Yes | Yes | |

* Information as of April 7, 2020, compiled from EOIR Operational Status During Coronavirus Pandemic, Department of Justice, https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic