**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-00852-CJN |
| EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*, | |
| Defendants. | |

<u>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**</u>
<u>**MOTION FOR TEMPORARY RESTRAINING ORDER**</u>

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 4

    A.   The Executive Office for Immigration Review and Its Response to COVID-19 ............ 4

    B.   U.S. Immigration and Customs Enforcement and Its Response to COVID-19. ............ 8

    C.   This Lawsuit ............................................................................................................. 12

LEGAL STANDARD ............................................................................................................ 13

ARGUMENT ........................................................................................................................ 14

    I.   This Court Does Not Have Jurisdiction to Grant Plaintiffs' TRO Motion ................... 14

        A.   The Individual Plaintiffs Lack Article III Standing. ............................................ 14

        B.   The Organizational Plaintiffs Lack Article III Standing and Are Outside of the
            INA's Zone of Interests. ...................................................................................... 16

        C.   The INA Prohibits District-Court Review of Plaintiffs' Claims Arising From
            Removal Proceedings. .......................................................................................... 20

        D.   The INA Bars This Court From Enjoining or Restraining Operation of
            Immigration-Court Proceedings or the INA Detention and Removal
            Provisions. ........................................................................................................... 26

        E.   The INA Prohibits This Court From Compelling EOIR to Conduct Remote
            Immigration Proceedings Nationwide. ................................................................. 28

    II.   Plaintiffs Are Not Entitled to a TRO. ........................................................................ 29

        A.   Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims. .................... 29

            1.   EOIR's and ICE's Actions Are Not Subject to Review Under the APA and
                In Any Event Are Not Arbitrary and Capricious. ......................................... 29

            2.   EOIR's and ICE's Policies Do Not Violate Plaintiffs' Constitutional or
                Statutory Rights to Counsel or Procedural Due Process. ............................... 36

        B.   Considerations of Harm and the Equities Weigh Strongly Against a TRO. .......... 39

        C.   Even if This Court Were to Grant a TRO, It Must Be Sharply Limited. ............... 42

CONCLUSION...................................................................................................................... 45

## TABLE OF AUTHORITIES

**Federal Cases**

*Abulhawa v. U.S. Dep't of Treasury,*
239 F. Supp. 3d 24 (D.D.C. 2017) .................................................................. 18

*Adams v. Vance,*
570 F.2d 950 (D.C. Cir. 1978) ....................................................................... 45

*Aguilar v. ICE,*
510 F.3d 1 (1st Cir. 2007) ........................................................................ 21, 23

*Alvarez v. Sessions,*
338 F. Supp. 3d 1042 (N.D. Cal. 2018) ........................................................ 23

*Am. Immigration Lawyers Ass'n v. Reno,*
199 F.3d 1352 (D.C. Cir. 2000) ............................................................... 18, 19

*American Library Ass'n v. FCC,*
401 F.3d 489 (D.C. Cir. 2005) ....................................................................... 16

*Ardestani v. INS,*
502 U.S. 129 (1991) ....................................................................................... 39

*Ark Initiative v. Tidwell,*
749 F.3d 1071 (D.C. Cir. 2014) ..................................................................... 17

*Asylum Seeker Advocacy Project v. Barr,*
409 F. Supp. 3d 221 (S.D.N.Y. 2019) ...................................................... 22, 23

*Bains v. Schiltgen,*
No. 97-cv-2573, 1998 WL 204977 (N.D. Cal. Apr. 21, 1998) ....................... 20

*Belbacha v. Bush,*
520 F.3d 452 (D.C. Cir. 2008) ................................................................. 13, 27

*Benjamin v. U.S. Attorney General,*
682 F. App'x 725 (11th Cir. 2017) ................................................................. 39

*Bennett v. Spear,*
520 U.S. 154 (1997) ................................................................................. 29, 30

*Biwot v. Gonzalez,*
403 F.3d 1094 (9th Cir. 2005) ............................................................. 4, 37, 38

*Blackie's House of Beef, Inc. v. Castillo,*
659 F.2d 1211 (D.C. Cir. 1981) ............................................................... 40, 45

*Block v. Community Nutrition Institute*,
    467 U.S. 340 (1984)...............................................................................................23

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ...............................................................................45

*Castro-O'Ryan v. U.S. Dep't of Immigration and Naturalization*,
    847 F.2d 1307 (9th Cir. 1987) .............................................................................37

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006)..............................................................................40

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)................................................................................................14

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013).......................................................................................14, 41

*Clarke v. Secs. Indus. Ass'n*,
    479 U.S. 388 (1987)..............................................................................................19

*Cobell v. Norton*,
    392 F.3d 461 (D.C. Cir. 2004)..............................................................................31

*Cohen v. United States*,
    650 F.3d 717 (D.C. Cir. 2011)..............................................................................31

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*,
    15 F. Supp. 2d 1 (D.D.C. 1997)...........................................................................14

*Cuban Am. Bar Ass'n, Inc. v. Christopher*,
    43 F.3d 1412 (11th Cir. 1995) .............................................................................18

*Cutler v. Hayes*,
    818 F.2d 879 (D.C. Cir. 1987)..............................................................................32

*Dawson v. Asher*,
    No. 20-cv-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020)...........15, 41

*DHS v. New York*,
    140 S. Ct. 599 (2020)...........................................................................................44

*Dia v. Ashcroft*,
    353 F.3d 228 (3d Cir. 2003)..................................................................................37

*DRG Funding Corp. v. HUD*,
    76 F.3d 1212 (D.C. Cir. 1996)..............................................................................30

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
    396 F.3d 1265 (D.C. Cir. 2005) ........................................................ 30

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) .......................................................... 20

*Federal Defenders of New York, Inc. v. Federal Bureau of Prisons*,
    No. 19-1778, 2020 WL 1320886 (2d Cir. 2020) ........................................ 20

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ............................................................... 42

*Gonzalez v. INS*,
    82 F.3d 903 (9th Cir. 1996) ........................................................... 37

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ................................................................. 43

*Haitian Refugee Ctr. v. Gracey*,
    809 F.2d 794 (D.C. Cir. 1987) ......................................................... 18

*Hamama v. Adducci*,
    912 F.3d 869 (6th Cir. 2018) .......................................................... 27

*Helling v. McKinney*,
    509 U.S. 25 (1993) .................................................................. 15

*Hutchins v. District of Columbia*,
    188 F.3d 531 (D.C Cir. 1999) ......................................................... 24

*Innovation Law Lab v. McAleenan*,
    924 F.3d 503 (9th Cir. 2019) .......................................................... 45

*Innovation Law Lab v. Nielsen*,
    310 F. Supp. 3d 1150 (D. Or. 2018) .................................................... 19

*INS v. Lopez-Mendoza*,
    468 U.S. 1032, 1038 (1984) ........................................................... 36

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) ................................................... *passim*

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ................................................................ 21

*Kiyemba v. Obama*,
    561 F.3d 509 (D.C. Cir. 2009) ..................................................... 13, 27

*Koller By and Through Koller v. Richardson-Merrell, Inc.*,
   737 F.2d 1038 (D.C. Cir. 1984) ...................................................... 36

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) .............................................................. 18, 19

*Kucana v. Holder*,
   558 U.S. 233 (2010) .................................................................. 28

*Landon v. Plasencia*,
   459 U.S. 21 (1982) .................................................................... 45

*Lara-Torres v. Ashcroft*,
   383 F.3d 968 (9th Cir. 2004) ............................................... 4, 37, 38

*Las Americas v. Trump*,
   No. 19-cv-2051, 2020 WL 1671584 (D. Or. Apr. 2, 2020) ..................... *passim*

*Liadov v. Mukasey*,
   518 F.3d 1003 (8th Cir. 2008) ...................................................... 34

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ................................................................... 29

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................... 43

*Maldonado-Perez v. INS*,
   865 F.2d 328 (D.C. Cir. 1989) ...................................................... 36

*Martinez v. Napolitano*,
   704 F.3d 620 (9th Cir. 2012) ........................................................ 22

*Martinez v. Nielsen*,
   341 F. Supp. 3d 400 (D.N.J. 2018) ................................................. 25

*Mendez v. Cooper*,
   No. 19-cv-01701, 2019 WL 2577477 (D. Ariz. Apr. 17, 2019) ................. 34

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ................................................................... 42

*Montes-Lopez v. Holder*,
   694 F.3d 1085 (9th Cir. 2012) ...................................................... 38

*Morgan Stanley DW Inc. v. Rothe*,
   150 F. Supp. 2d 67 (D.D.C. 2001) .................................................. 13

*Munaf v. Geren,*
    553 U.S. 674 (2008) ......................................................................................... 21

*Nat'l Conference on Ministry to Armed Forces v. James,*
    278 F. Supp. 2d 37 (D.D.C. 2003) .................................................................. 14

*Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.,*
    435 F.3d 326 (D.C. Cir. 2006) ........................................................................ 45

*Ngure v. Ashcroft,*
    367 F.3d 975 (8th Cir. 2004) ........................................................................... 32

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................................... 40

*Norton v. Southern Utah Wilderness Alliance,*
    542 U.S. 55 (2004) ...................................................................................... 3, 31

*O.A. v. Trump,*
    404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................... 25

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ......................................................................................... 14

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ......................................................................................... 16

*P.L. v. ICE,*
    No. 19-cv-1336, 2019 WL 2568648 (S.D.N.Y. June 21, 2019) ................. 22, 23

*Perez v. Sessions,*
    690 F. App'x 360 (6th Cir. 2017) ................................................................... 39

*Pub. Citizen v. Nat'l Highway Traffic Safety Admin.,*
    374 F.3d 1251 (D.C. Cir. 2004) ...................................................................... 32

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012) ......................................................................................... 27

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ......................................................................................... 24

*Saavedra Bruno v. Albright,*
    197 F.3d 1153 (D.C. Cir. 1999) ...................................................................... 20

*Scenic America, Inc. v. DOT,*
    836 F.3d 42 (D.C. Cir. 2016) .......................................................................... 16

*Sessions v. Morales-Santana*,
  137 S. Ct. 1678 (2017) ............................................................................. 18

*Sibley v. Obama*,
  810 F. Supp. 2d 309 (D.D.C. 2011) ........................................................ 13

*Skorusa v. Gonzales*,
  482 F.3d 939 (7th Cir. 2007) ................................................................... 37

*Sophia v. Decker*,
  No. 19-cv-9599, 2020 WL 764279 (S.D.N.Y. Feb. 14, 2020) ................. 22

*Spencer Enters., Inc. v. United States*,
  345 F.3d 683 (2003) .................................................................................. 29

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .................................................................................. 42

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) .............................................................................. 43

*Trump v. IRAP*,
  137 S. Ct. 2080 (2017) .............................................................................. 44

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*,
  106 F. Supp. 3d 126 (D.D.C. 2015) ........................................................ 44

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) .................................................................................. 32

*United States v. Martinez-Fuerte*,
  428 U.S. 543 (1976) .................................................................................. 40

*United States v. Salerno*,
  481 U.S. 739 (1987) .................................................................................. 34

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981) .................................................................................. 44

*Vazquez Perez v. Decker*,
  No. 18-cv-10683, 2019 WL 4784950 (S.D.N.Y. Sept. 30, 2019) ........... 27

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
  435 U.S. 519 (1978) ............................................................................. 4, 32

*Vetcher v. Sessions*,
  316 F. Supp. 3d 70 (D.D.C. 2018) ................................................... 3, 22, 25

*Virginia Soc'y for Human Life v. FEC*,
    263 F.3d 379 (4th Cir. 2001) ........................................................................... 43

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ............................................................... 13, 29, 40, 42

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (1985) ......................................................................................... 42

*Youngberg v. Romeo*,
    457 U.S. 307 (1982) ......................................................................................... 40

*Zhu v. Gonzales*,
    411 F.3d 292 (D.C. Cir. 2005) ....................................................................... 28

## <u>Federal Statutes</u>

5 U.S.C. § 555(b) ................................................................................................... 39

5 U.S.C. § 702 ............................................................................................... 19, 29

5 U.S.C. § 704 ............................................................................................... 29, 30

5 U.S.C. § 706(1) ................................................................................................... 31

5 U.S.C. § 706(2) ................................................................................................... 43

8 U.S.C. § 1103(g) ................................................................................................... 5

8 U.S.C. § 1225(b)(1)(B)(ii) ................................................................................... 9

8 U.S.C. § 1225(b)(2)(A) ........................................................................................ 9

8 U.S.C. § 1226(a) ................................................................................................... 5

8 U.S.C. § 1226(c) ............................................................................................... 5, 9

8 U.S.C. § 1229a(a)(1) ............................................................................................ 5

8 U.S.C. § 1229a(b)(2)(A) ................................................................................. 3, 28

8 U.S.C. § 1231(a)(2) ............................................................................................... 9

8 U.S.C. § 1231(g)(1) ............................................................................................... 9

8 U.S.C. § 1252(a)(2)(B)(ii) ............................................................................... 3, 28

8 U.S.C. § 1252(a)(5) ................................................................................... *passim*

8 U.S.C. § 1252(b)(9) .................................................................................................. *passim*

8 U.S.C. § 1252(f)(1) ............................................................................................ 3, 26, 27

8 U.S.C. § 1252(g) .................................................................................................. 24, 26

8 U.S.C. § 1329 ............................................................................................................. 20

8 U.S.C. § 1362 .................................................................................................. 22, 36, 39

28 U.S.C. § 1331 ........................................................................................................... 24

28 U.S.C. § 1651(a) ............................................................................................. 13, 25, 27

## **Federal Regulations**

8 C.F.R. § 1003.10(b) ................................................................................................. 5, 6

8 C.F.R. § 1003.12 ......................................................................................................... 5

8 C.F.R. § 1003.18 ..................................................................................................... 5, 8

8 C.F.R. § 1003.19 ......................................................................................................... 5

8 C.F.R. § 1003.25 ......................................................................................................... 5

8 C.F.R. § 1003.27 ......................................................................................................... 5

8 C.F.R. § 1003.29 ..................................................................................................... 5, 8

8 C.F.R. § 1003.31 ..................................................................................................... 5, 8

8 C.F.R. § 1003.38 ......................................................................................................... 5

8 C.F.R. § 1003.40 ......................................................................................................... 5

## **Other Authorities**

Administrative Office of the U.S. Courts, *Judiciary Preparedness for Coronavirus (COVID-19)*,
     https://www.uscourts.gov/news/2020/03/12/judiciary-preparedness-coronavirus-covid-19
     ....................................................................................................................... 34

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev.
     417 (2017) ............................................................................................................ 43

The Federalist No. 78 (Alexander Hamilton) (Clinton Rossiter ed., 1961) .................................. 43

## **INTRODUCTION**

This Court should deny Plaintiffs' extraordinary request for this Court to broadly suspend in-person immigration-court hearings, assume oversight over the immigration-detention system, and order the release of tens of thousands of aliens despite the laws enacted by Congress. The federal government is responding expeditiously, carefully, and thoroughly to address the challenges presented by COVID-19. That comprehensive response includes tailored and effective measures taken by the Executive Office for Immigration Review (EOIR) over the immigration courts and by U.S. Immigration and Customs Enforcement (ICE) over immigration detention facilities.

The United States' immigration courts, which adjudicate removability and claims for relief from removal of hundreds of thousands of aliens, have faced the same considerable challenges as other court systems have from the COVID-19 pandemic. The immigration courts have responded swiftly to those challenges by postponing all immigration hearings for non-detained aliens through May 1, 2020; limiting in-person appearances in courts where possible; and, reminding immigration judges—who are independent administrative judges—of their authority to waive appearances, grant continuances, decide cases on the papers, and conduct hearings by video or telephone where possible to limit the risk of exposure. *See* Ex. 1, Decl. of EOIR Director James McHenry ¶¶ 44–54, 68–70; Ex. 2, EOIR Policy Mem. 20-10, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak (EOIR Mem.). Similarly, ICE "is taking necessary and prompt measures" to curb the spread of COVID-19 while still permitting robust access to counsel and ensuring the safety of staff, detainees, and legal representatives. Ex. 3, E COVID-19 Pandemic Response Requirements (ICE Pandemic Response) 1; Ex. 4, Decl. of Russell Hott, Acting Asst. Director of ICE's Custody Management Division ¶¶ 19–30. Such steps potentially include "[a]dding all immigration attorneys of record to the Talton Pro-bono platform,"

"[l]everaging technology (e.g., tablets, smartphones) to facilitate attorney/client communication" and "[w]orking with the various detention contractors and telephone service providers to ensure that all detainees receive some number of free calls per week." ICE Pandemic Response 12–13.

Against these efforts, Plaintiffs—three organizations and five detained aliens—move for an extraordinary order that would shut down all remaining immigration-court operations *everywhere* and require the release of tens of thousands of criminal and other aliens unless ICE immediately implements Plaintiffs' preferred policies. Their TRO Motion centers on the first three claims in their Complaint alleging that EOIR's and ICE's COVID-19 responses are arbitrary and capricious under the Administrative Procedure Act (APA), violate the Individual Plaintiffs' statutory right to counsel under the Immigration and Nationality Act (INA), and violate the Individual Plaintiffs' right to procedural due process. *See* Mot. for Temporary Restraining Order (Mot.; ECF No. 7); Compl. ¶¶ 66–82. And although they ask for universal relief applicable to all immigration courts and all immigration detention facilities (including, apparently, those operated by state and local authorities), Plaintiffs do not purport to represent a class or raise class claims.

Like the only other court to address similar claims seeking universal relief, *see Las Americas v. Trump*, No. 19-cv-2051, 2020 WL 1671584, at *2 (D. Or. Apr. 2, 2020), this Court should reject this request.

To start, this Court does not have jurisdiction to grant Plaintiffs' TRO Motion. *First*, the Individual Plaintiffs lack Article III standing to bring their APA claim and their access-to-counsel and procedural-due-process claims because their requests rest on speculation. Plaintiffs are either unrepresented or have not explained why remote communication is insufficient, and none of them have imminent immigration-court hearings that cannot be conducted by remote means. *Second*, the Organizational Plaintiffs fail to establish standing because they do not identify a specific

"legally protected interest" of the organizations or their members that has been impinged upon and do not establish that the relief they seek is likely to redress their alleged injuries. They also cannot state an APA claim because their interests are not within the INA's zone of interests. *Third*, this Court lacks jurisdiction over all claims because the INA requires "all questions of law and fact ... arising from any action taken or proceeding brought to remove an alien from the United States" to be reviewed exclusively in federal courts of appeals—not district courts—after exhausting administrative proceedings, 8 U.S.C. §§ 1252(b)(9), 1252(a)(5), including Plaintiffs' "policies-and-practices challenges," right-to-counsel claims, and procedural-due-process challenges, *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029, 1033, 1035 (9th Cir. 2016); *Vetcher v. Sessions*, 316 F. Supp. 3d 70, 76 (D.D.C. 2018). *Fourth*, Congress has prohibited this Court from granting Plaintiffs' requested injunctive relief against the operation of statutes governing removal proceedings and alien detention. *See* 8 U.S.C. § 1252(f)(1) ("Limit on Injunctive Relief"). *Finally*, the INA prohibits this Court from requiring EOIR to conduct immigration proceedings exclusively by remote means—which, in any event, EOIR has already "remind[ed]" its immigration judges that they may do. EOIR Mem. 2. The use of video- or teleconferencing in immigration proceedings is committed by statute to the government's discretion, *see* 8 U.S.C. § 1229a(b)(2)(A), and the INA prohibits district-court review of the government's discretionary determinations, *id.* § 1252(a)(2)(B)(ii).

Even if this Court possesses jurisdiction, it should still deny a TRO because all injunctive factors favor the government. *First*, Plaintiffs cannot succeed on the merits of their APA claim or their right-to-counsel and procedural-due-process claims. The APA may not be invoked to demand "day-to-day agency management," *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004), which is committed to agency authority and is entitled to deference, *see Vermont Yankee*

*Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543 (1978), particularly in the immigration context. EOIR and ICE are exercising that authority soundly, and Plaintiffs provide no basis to hamstring these agencies' abilities to respond to the evolving health crisis. Plaintiffs also fail to explain how EOIR's decision not to suspend certain essential in-person immigration hearings nationwide or ICE's disease-prevention or attorney-access protocols are "tantamount to denial of counsel." *Biwot v. Gonzalez*, 403 F.3d 1094, 1098 (9th Cir. 2005). Nor could they, since such claims require a backward-looking inquiry into "the actual substance of the hearing[s]," *Lara-Torres v. Ashcroft*, 383 F.3d 968, 973 (9th Cir. 2004)—which, here, have not occurred—to determine whether there was a prejudicial violation. *Second*, Plaintiffs' speculative claims of future injury do not outweigh the public interest in retaining EOIR's and ICE's flexibility to respond to changing circumstances. And even if emergency relief were appropriate, the scope of Plaintiffs' requested relief is overbroad and risks harm to individuals who Plaintiffs purport to help. At a minimum the Court must limit any relief to the Individual Plaintiffs named in the complaint and any actual clients of the Organizational Plaintiffs' members whom they can identify as having imminent immigration-court hearings.

## BACKGROUND

**A.      The Executive Office for Immigration Review and Its Response to COVID-19.**

Immigration-Court System. EOIR is a component of the U.S. Department of Justice (DOJ) that oversees a system of 69 immigration courts located across the country. McHenry Decl. ¶ 9. Generally, when the U.S. Department of Homeland Security (DHS) seeks to remove an alien from the United States, DHS issues a "notice to appear" that explains the "charges against the alien and the statutory provisions alleged to have been violated." 8 U.S.C. § 1229. The INA sets out a range of grounds that can make an alien removable from the United States. *See id.* §§ 1182, 1227. Under 8 U.S.C. § 1229a, immigration judges decide whether aliens are removable and resolve claims

from individual aliens seeking relief from removal. *Id.* § 1229a(a)(1). Congress has mandated that certain categories of aliens must be detained during removal proceedings. *See, e.g.*, *id.* § 1226(c). For other categories of aliens, immigration judges may conduct bond hearings and grant release on bond in certain circumstances. *See id.* § 1226(a); *see also* McHenry Decl. ¶¶ 8–43 (describing proceedings in immigration court). Aliens may appeal from the immigration judges' decisions, including decisions on custody and bond, to the Board of Immigration Appeals (BIA). 8 C.F.R. § 1003.38. An alien may seek judicial review of a BIA decision by filing a petition for review in the court of appeals for the circuit where the immigration court that heard the claim is located. 8 U.S.C. §§ 1252(a)(5), (b)(9).

The Attorney General oversees EOIR, and he has authority to establish regulations governing the operation of the immigration courts and to carry out the provisions of the INA. *See* 8 U.S.C. § 1103(g). "[T]o assist in the expeditious, fair, and proper resolution of matters" before the immigration courts, 8 C.F.R. § 1003.12, there are various regulations that govern the conduct of removal proceedings, including regulations giving immigration judges authority over "scheduling cases," *id.* § 1003.18; and to make custody determinations, *id.* § 1003.19; grant continuances "for good cause shown," *id.* § 1003.29; waive the "presence of the parties" in certain circumstances or permit telephonic or video hearings, *id.* § 1003.25; limit public access to hearings, *id.* § 1003.27; "set and extend time limits" for filings, *id.* § 1003.31; and "establish local operating procedures," *id.* § 1003.40. Immigration judges "exercise the powers and duties delegated to them by the [INA] and by the Attorney General through regulation," and "[i]n deciding the individual cases before them," "exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases." *Id.* § 1003.10(b). "In all cases,

immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations." *Id*.

<u>Immigration-Court Response to the Pandemic.</u> In response to the outbreak of COVID-19, EOIR "has followed a path similar to that of other courts" that have "grappled with the operational challenges posed by the outbreak," and have not closed entirely but have scaled back operations to "what may be characterized as essential or critical services," including processing filings by mail and email, adjudicating motions or filings that can be resolved without a hearing, "conduct[ing] critical hearings of individuals in custody," and issuing announcements on operational status as facts develop. McHenry Decl. ¶¶ 44–45.

On March 18, 2020, EOIR "postponed all removal hearings of non-detained aliens through at least April 10, 2020," and later postponed hearings for non-detained aliens through May 1. McHenry Decl. ¶¶ 53, 68. On March 18, the Director of EOIR also issued a Policy Memorandum modeled on orders issued by federal district courts adopting guidance for "all immigration court cases effective immediately" to "promote the safety of immigration court personnel, representatives, aliens, attorneys for [DHS], and the general public during the ongoing national emergency related to the COVID-19 outbreak." *Id.* ¶¶ 47–49; EOIR Mem. 1–4.

Among other things, EOIR restricted access to immigration courts for individuals at risk of having COVID-19. EOIR Mem. 2; McHenry Decl. ¶¶ 47–48. EOIR also reminded immigration judges of their authority to take a range of actions "for preventative purposes to minimize contact among individuals involved in immigration proceedings," and advised that immigration judges "may consider applicable public health guidance in exercising these authorities." EOIR Mem. 2; *see also* McHenry Decl. ¶¶ 47–49. To this end, the Director advised immigration judges that they "may waive the presence of represented aliens"; "grant a motion for a continuance upon a showing

of good cause"; "place reasonable limitations upon the number in attendance at a hearing" or "hold a closed hearing"; "issue standing orders, including orders regarding telephonic appearances by representatives"; waive various requirements that would normally apply to the proceedings; conduct "hearing by video teleconferencing (VTC) where operationally feasible" or by telephone in certain circumstances; and, "encourage[d] immigration judges to resolve as many cases as practicable without the need for a hearing and, thus, to minimize contact among individuals involved in immigration proceedings." EOIR Mem. 2–3; *see also* McHenry Decl. ¶¶ 47–49.

The Director also noted that while "the ultimate disposition of any particular case remains committed to the immigration judge in accordance with the law," he "encouraged [parties] to resolve cases through written pleadings, stipulations, and joint motions" where possible, noted holding certain categories of hearings was "disfavored," and provided that hearings that must go forward, such as for detained aliens, should be conducted by remote means "to the maximum extent practicable in accordance with the law." EOIR Mem. 3–4; McHenry Decl. ¶¶ 47–49. EOIR thus committed to "using alternative hearing mediums" as much as possible to "further minimize in-person interaction and reduce the risk of spread of COVID-19." EOIR Mem. 3.

Although the immigration courts have significantly scaled back operations, they continue to carry out essential functions such as holding bond hearings for detained aliens or other hearings that may lead to an alien's release. McHenry Decl. ¶¶ 31–36. The outbreak has generated demand for EOIR to hold more or more-immediate hearings, including litigation and threatened litigation in other district courts requesting that immigration courts expedite certain types of hearings. *See id.* ¶¶ 34, 67. For hearings that must proceed, EOIR has developed court-specific plans to ensure that the hearings can take place through remote means and are consistent with social-distancing practices even when individuals are in the same location, such as where immigration courts are

located in detention facilities. Ex. 5, Decl. of Acting Chief Immigration Judge Christopher Santoro ¶¶ 6–11. Immigration courts must also remain open to accept certain urgent filings, including motions to reopen or stay removal, and EOIR has now provided means for aliens to file such motions electronically in every immigration court and the BIA. *Id.* ¶¶ 61, 71, 93. Closing courts to such motions would leave aliens without the ability to seek urgent relief from removal. *Id.* ¶ 61. Various statutes and court orders require immigration judges to take certain actions within strict timelines, and closing the immigration courts completely may violate those orders. *Id.* ¶ 67.

Immigration judges have authority to extend deadlines if necessary and to excuse untimely filings caused by the outbreak where appropriate, as courts have done with other emergencies. McHenry Decl. ¶¶ 21–26; *see also* 8 C.F.R. §§ 1003.18, 1003.29, 1003.31. Immigration judges also have authority to issue standing orders and adopt local operating procedures, and many courts "have done so over the past three weeks in response to the COVID-19 and have tailored them to the particular circumstances of their respective dockets." McHenry Decl. ¶ 40. For aliens who receive *in absentia* orders, immigration judges can reopen the proceedings for aliens who show that they did not attend the hearing because they did not receive proper notice or for other exceptional circumstances. *Id.* ¶ 18.

Finally, EOIR has set up systems and methods for communicating updates and changes to immigration-court operations as they develop, including through posting updates on EOIR's website. McHenry Decl. ¶¶ 73–78. EOIR has also worked to correct any earlier inconsistent communications and has developed additional procedures for ensuring clear, consistent, and easily accessible communications going forward. *Id.* ¶¶ 59–60.

**B.     U.S. Immigration and Customs Enforcement and Its Response to COVID-19.**

ICE is a DHS agency charged with protecting the United States from cross-border crime and illegal immigration that threatens national security and public safety. Hott Decl. ¶ 5. ICE's

Enforcement and Removal Operations' (ERO) mission is "to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of our immigration laws and our border control efforts." *Id.* ¶ 6. Congress mandated that certain aliens must be detained during removal proceedings or pending their removal, *see, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(c), 1231(a)(2), and ICE retains discretion to "arrange for appropriate places of detention" during removal proceedings or prior to removal, *id.* § 1231(g)(1). ICE houses these aliens in ICE Health Service Corps (IHSC)-staffed facilities; non-IHSC-staffed, ICE-dedicated facilities; or contract facilities while they await adjudication of their case or removal. *See* Hott Decl. ¶¶ 6, 11–13.

ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention-and-control protocols, and issuing guidance to staff for the screening and management of potential exposure among detainees. *See* Hott Decl. ¶ 20. ICE directed its field leadership to review their detainees' cases and consider release for those who are vulnerable to COVID-19. Ex. 6, Assistant Director Peter Berg., Field Operations, "Updated Guidance: COVID-19 Detained Docket Review" 1–2 (ICE Docket Guidance). Such detainees include those who are over 60, pregnant or who have recently given birth, and those with a chronic illness that makes them immune-compromised. *Id.* The presence of any of these factors is a "significant discretionary factor weighing in favor of release" for those who are eligible. *Id.*

To safeguard those in its custody, ICE has implemented multiple measures that are in compliance with CDC guidance. *See* ICE Pandemic Response 5. These CDC-compliant measures include robust screening of detainees for COVID-19 symptoms or potential exposure and follow-on monitoring, treatment, and cohorting for those detainees who display symptoms or test positive,

and other measures to limit exposure to COVID-19 from individuals entering these facilities. *See* ICE Pandemic Response 5–16; Hott Decl. ¶¶ 19–23.

ICE remains committed to ensuring that detainees are able to communicate with legal representatives and has issued guidance to the facilities to that effect. Hott Decl. ¶¶ 24–27. Individual facilities have implemented ICE guidance in various ways to correspond to each individual facility's options for providing robust access to attorney-client communication by various means. For example, the La Palma Correctional Center in Eloy, Arizona, where Plaintiffs Napoles Vaillant, Rodriguez Cedeno, and Guerrero-Cornejo are detained, Compl. ¶¶ 14, 15, 17, allows in-person and telephonic attorney conferences. *See* Ex. 7, Decl. of Jason Ciliberti ¶¶ 25–33. In-person visits are permitted on Monday through Friday from 8:00 AM to 5:00 PM, and on weekends from 8:00 AM to 12:00 PM, and can be scheduled based on an attorney's request. *Id.* ¶ 25. Any visitors—including attorneys, consular officers, and legally mandated Congressional visitors—must wear personal protective equipment (PPE) and be screened for COVID-19 exposure prior to entering. *Id.* ¶ 19. Attorneys can also request that their clients call them by sending an email to a dedicated inbox, which will be delivered to the detainee by facility staff. *Id.* ¶ 27.a. Phones are available throughout the facility, and attorney call are not recorded. *Id.* ¶¶ 28.a, 29.a, 31. For example, on April 6, 2020, Plaintiff Guerrero-Cornejo was given a message to call his attorney that provided the phone number he should call. *Id.* ¶ 30. Since January 3, 2020, Plaintiff Rodriguez Cedeno has had 19 official attorney visits, with the four most recent occurring between March 4 and March 12, 2020. *Id.* Since January 3, 2020, Plaintiff Enrique Napoles Vaillant has had 18 official attorney visits, with the four most recent occurring in the first two weeks of March. *Id.*

The Eloy Detention Center in Eloy, Arizona, where Plaintiff Arliaga-Cobas is detained,

Compl. ¶ 16, allows in-person and telephonic attorney conferences. *See* Ciliberti Decl. ¶¶ 25–33. In-person visits are permitted daily from 8:00 AM to 5:00 PM, or outside those hours if requested. *Id.* ¶ 25. Any permitted visitors must wear PPE and be screened for COVID-19 exposure prior to entering the facility. *Id.* ¶ 19. Attorneys can also request that their clients call them by sending a message to a dedicated inbox, which will be delivered to the detainee by facility staff. *Id.* ¶ 27.b. Phones are available throughout the facility, including in private booths. *See id.* ¶¶ 28.b, 29.b. Calls with attorneys are not recorded. *Id.* ¶ 31.

The Pine Prairie ICE Processing Center in Pine Prairie, Louisiana, where Plaintiff Velasquez Quiala is detained, Compl. ¶ 18, allows in-person, telephone, and VTC attorney-client conferences. Ex. 8, Decl. of Alcide R. Benoit ¶¶ 27–38. Attorneys can schedule phone or VTC conferences with their clients by emailing a request to a dedicated inbox the preceding day, along with the date and time of the requested conference, some basic information about the detainee and the attorney, and a Skype address and phone number. *Id.* ¶ 28. In-person visits are scheduled similarly. *Id.* ¶ 31. Detainees may request to call their attorneys through their case manager, who contacts the attorney and schedules a call. *Id.* ¶ 30. Attorneys who visit the facility in-person must wear PPE and be screened for COVID-19 exposure prior to entering the facility. *Id.* ¶ 33–34. Attorney visits occur in the open-space visitation area, where attorneys and their clients are seated six feet apart with a table in between. *Id.* ¶ 36. Plaintiff Velasquez Quiala had a VTC conference with his attorney on March 6, 2020. *Id.* ¶ 42.

Other facilities discussed in Plaintiffs' motion papers also have facilitated attorney access. The Otay Mesa Detention Center in California allows attorneys and detainees to meet via 26 VTC units in the facility's lobby or by telephone. Ex. 9, Decl. of Kelley Beckhelm ¶¶ 24–25. Attorneys may meet their clients at the Stewart Detention Center in Georgia in person with a secure divider

in between, or communicate confidentially by telephone or VTC. Ex. 10, Decl. of John Bretz ¶ 18. The Elizabeth Contract Detention Facility in Newark, New Jersey, can accommodate nine one-hour telephonic legal visits in three private rooms per day, for a total of 27 timeslots for its detainees. Ex. 11, Decl. of Jose Simao ¶ 11. The Butler County Jail in Hamilton, Ohio, allows attorneys with PPE to visit clients in person and provides detainees with surgical masks, or allows to meet with clients through closed circuit audio/video equipment from the lobby. Ex. 12, Decl. of Christopher L. LaBier ¶ 22. And the Folkston ICE Processing Center gives detainees access to telephones, mail, and Skype-enabled devices. Ex. 13, Decl. of Brian Allen ¶ 17.

C.     **This Lawsuit**

Plaintiffs are three organizations that assist immigration attorneys (the Organizational Plaintiffs) and five individuals housed at three immigration detention facilities in Arizona and Louisiana (the Individual Plaintiffs). Compl. ¶¶ 10–18. They filed this lawsuit on March 30, 2020, alleging that EOIR has failed to enact nationwide policies to address COVID-19 in immigration courts and that ICE has failed to enact nationwide policies with respect to attorney-client visitation and participation in court proceedings while in detention facilities, and that EOIR's and ICE's existing policies (which differ by locality) violate certain statutory and constitutional provisions. Compl. ¶¶ 36–65, 70, 77, 81, 91–93, 100, 109. Plaintiffs do not assert any class claims, but they ask the Court to suspend in-person immigration hearings nationwide and order EOIR and ICE to promulgate a variety of nationwide procedures or, in the alternative, to temporarily release tens of thousands of detained aliens. *Id.* at 27–28. The Individual Plaintiffs assert claims under the INA, the Administrative Procedure Act (APA), the First Amendment, and the Fifth Amendment's Due Process Clause. *Id.* ¶¶ 66–82, 86–93, 101–09. The Organizational Plaintiffs assert claims under the APA, the First Amendment, and the Due Process Clause. *Id.* ¶¶ 66–72, 83–85, 94–100.

On April 8, 2020, Plaintiffs moved for a TRO on only their APA claim (raised by all

Plaintiffs) and their right-to-counsel and procedural-due-process claims (raised only by the Individual Plaintiffs). Mot. 30 n. 58; *see* Compl. ¶¶ 73–77. They seek an order requiring EOIR to "[s]uspend all in-person non-bond hearings and immediately convert all in-person bond hearings to remote hearings; [p]romulgate policies and procedures that, at a minimum, permit remote court appearances by all necessary participants (*e.g.*, court personnel, detained persons, counsel, interpreters, transcription); and [p]ermit continuances as of right due to COVID-19," Mot. 2–3, and requiring ICE to "[p]romulgate policies and procedures enabling remote interconnection by and with all necessary participants in court appearances; [f]acilitate communications between detained persons and immigration courts to enable the submission of requests for rescheduling and for continuance; and [d]evelop policies, procedures, and facilities that will enable those who are detained to obtain, and counsel to provide legal advice remotely and without monitoring, and with adequate protection of human health," Mot. 3; *see also* Proposed Order 1–6 (ECF No. 7-37).

## LEGAL STANDARD

"A temporary restraining order is an extraordinary remedy, one that should be granted only when the moving party, by a clear showing, carries the burden of persuasion." *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011). "The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction." *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001). The movant must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The All Writs Act, 28 U.S.C. § 1651(a), does not absolve a party seeking a TRO from satisfying the four-factor test for preliminary relief. *See Belbacha v. Bush*, 520 F.3d 452, 457 (D.C. Cir. 2008); *Kiyemba v. Obama*, 561 F.3d 509, 513 n.3 (D.C. Cir. 2009).

When the movant seeks mandatory, rather than prohibitory, injunctive relief, the movant "must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (quotation makes and citation omitted), *aff'd*, 159 F.3d 636 (D.C. Cir 1998). A mandatory preliminary injunction "should not issue ... unless the facts and the law clearly favor the moving party." *Nat'l Conference on Ministry to Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (internal quotations omitted).

## ARGUMENT

### I.     This Court Does Not Have Jurisdiction to Grant Plaintiffs' TRO Motion.

#### A.     The Individual Plaintiffs Lack Article III Standing.

The Individual Plaintiffs lack Article III standing to bring their APA claim (Claim I) or access-to-counsel claims (Claims II & III) because they do not "satisfy the threshold requirement" of "alleg[ing] an actual case or controversy." *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974). Where, as here, the relief sought is prospective relief only, a plaintiff must demonstrate a risk of future injury that is both "real" and "immediate" and neither "conjectural" nor "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). A plaintiff seeking forward-looking relief bears the burden of proving the existence of a future "threatened injury [that is] certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Plaintiffs' requests for relief fall short because they rest on speculation related to immigration-court hearings and access to counsel, and the speculative effect of EOIR's and ICE's policies on those events, but Plaintiffs are either unrepresented or have not explained why telephonic communication is insufficient, and none of them have imminent immigration-court hearings that cannot be conducted by remote means.

Plaintiffs' speculative allegations of harm do not raise any concrete injury sufficient to

establish standing or obtain injunctive relief. Only two Plaintiffs have submitted declarations in support of the TRO motion, and neither identifies any impending or concrete injury. *See* Pls.' Ex. 5, Rodriguez Cedeno Decl. (ECF No. 7-6); Pls.' Ex. 21, Napoles Vaillant Decl. (ECF No. 7-22). Neither of them is represented by counsel or has an imminent hearing in immigration court—Napoles Vaillant's hearing is not until June 22, and is set to be done "by video," Vaillant Decl. ¶ 6; Rodriguez Cedeno alleges he had a hearing set for April 2, Cedeno Decl. ¶ 6, but it has been continued until August 5, 2020, Ex. 14, Decl. of Elizabeth Burgus ¶ 3.[1] As to the three remaining Individual Plaintiffs: Aliaga-Cobas does not have counsel and does not have a hearing until June, Compl. ¶ 16; Guerrero-Cornejo has counsel but has not given any reason why telephone access at the La Palma facility is insufficient, *id.* ¶ 17, and Velasquez Quiala has counsel but does not allege that telephone access at the Pine Prairie facility is somehow inadequate, *id.* ¶ 18. *See also* Ciliberti Decl. ¶ 28.a. ("[D]etainees [at La Palma] can schedule a free call with a legal representative from the telephone in [the] visitation [area]. ...  There is no limitation placed on the length of the call."); Benoit Decl. ¶¶ 27–32 (attorneys visits at Pine Prairie can occur in person, by telephone, or Skype).

Claims based on potential exposure to diseases are generally limited to cases where the disease has been shown to exist in a particular facility and is "sure or very likely" to spread and cause injury, *see Helling v. McKinney*, 509 U.S. 25, 32 (1993), as opposed to Plaintiffs' speculation about hypothetical future exposure to a virus that has not been shown to be spreading in the facilities at issue, *see Dawson v. Asher*, No. 20-cv-0409, 2020 WL 1304557, at *2 (W.D. Wash. Mar. 19, 2020) (denying TRO because "there is no evidence that anyone at [the ICE facility] has COVID-19, and Plaintiffs do not address the measures Defendants are taking to prevent such

---

[1] Plaintiffs also submitted a declaration from one other alien, but he is not a Plaintiff and his allegations about an April 2 hearing are out-of-date, *see* Pls.' Ex. 18, Estrada Fernandez Decl. ¶ 7 (ECF No. 7-19), as that hearing was postponed, Ex. 15, Decl. of Elizabeth Burgus ¶ 3.

a spread from occurring"). Given the extensive measures Defendants have taken in response to the outbreak to limit exposure and expand options for attorney-client communications and immigration-court hearings and filings by remote means, Plaintiffs cannot show a standing-conferring injury here. Ciliberti Decl. ¶ 28.a; Benoit Decl. ¶¶ 27–32; McHenry Decl. ¶¶ 44–72. Moreover, even if Plaintiffs could otherwise satisfy Article III, their claims are not ripe because there is no actual, imminent controversy or any indication that Defendants' actions will be insufficient to stem the spread of COVID-19 while still allowing for sufficient access to counsel and the courts. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–34 (1998) (holding challenge to agency plan not ripe for review "until a site-specific action occurs" that makes the harm "more imminent and more certain").

### B.    The Organizational Plaintiffs Lack Article III Standing and Are Outside of the INA's Zone of Interests.

The Organizational Plaintiffs appear to assert (as best as Defendants can discern) two standing theories tied to their APA claim: associational standing and third-party standing. *See, e.g.*, Compl. ¶ 5, Mot. 7, 12, 33 n.62. Plaintiffs thus "forfeit [any] claim that [the Court] possess jurisdiction" on other grounds. *Scenic America, Inc. v. DOT*, 836 F.3d 42, 53 (D.C. Cir. 2016). To establish associational standing, the Organizational Plaintiffs must show through competent evidence that: "(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *American Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005).

Plaintiffs fail this test because they have not identified a single member of their organizations who themselves has Article III standing. As with the Individual Plaintiffs, this turns on whether the members can demonstrate injury, causation, and redressability. *See Ark Initiative*

*v. Tidwell*, 749 F.3d 1071, 1075 (D.C. Cir. 2014). Plaintiffs' APA claim does not identify a "legally protected interest" that has been impinged upon. Rather, Plaintiffs contend that EOIR's and ICE's policies have violated some vague combination of "statutory, regulatory, and constitutional rights." Compl. ¶ 70. In support, the Organizational Plaintiffs submit several declarations from member attorneys who generally allege that in-person hearings may be detrimental to their health, while remote hearings and consultation are insufficient to allow them to adequately represent their clients. Mot. 1–2. But the member attorneys do not establish any "concrete and particularized" injury stemming from Defendants' responses to the pandemic. For example, one attorney says that she attended an immigration hearing in New York on March 11, and she tested positive for COVID-19 on April 2, speculating that she "might have been exposed" while at the immigration court. Pls.' Ex. 1, Arce Decl. at 1. It is unclear why she places full blame on the immigration court for her positive diagnosis: She does not say it is the only place she visited outside her home during those three weeks, and she admits that she "*felt* compelled"—not that she *was* compelled—to appear at the court in person. *Id.* (emphasis added); *see also* Pls.' Ex. 3, Church Decl. ¶ 9 (attorney chose to attend hearings in person, rather than utilize telephonic option, on March 30). Another immigration attorney protests the challenges of communicating telephonically with a detained client. Pls.' Ex. 2, Erlich Decl. ¶ 1 ("Even several one-hour telephone meetings are far inferior to the face-to-face meetings, not limited in time, that were available in the EDC before the pandemic."). But attorneys do not have some general right to represent clients in a particular way, especially during a public health crisis. That the attorneys may have to expend some effort to communicate with detained clients within the bounds of Defendants' responses to the public health crisis is insufficient to establish Article III standing.

　　　Plaintiffs also do not establish that the relief they seek is likely to redress these alleged

injuries. They ask for EOIR and ICE to implement "uniform policies" in response to the COVID-19 pandemic. Mot. 28. But whatever uniform policies might be adopted, Plaintiffs have not shown that they would better prevent the member attorneys from contracting the virus or that they would allow member attorneys unfettered access to their clients at any time and manner of their choosing. Plaintiffs' speculative assertions about Defendants' responses are insufficient to establish Article III standing. *See Abulhawa v. U.S. Dep't of Treasury*, 239 F. Supp. 3d 24, 36 (D.D.C. 2017).

Plaintiffs also fail to demonstrate third-party standing. To the extent that the Organizational Plaintiffs rely on alleged harms to detained aliens to justify their own standing, "a party must assert his own legal rights and cannot rest his claim to relief on the legal rights of third parties." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017). The Organizational Plaintiffs cannot assert third-party standing based on any purported right that detained aliens have to access counsel or to challenge the impact of EOIR or ICE policies on aliens. *See Am. Immigration Lawyers Ass'n v. Reno (AILA)*, 199 F.3d 1352, 1364 (D.C. Cir. 2000) (rejecting third-party standing "to raise claims, whether statutory or constitutional, on behalf of aliens," noting "the judicial presumption against suits seeking relief for a large and diffuse group of individuals, none of whom are party to the lawsuit"). That is especially so where Plaintiffs purport to speak on behalf of tens of thousands of aliens, none of whom they identify by name. *See Kowalski v. Tesmer*, 543 U.S. 125, 134 (2004). In particular, an attorney's putative "future attorney-client relationship with as yet unascertained" clients is not a permissible basis for standing. *Id*. at 130; *see Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1422–23 (11th Cir. 1995) (legal organization lacked standing to assert alleged injury to aliens it did not represent); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 809–10 (D.C. Cir. 1987) (similar). The Organizational Plaintiffs reference clients of their member attorneys, Mot. 7, 13, yet never identify any actual client of the Plaintiffs, let alone one who is

subject to and allegedly harmed by the challenged EOIR and ICE actions. Organizations cannot demonstrate third-party standing based on alleged injury to "the rights of some hypothetical claimant." *Kowalski*, 543 U.S. at 134 n.5. If Plaintiffs have an attorney-client relationship with any actual alien affected by the challenged policies, they can represent the alien in a first-party challenge to the policies. Indeed, five detained aliens are Plaintiffs in this lawsuit, so an individual alien plainly can "protect his or her own interests." *AILA*, 199 F.3d at 1358, 1362; *see Kowalski*, 543 U.S. at 129 (party invoking third-party standing must show that "the party asserting the right ha[d] a 'close' relationship with the person who possesses the right," and "there [was] a 'hindrance' to the possessor's ability to protect his own interests").[2]

Even if they had constitutional standing, the Organizational Plaintiffs cannot obtain review under the APA of EOIR's and ICE's actions because their interests are not within the zone of interests protected by the INA. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved," "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Clarke*, 479 U.S. at 396 (modifications omitted).

Nothing in the INA suggests that it is meant to protect the interests of immigration attorneys. Although the Organizational Plaintiffs suggest that they are seeking to challenge "limitations on access to counsel" through their APA claim, Mot. 33 n.62, they point to no

---

[2] The sole case Plaintiffs rely on for third-party standing, *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150 (D. Or. 2018), Mot. 33 n.62, is contrary to this Circuit's controlling *AILA* and *Gracie* precedents, as well as the Supreme Court's *Kowalski* decision.

particular regulation or statute that arguably protects or regulates their interests in this regard.[3] And

Plaintiffs themselves recognize that the INA provisions regarding the ability of an alien to retain

counsel relates to the *alien's* interests, not the interests of the immigration bar. Compl. ¶¶ 73–77

(asserting statutory claims regarding access to counsel only on behalf of the Individual Plaintiffs);

*see, e.g.*, *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900–04 (D.C. Cir. 1996)

(immigration advocacy organizations are outside immigration statutes' zone of interests).

Congress similarly made clear that no party other than the United States could litigate

challenges to removal proceedings in the district courts by withdrawing jurisdiction for such causes

of action that had previously existed. Until Congress amended the INA to include the claim-

channeling provisions of § 1252, a separate provision, 8 U.S.C. § 1329, provided jurisdiction for

suits in federal district courts filed by any alien or organization challenging implementation of the

immigration laws. *See, e.g.*, *Bains v. Schiltgen*, No. 97-cv-2573, 1998 WL 204977, at *3 (N.D.

Cal. Apr. 21, 1998) (describing statute's prior version). But Congress amended § 1329 in 1996,

"making clear that district court jurisdiction founded on the immigration statute is confined to

actions brought by the government." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir.

1999). This provision makes clear that organizations have no cause of action under the INA to

raise challenges related to removal proceedings.

### C.      The INA Prohibits District-Court Review of Plaintiffs' Claims Arising From Removal Proceedings.

Plaintiffs argue that "ICE's failure to act to increase detained persons' access to robust

remote communication and EOIR's failure to suspend in-person hearings and grant continuances

---

[3] For this reason, the analysis in *Federal Defenders of New York, Inc. v. Federal Bureau of Prisons*, No. 19-1778, 2020 WL 1320886 (2d Cir. 2020), that Plaintiffs invoke, *see* Mot. 33 n.62, is not applicable here. In that case, the Second Circuit held that the attorneys' APA claim fell within the zone of interests of the BOP's regulations on inmate-attorney visits. *Id.* at *9. There is no similar regulation or statute that could possibly apply to the Organizational Plaintiffs here.

as a matter of course together deprive detained persons of their right to access to counsel" in removal proceedings and to procedural due process. Mot. 37; *see also id.* at 34–37. But the INA divests district courts of jurisdiction to review those claims because they "aris[e] from" removal proceedings. 8 U.S.C. § 1252(b)(9). Therefore, those claims cannot form the basis for a TRO. *See Munaf v. Geren*, 553 U.S. 674, 690 (2008).

The INA states that "a petition for review filed with an appropriate court of appeals in accordance with [8 U.S.C. § 1252] shall be the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. § 1252(a)(5). The same section permits "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States ... *only* in judicial review of a final order." *Id.* § 1252(b)(9) (emphasis added). Through § 1252, "Congress has clearly provided that all claims—whether statutory or constitutional—that 'aris[e] from' immigration removal proceedings can only be brought through the petition for review process in federal courts of appeals." *J.E.F.M.*, 837 F.3d at 1029. Section 1252(b)(9)'s channeling provisions are "breathtaking" in scope and "vise-like" in grip, swallowing up "virtually all claims that are tied to removal proceedings." *Id.* at 1031 (quoting *Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007)). "Taken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the PFR process." *Id.*; *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 840 (2018) (§ 1252(b)(9) is a "jurisdiction bar" to challenges to "any part of the process by which [an alien's] removability will be determined"); *id.* at 841 n.3 ("the question is not whether [the *challenged action*] is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action" (emphases in original)). These channeling provisions include "right-to-counsel claims" and

"challenges to agency policies," *J.E.F.M.*, 837 F.3d at 1035, and any challenge arising from any aspect of the processes or practices that apply to aliens in immigration court, *see Vetcher*, 316 F. Supp. 3d at 76; *Sophia v. Decker*, No. 19-cv-9599, 2020 WL 764279, at \*2 (S.D.N.Y. Feb. 14, 2020); *Asylum Seeker Advocacy Project (ASAP) v. Barr*, 409 F. Supp. 3d 221, 225–26 (S.D.N.Y. 2019).

Section 1252(b)(9) channels the Individual Plaintiffs' claims against EOIR into the courts of appeals. All Plaintiffs challenge how EOIR is conducting immigration proceedings and their ability to retain or consult with counsel. *See, e.g.*, Mot. 8–20, 30–37. Those claims are covered by § 1252(b)(9) and so are outside this Court's jurisdiction. *See J.E.F.M.*, 837 F.3d at 1029, 1033, 1035 (constitutional and statutory "policies-and-practices challenges" and "right-to-counsel claims must be raised through the PFR process because they "arise from" removal proceedings"); *Vetcher*, 316 F. Supp. 3d at 76 (similar). That includes Plaintiffs' claims that EOIR's implementation of its video-teleconference or telephonic-hearing policies violates their statutory or due-process rights. *P.L. v. ICE*, No. 19-cv-1336, 2019 WL 2568648, at \*3 (S.D.N.Y. June 21, 2019) ("Plaintiffs' challenge to Defendants' VTC policy arises from 'proceeding[s] brought to remove [undocumented immigrants] from the United States.'").

Section 1252(b)(9) also channels all Plaintiffs' claims against ICE into the courts of appeals. Plaintiffs argue that ICE's disease-prevention and attorney-access protocols violate their statutory right to counsel and their procedural-due-process rights. *See* Mot. 12–16, 34–37. But the right to counsel exists only "[i]n any removal proceedings," 8 U.S.C. § 1362, so any challenge based on the deprivation of that right (and its attendant procedural-due-process challenge), "however it is framed," is reviewable only as part of the review of a final removal order. *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012); *see J.E.F.M.*, 837 F.3d at 1035 (§ 1252(b)(9)

bars constitutional and statutory "right-to-counsel claims"); *Aguilar*, 510 F.3d at 18 (right-to-counsel and procedural-due-process claims, like claims involving "difficulties in calling witnesses and in presenting evidence at the removal proceedings," are subject to § 1252(b)(9)); *Alvarez v. Sessions*, 338 F. Supp. 3d 1042, 1048 (N.D. Cal. 2018) ("Petitioners' challenge based on the potential loss of counsel 'arises from' their removal proceedings and can only be raised through the PFR process, as required by § 1252(a)(5) and § 1252(b)(9)."). In their reply, Plaintiffs may cite to *Arroyo v. DHS*, No. 19-cv-815, 2019 WL 2912848, at *12 (C.D. Cal. June 20, 2019), and argue that § 1252(b)(9) does not apply to claims regarding an existing attorney-client relationship. They would be wrong. Section 1252(b)(9) applies to existing *and* prospective attorney-client relationships. *See Avilez v. Barr*, No. 2020 WL 570987, at *3 (N.D. Cal. Feb. 5, 2020) (following *Alvarez* instead of *Arroyo* because *Arroyo* is inconsistent with circuit precedent and "is not persuasive").

Section 1252(b)(9) also divests this Court of jurisdiction over the Organizational Plaintiffs' claims. "[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984). Congress's decision to consolidate review of claims "arising from" removal proceedings, 8 U.S.C. § 1252(b)(9), into review of the final removal order itself bars organizations from challenging practices in removal proceedings or right-to-counsel claims in those proceedings on an individual alien's behalf. *See, e.g.*, *ASAP*, 409 F. Supp. 3d at 227 (dismissing "action for declaratory and injunctive relief brought by organizational plaintiffs"); *P.L.*, 2019 WL 2568648, at *1 (dismissing claims brought by "Organizational Plaintiffs" who "represent" "detained immigrants in removal proceedings").

And, another provision of the INA independently prevents Plaintiffs from establishing jurisdiction over their right-to-counsel claims against EOIR: 8 U.S.C. § 1252(g) provides that, apart from a petition for review to the appropriate court of appeals, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien," "notwithstanding any other provision of law (statutory or nonstatutory)." This jurisdictional bar on claims that relate to the manner in which EOIR "adjudicate[s] cases" covers claims related to the "prosecution" of any "of the various stages in the deportation process" and is aimed at preventing the type of piecemeal litigation that Plaintiffs have initiated here, challenging certain aspects of immigration-court procedures outside the context of the specific cases where their claims allegedly arise. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483, 487 (1999) (Congress enacted § 1252(g) to prevent "deconstruction, fragmentation, and hence prolongation of removal proceedings"). Thus, §§ 1252(a)(5), (b)(9), and (g) divest this Court of jurisdiction over Plaintiffs' right-to-counsel claims.

Rather than explain why their claims are exempt from section 1252's reach, Plaintiffs assert—in a footnote—that "[t]his Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331," and that "[t]hat jurisdiction is not limited by 8 U.S.C. §§ 1252(a)(5) or (b)(9) because this action is not arising from removal proceedings." Mot. 33 n.62. This Court "need not consider cursory arguments made only in a footnote." *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C Cir. 1999). But even if credited, Plaintiffs' assertion is wrong: Plaintiffs' claims "are not independent or ancillary to the removal proceedings. *J.E.F.M.*, 837 F.3d at 1033. Plaintiffs allege that EOIR's and ICE's actions (or non-actions) violate the APA, their statutory right to counsel in removal proceedings, and their right to procedural due process (as well as the other claims not

24

relied on in this Motion). *See, e.g.*, Compl. ¶ 14 (Napoles Vaillant "is afraid that being forced *to appear at his hearing unrepresented* will result in a worse outcome for his case."); *id.* ¶ 15 (Rodriguez Cedeno "is concerned about *his ability to represent himself in complicated immigration proceedings* during this time."); *id.* ¶ 16 (Aliaga-Cobas fears "*proceeding without an attorney in her case*."); *id.* ¶ 17 (Guerrero-Cornejo is allegedly "unable to see his attorney in person because of the policies Defendants have put in place restricting access to the facilities, and his phone access *is not sufficient to fully prepare him for the hearing*."); *id.* ¶ 18 (Velasquez Quiala "is currently unable to see his attorney *in order to prepare for the hearing*, and he is limited to 30 minutes a day for attorney calls.") (all emphases added). These claims "are bound up in and an inextricable part of the administrative process" and can be raised only in a petition for review. *J.E.F.M.*, 837 F.3d at 1033; *Vetcher*, 316 F. Supp. 3d at 77.

Plaintiffs cite to *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), and *Martinez v. Nielsen*, 341 F. Supp. 3d 400 (D.N.J. 2018), to argue that §§ 1252(a)(5) and (b)(9) do not apply to their claims, *see* Mot. 33 n.62, but neither case helps them. In both cases, the district courts held that §§ 1252(a)(5) and (b)(9) did not apply because the challenges "'ar[ose] from' a rulemaking of general applicability," *O.A.*, 404 F. Supp. 3d at 132, 133, and from the government's arrest of an alien following an interview for a waiver of inadmissibility, *Martinez*, 341 F. Supp. 3d at 408, rather than "from any action taken or proceeding brought to remove an alien from the United States," 8 U.S.C. § 1252(b)(9). Those cases were wrongly decided, but in any event do not help Plaintiffs here because their challenges *are* to the (speculative) effect of EOIR's and ICE's actions on their removal proceedings. *See* Compl. ¶¶ 14–18. As explained, review of these claims is available only in the courts of appeals.

Finally, these provisions expressly supersede the All Writs Act, 28 U.S.C. § 1651(a), as a

basis for a TRO. *See* 8 U.S.C. § 1252(b)(9) ("no court shall have jurisdiction ... by section ... 1651 of [title 28, the All Writs Act], or by any other provision of law"); *id.* § 1252(g) (same).

D.      **The INA Bars This Court From Enjoining or Restraining Operation of Immigration-Court Proceedings or the INA Detention and Removal Provisions.**

Plaintiffs' requested relief also runs afoul of 8 U.S.C. § 1252(f)(1), which bars district courts from awarding injunctive relief enjoining or restraining operation of 8 U.S.C. §§ 1221–1232, including the provisions governing operation of removal proceedings, *see* 8 U.S.C. §§ 1229, 1229a, and detention and removal of aliens, *id.* §§ 1225, 1226, 1231. Title 8 U.S.C. § 1252(f)(1) provides that "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221–1232, which include provisions governing the conduct of removal proceedings], *other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated*." (Emphasis added.)

The relief sought by the Organizational Plaintiffs falls squarely within the scope of injunctive relief that § 1252(f)(1) prohibits. Plaintiffs seek to enjoin the operation of the immigration courts nationwide (except for remote bond hearings), which means enjoining provisions of 8 U.S.C. § 1229a (governing how "[a]n immigration judge shall conduct proceedings"), 8 U.S.C. § 1229 (establishing processes within the immigration court), § 1225(b)(1)(B)(iii)(III) (requiring immigration judges to undertake "prompt review" of negative credible fear determinations "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination."), 8 U.S.C. § 1226 (providing for bond hearings for certain detained aliens), and 8 U.S.C. §§ 1231(a) and (g) (providing for detention following entry of a final removal order).

Plaintiffs' requested TRO would, *inter alia*, require all immigration courts nationwide to "suspend all in-person non-bond hearing and immediately convert all in-person bond hearings to remote hearings" and require immigration judges to grant continuances. *See* Mot. 2. These requirements appear nowhere in sections 1225, 1226, 1229, 1229a, or 1231, and indeed these requirements would halt the operation of those provisions as written and read into them additional requirements. Plaintiffs' requested relief thus seeks to rewrite these provisions via a TRO to include significant limitations on the government's authority "that [do] not exist in the statute," during a public health emergency, which is what § 1252(f) forecloses. *Hamama v. Adducci*, 912 F.3d 869, 879–80 (6th Cir. 2018); *see Vazquez Perez v. Decker*, No. 18-cv-10683, 2019 WL 4784950, at *6 (S.D.N.Y. Sept. 30, 2019) (similar).

Section 1252(f)(1) also forecloses Plaintiff's suggestion (at Mot. 29 & n.57) that the All Writs Act, 28 U.S.C. § 1651(a), supplies jurisdiction to grant a TRO. Congress made clear that § 1252(f)(1)'s bar to injunctive relief is expansive and applies "*[r]egardless* of the nature of the action or claim." 8 U.S.C. § 1252(f)(1) (emphasis added). Section 1252(f)(1)'s specific jurisdictional bar thus trumps the All Writs Act's more general jurisdictional grant. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (in issues of statutory construction, "the specific governs the general"). Moreover, because Plaintiffs seek a TRO to prevent future injury (rather than to preserve this Court's jurisdiction over the Complaint), the All Writs Act does not absolve Plaintiffs of their need to satisfy the traditional preliminary-injunction factors, *see Belbacha*, 520 F.3d at 457; *Kiyemba*, 561 F.3d at 513 n.3, including showing a likelihood of success on their underlying claims. They cannot make that showing where § 1252(f)(1) bars the relief they seek.

### E.    The INA Prohibits This Court From Compelling EOIR to Conduct Remote Immigration Proceedings Nationwide.

Plaintiffs seek an order requiring EOIR to "immediately convert all in-person bond hearings to remote hearings" and "[p]romulgate policies and procedures that, at a minimum, permit remote court appearances by all necessary participants (*e.g.*, court and court personnel, detained persons, counsel, interpreters, transcription)." Mot. 2. But the INA prohibits this Court from granting that relief too. As relevant here, 8 U.S.C. § 1252(a)(2)(B)(ii) states: "no court shall have jurisdiction to review ... any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." This Court cannot order EOIR to conduct remote immigration hearings because the use of remote technology is specified to be in the government's discretion. *See* 8 U.S.C. § 1229a(b)(2)(A) ("The proceeding *may* take place (i) in person, (ii) where agreed to by the parties, in the absence of the alien, (iii) through video conference, or (iv) subject to subparagraph (B), through telephone conference." (emphasis added)). This grant of authority does not provide any statutory standard to apply—it calls for the exercise of "expertise and judgment unfettered by any statutory standard whatsoever." *Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005).

Plaintiffs may argue in their reply that the authority granted under § 1229a(b)(2)(A) is not "specified ... to be in the discretion" of the government. *Kucana v. Holder*, 558 U.S. 233, 239 (2010). They would be wrong. The fact that a specific provision does not use the word "discretion" does not mean § 1252(a)(2)(B)(ii) does not apply. *See Zhu*, 411 F.3d at 295 ("a decision may be 'specified ... to be in the discretion of the Attorney General' even if the grant of authority to make that decision does not use the word 'discretion'"). Section 1252(a)(2)(B)(ii) applies because the decision whether to use remote technology is, by statute, "entirely within [the] judgment or

conscience" of the government. *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 690 (2003).

This Court has no jurisdiction to grant a TRO.

## II.      **Plaintiffs Are Not Entitled to a TRO.**

Even if this Court possesses jurisdiction to grant Plaintiffs' TRO Motion, Plaintiffs fail to make a "clear showing" of their entitlement to relief for each of the preliminary-injunction factors. *Winter*, 555 U.S. at 20, 23.

### A.      **Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims.**

#### 1.      **EOIR's and ICE's Actions Are Not Subject to Review Under the APA and In Any Event Are Not Arbitrary and Capricious.**

Plaintiffs assert that "Defendants have violated the APA by refusing to direct immigration courts to conduct proceedings in a manner consistent with the public health and protection of detained persons' rights to counsel." Mot. 30; *see also id.* at 30–34; Compl. ¶ 70. Plaintiffs are incorrect both on their factual assertions and on the law.

Plaintiffs cannot raise an APA claim because they do not identify any "final agency action," subject to APA review. *See* 5 U.S.C. § 704; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–93 (1990). Plaintiffs argue that the "APA entitles '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action' to 'judicial review thereof.'" Mot. 33 (citing 5 U.S.C. § 702). But the APA permits review only of *final* agency actions. 5 U.S.C. § 704. Generally, "two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process," and "second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

Here, Plaintiffs do not identify any specific final agency action from which they allege "legal consequences" flow. Plaintiffs' APA claim seeks additional "guidance for immigration

court proceedings" and "attorney-client visits in detention facilities" to "preserve[ ] Plaintiffs'
statutory, regulatory, and constitutional rights" in removal proceedings in immigration court.
Compl. ¶ 70. But the only decision in removal proceedings with actual "force and effect of law,"
*Bennett*, 520 U.S. at 177–78, would be a decision by an immigration judge in an *individual case*
and not any decision to adopt or not adopt particular practices for counsel access. *See, e.g.*, *DRG
Funding Corp. v. HUD*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) ("courts have defined a nonfinal
agency order as one, for instance, that does not itself adversely affect complainant but only affects
his rights adversely on the contingency of future administrative action" (internal quotations
omitted)). There is no way to tell whether, for example, having an attorney visit with a client or
attend a hearing telephonically to prevent the spread of COVID-19 will have any effect on the
outcome of the proceedings or any legal consequences before the immigration judge even renders
a decision. And Plaintiffs' challenges related to access to counsel, scheduling of hearings, and
practices for filings in immigration court, are all at bottom premised on speculative potential
effects on these immigration-judge decisions.

Plaintiffs also cannot state an APA claim because, as explained above, Congress has set
out a separate specific and exclusive mechanism for review of decisions of immigration judges,
8 U.S.C. § 1252(a)(5), and the APA provides a cause of action only for claims challenging "final
agency action for which there is *no other adequate remedy in a court*," 5 U.S.C. § 704 (emphasis
added). To "determin[e] whether an adequate remedy exists," courts "focus[] on whether a statute
provides an independent cause of action or an alternative review procedure." *El Rio Santa Cruz
Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005). Here, APA review
would impermissibly provide review that is duplicative of the specific alternative review procedure
available in the courts of appeals under 8 U.S.C. § 1252(b)(9) over any challenge to how removal

proceedings are conducted. And "if an adequate remedy at law exists, equitable relief is not available under the APA." *Cohen v. United States*, 650 F.3d 717, 731 (D.C. Cir. 2011).

Plaintiffs' alternative argument, made in a footnote, is that, if Defendants' "decisions are instead construed as a failure to act rather than agency action, their failures to act are also reviewable under 5 U.S.C. § 706(1)." Mot. 34 n.63. But this argument fares no better. To raise a claim under § 706(1), "[a]n agency must have failed to perform a non-discretionary duty to act." *Norton*, 542 U.S. at 64. "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*," *id.*, and Plaintiffs cite no provision requiring the government to take any particular action or that otherwise cabins the agencies' discretionary choices on how to best respond to a pandemic. And even if Plaintiffs could identify a basis to argue that the government is required to take some additional action, they still could not obtain an order directing agency operations in the particular ways they ask for; under § 706(1) a court can at most compel an agency "to take action upon a matter, without directing *how* it shall act." *Cobell v. Norton*, 392 F.3d 461, 475 (D.C. Cir. 2004).

"The principal purpose of the APA limitations" in sections 702, 704, and 706(1) "is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66. "If courts were empowered to enter general orders compelling" agencies to carry out their general mandates in particular ways not required by any specific statutory provision, as Plaintiffs ask the Court to do here, "it would ultimately become the task of the supervising court, rather than the agency" to oversee "day-to-day agency management," raising the prospect of pervasive oversight by federal courts" that "is not contemplated by the APA." *Id.* at 66–67. A "policy disagreement" with an agency's decision or approach to a problem is not a

"basis for substituting [Plaintiffs'] views for the agency's" even where "the record could have supported" Plaintiffs' preferred approach. *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004).

EOIR has reasonably exercised its discretion and authority here. EOIR has taken steps to delay certain categories of hearings that can reasonably be postponed, including continuing all hearings for aliens who are not detained through May 1, 2020, has restricted access to immigration courts for individuals at risk of having COVID-19, and continues to evaluate whether additional steps are necessary to respond to the outbreak as facts develop. McHenry Decl. ¶¶ 44–58. EOIR has issued guidance to all immigration courts encouraging them to take certain steps to respond to the outbreak, and EOIR's decision to allow immigration courts some flexibility to respond to local concerns and immigration judges to make decisions about how to best manage individual proceedings for detained aliens, is not arbitrary and capricious. Those decisions are entitled to significant deference. *See Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 543; *Ngure v. Ashcroft*, 367 F.3d 975, 983 (8th Cir. 2004); *Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987). This is especially so in the immigration context where "flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).

Plaintiffs also contend that "EOIR has not suspended non-essential in-person hearings" and "has refused to issue any uniform policy designed to minimize the COVID-19 health risks" or to follow CDC guidance "calling for 'alternatives to in-person court appearances.'" Mot. 31. That too is wrong. On March 18, the Director of EOIR issued a Policy Memorandum adopting guidance for "all immigration court cases effective immediately" to "promote the safety of immigration court personnel, representatives, aliens, attorneys for [DHS], and the general public during the

ongoing national emergency related to the COVID-19 outbreak." EOIR Mem. 1; McHenry Decl. ¶¶ 47–55. In doing so, EOIR reminded immigration judges of their broad authority to take certain steps that could help minimize the risk of exposure to COVID-19, such as waiving appearances, granting continuances, limiting physical presence in the courtroom, issuing standing orders providing for additional procedures in response to the outbreak, and conducting hearings telephonically or by video-teleconference. EOIR Mem. 2. EOIR has also encouraged immigration judges to resolve cases through written filings where possible and to establish policies for conducting hearings through VTC or by telephone to the maximum extent practicable consistent with the law, has waived the requirement for original signatures for certain filings, and has made electronic filing by email available for all 69 immigration courts. *Id.*

EOIR has taken reasonable steps to mitigate exposure and permit flexibility while still following the statutory and court-ordered strictures by which it is bound. Among other things, EOIR's response allows for remote options for filings and hearings; ensures that aliens continue to timely receive what they are entitled to by statute and federal court orders; accords deference to immigration judges to manage their own dockets and respond to unique factors or considerations in individual cases; and allows detained aliens to continue to receive bond hearings to respond to the surge in requests for bond hearings in light of the COVID-19 outbreak, including requests made as part of litigation pending in other district courts. *See, e.g.*, McHenry Decl. ¶¶ 44, 67, 70, 92–93; *see also Las Americas*, 2020 WL 1671584, at *2 (noting "evidence" "demonstrating that [immigration courts] have taken significant steps to reduce in-person contacts and appropriately modify immigration court functions in the wake of the COVID-19 outbreak," including postponing hearings, granting continuances, allowing email filings, and permitting appearances "by video or telephonically" in the hearings that have not been postponed because they involve "detained

individuals, who may favor earlier hearings due to their custody status").

EOIR's approach, including the deference given to individual immigration courts to exercise their expertise and discretion over certain local decisions, is no different than how the Administrative Office of the United States Courts has dealt with similar issues by encouraging jurisdiction-by-jurisdiction and case-by-case approaches for the judiciary. *See* Administrative Office of the U.S. Courts, *Judiciary Preparedness for Coronavirus (COVID-19)*, https://www.us courts.gov/news/2020/03/12/judiciary-preparedness-coronavirus-covid-19. This similar approach by other courts shows EOIR's approach is reasonable. *Cf. Liadov v. Mukasey*, 518 F.3d 1003, 1009 (8th Cir. 2008) (noting that the same rationale for strict filing deadlines in Article III courts applies in immigration courts). To the extent that Plaintiffs believe that additional COVID-19-related changes are needed to procedures in particular courts or cases, they can raise those requests with individual immigration judges. Defendants are not aware of any reasonable requests for continuances, extensions, or waivers of appearances being systematically denied. McHenry Decl. ¶ 88. This is a critical flaw with Plaintiffs' demand for a sweeping TRO: the needs of an individual alien in the proceedings and any request related to COVID-19 must be judged based on that alien's circumstances, and Plaintiffs cannot plausibly argue that every alien will be harmed by the absence of the policies they demand. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs thus cannot carry their burden for a TRO, *see Mendez v. Cooper*, No. 19-cv-01701, 2019 WL 2577477, at *1 (D. Ariz. Apr. 17, 2019), and their systemic claims cannot succeed. *See Las Americas*, 2020 WL 1671584, at *1–2 (noting that similar TRO motion attacked practices "outside of the District," did not claim challenged practices were "occurring in every immigration court," and finding no reason why "review of individual court practices" would not "suffice to address practices in those particular courts"). Thus, on the merits, Plaintiffs' requests should be denied.

The same is true for Plaintiffs' APA claim against ICE. Plaintiffs argue that "the CDC issued guidance on practices to implement in correctional and detention facilities" that calls for "decreasing 'operational entrances and exits to the facility' (e.g., for attorney visits and to attend hearings)," and claim that "ICE has refused to implement policies that are consistent with federal health mandates to facilitate limitations on unnecessary transfer of detained persons or on operational entrances and exits to detention facilities." Mot. 30–31. But this is not true. ICE facilities have adopted policies to restrict unnecessary access to facilities, test individuals for signs of fever before permitting entry, and test detainees for COVID-19 before admitting them to a facility. *See* ICE Pandemic Response 12–13; Ciliberti Decl. ¶¶ 8–23; Benoit Decl. ¶¶ 13–26; Beckhelm Decl. ¶¶ 10–23; Bretz Decl. ¶¶ 9–16; Simao Decl. ¶¶ 6–7; LaBier Decl. ¶¶ 9–21; Allen Decl. ¶¶ 7–16. They have also adopted precautions to prevent the spread of the virus by maintaining or expanding options for remote attorney conferencing, by requiring any visits that must take place in person use protective gear or occur through glass barriers, and instituting practices for cleaning and sanitizing any shared spaces or communications equipment *See* Ciliberti Decl. ¶¶ 19–24; Benoit Decl. ¶¶ 21–42; Beckhelm Decl. ¶¶ 17–26; Bretz Decl. ¶¶ 16–23; Simao Decl. ¶¶ 8–15; LaBier Decl. ¶¶ 21–26; Allen Decl. ¶¶ 16–22. Like with their challenges against EOIR, Plaintiffs fail to identify any uniform policy they disagree with that applies to all facilities, any reason why the agency is not entitled to deference in developing varied and targeted policies that leave room for individual facilities to adapt to local needs or challenges, or any reason why this Court—as opposed to the courts in the relevant districts—should oversee the operations of those facilities, some of which are already subject to ongoing litigation before courts in those districts. *See, e.g.* McHenry Decl. ¶ 67; *Las Americas*, 2020 WL 1671584.

Accordingly, Plaintiffs cannot meet their burden to show a likelihood of success on their

APA claim, and this Court should deny their motion for a TRO.

      **2.**      **EOIR's and ICE's Policies Do Not Violate Plaintiffs' Constitutional or Statutory Rights to Counsel or Procedural Due Process.**

Plaintiffs assert that "Defendants have violated [Plaintiffs'] constitutional and statutory rights to counsel and to due process," Mot. 30, "by impairing (1) their ability to retain counsel, (2) their ability to communicate confidentially with their counsel, and (3) their counsel's ability to competently represent them in immigration court," Mot. 36; *see also id.* at 34–37. They claim that "ICE's failure to act to increase detained persons' access to robust communication and EOIR's failure to suspend in-person hearings and grant continuances as a matter of course together deprive detained persons of their right of access to counsel." Mot. 37. They are wrong. Plaintiffs fail to explain how EOIR's decision not to suspend all in-person immigration hearings nationwide or ICE's disease-prevention or attorney-access protocols "effectively deny" the Individual Plaintiffs' access to counsel in violation of the INA or the Due Process Clause.

It is well-established that "there is in a civil case no constitutional right to counsel." *Koller By and Through Koller v. Richardson-Merrell, Inc.*, 737 F.2d 1038, 1052 (D.C. Cir. 1984), *vacated on other grounds sub nom. Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing."). Congress, however, has provided aliens a limited right to counsel in civil removal proceedings:

> In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

8 U.S.C. § 1362. This statutory right that Congress has afforded aliens in removal proceedings exceeds the minimum due-process requirement that an alien receive "some form of meaningful or fair hearing." *Maldonado-Perez v. INS*, 865 F.2d 328, 32 (D.C. Cir. 1989); *Dia v. Ashcroft*, 353

F.3d 228, 243 (3d Cir. 2003) (en banc) ("[a]liens only have those statutory rights granted by Congress"). Plaintiffs' procedural-due-process claim is thus subsumed by their statutory right-to-counsel claim: "[A]n immigration hearing that satisfies the statutory requirements of [the INA] also satisfies the requirements of the due process clause." *Skorusa v. Gonzales*, 482 F.3d 939, 943 n.1 (7th Cir. 2007).

Courts have held that the statutory right to counsel in immigration proceedings is violated only where conditions are "tantamount to denial of counsel." *Biwot*, 403 F.3d at 1098. Whether a denial occurred requires a backward-looking inquiry into "the actual substance of the hearing," *Lara-Torres*, 383 F.3d at 973, to determine whether the proceedings were "so fundamentally unfair that [the alien] was prevented from reasonably presenting his case," *Gonzalez v. INS*, 82 F.3d 903, 908 (9th Cir. 1996). And, a violation of the statute alone may not violate due process absent a showing of prejudice. *See Castro-O'Ryan v. U.S. Dep't of Immigration and Naturalization*, 847 F.2d 1307, 1312–13 (9th Cir. 1987).

Here, Plaintiffs allege that Defendants' COVID-19 response "impedes" the Individual Plaintiffs' ability to retain or consult with counsel. Mot. 26. But they fall far short of showing that they were effectively denied access to counsel during immigration proceedings. Against ICE, for example, Plaintiffs allege that "videoconferencing is not always made available" to immigration detainees, Mot. 22, and that detainees "common[ly]" miss telephone calls, must pay for calls, have their scheduled call times canceled, wait in line to make calls, have their calls "monitored or overheard by others," have time limits on calls, or experience poor connection quality. Mot. 22–23. And against EOIR, Plaintiffs complain that the lack of a blanket order permitting telephonic appearances as a matter of course at all immigration courts and the denial of some motions for continuances or for telephonic appearances make it more difficult to obtain or consult with counsel.

*See* Mot. 25–26. But these allegations are of a different kind and categorically less severe than the effective denial of counsel and forced self-representation that courts have recognized as a denial of the statutory right to counsel. *See, e.g.*, *Biwot*, 403 F.3d at 1096 (finding a violation of the statutory right to counsel when an immigration judge allowed an alien, "who was incarcerated and diligently seeking representation, only five working days to obtain counsel"); *Montes-Lopez v. Holder*, 694 F.3d 1085, 1089–90 (9th Cir. 2012) (violation where, after learning at a hearing that an alien's counsel had been suspended from the bar, immigration judge refused to grant the alien a continuance to secure new counsel and then denied the alien's claims for relief). And it is impossible to know now whether Plaintiffs' allegations will have any effect on their rights, let alone result in "substantial prejudice," before their immigration hearings have been held. *Lara-Torres*, 383 F.3d at 973 (quotation marks omitted). Such a determination can be made only by scrutinizing "the actual substance of the hearing" after the fact. *See id.*

Plaintiffs' and their declarants' actual allegations also fall far short of specifying why they believe Defendants are responsible for the issues of which they complain. For example, Plaintiff Napoles Vaillant states merely: "I am concerned that I do not have an attorney to represent me at this hearing. ... The Florence Immigrant & Refugee Rights Project was trying to obtain pro bono representation for me and my husband, Ernesto, but it had to suspend those efforts in light of COVID-19 and the government's response to COVID-19." Pls.' Ex. 21, Napoles Vaillant Decl. ¶¶ 7–8 (ECF No. 7-22). He offers no explanation why he believes that "the government's response to COVID-19" is the cause of his inability to find an attorney, nor does he say that the immigration judge has denied a request for a continuance. *See id.* Attorney Michelle Edstrom states that she filed a motion to continue a hearing scheduled for April 2, 2020, in the Dallas immigration court, but states only that she "remain[s] apprehensive that the motion will not be granted." Pls.' Ex. 28,

Edstrom Decl. ¶¶ 7–8 (ECF No. 7-29). There is no evidence in Plaintiffs' TRO Motion papers filed on April 8 that the request was in fact denied (despite the fact that such evidence would have been available by the time Plaintiffs filed this Motion and could have been submitted if it existed). Likewise, although Plaintiff Rodriguez Cedeno states that his motion for a continuance of his April 2 hearing was denied, *see* Pls.' Ex. 5, Rodriguez Cedeno Decl. ¶ 6, Plaintiffs fail to mention that Rodriguez Cedeno's hearing was later continued until August 5 and so did not occur on April 2, meaning that he was not denied any right to counsel. Burgus Decl. ¶ 3; *see, e.g.*, *Perez v. Sessions*, 690 F. App'x 360, 365 (6th Cir. 2017) (no violation of § 1362 where immigration judge provided alien five additional weeks to obtain counsel); *Benjamin v. U.S. Attorney General*, 682 F. App'x 725, 729 n.1 (11th Cir. 2017) (no violation where immigration judge provided two continuances to allow alien to obtain counsel). Plaintiffs fail to establish that they are likely to succeed on their right-to-counsel claims. And because that right exceeds the constitutional minimum required by the Due Process Clause, they also fail on their procedural-due-process claim.

Plaintiffs also cannot succeed on their argument (made in footnotes) that this Court can grant preliminary relief based on the APA's right-to-counsel provision, which states that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative." 5 U.S.C. § 555(b); *see* Mot. 35 n.64 & 37 n.66. "Congress intended the provisions of the [INA] to supplant the APA in immigration proceedings," *Ardestani v. INS*, 502 U.S. 129, 133 (1991), so the only right-to-counsel statute that applies here is the INA's (8 U.S.C. § 1362), not the APA's (5 U.S.C. § 555(b)). As discussed above, Defendants have not violated that statute.

Plaintiffs cannot succeed on their access-to-counsel or procedural-due-process claims.

## B. Considerations of Harm and the Equities Weigh Strongly Against a TRO.

It is well-settled that the public interest in enforcement of United States immigration laws

is significant. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs seek injunctive relief altering Defendants' response to COVID-19, but the disruptive effect of ordering the relief Plaintiffs seek based on these temporary circumstances would long survive the COVID-19 pandemic, and the precedent would serve to allow organizations and individuals to rewrite the immigration statutes and change federal policy anytime they disagree with the government's response to a crisis. Granting such far-flung relief based on temporary circumstances is not in the public interest. The public interest is instead best served by allowing the orderly processes and protocols designed to safeguard the essential functions of the immigration system, and implemented by government professionals, to proceed. *See Youngberg v. Romeo*, 457 U.S. 307, 322–23 (1982) (urging judicial deference and finding presumption of validity for decisions of medical professionals concerning conditions of confinement). The burden and attendant harm caused by the relief Plaintiffs seek, and its impact on EOIR and ICE operations nationwide, is not justified at this preliminary stage.

Against these weighty considerations, Plaintiffs fail to show that they will suffer irreparable injury absent a TRO. Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). The D.C. Circuit thus "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Plaintiffs claim that "Defendants' failures to implement uniform, reasonable policies that protect Plaintiffs' constitutional and statutory rights to counsel and that conform with public health requirements have already injured Plaintiffs (and the public) and will continue to do so absent immediate relief." Mot. 37; *see also* Mot. 37–41. They are wrong.

First, for the reasons explained above, Defendants EOIR and ICE have implemented policies that protect aliens' rights and safeguard the agencies' essential functions, with an eye towards maintaining public health. *See supra* at pp. 4–12.

Second, Plaintiffs' allegations of certain and irreparable harm fail on their face. Plaintiffs themselves admit that they seek a TRO only to prevent "the *possibility* of [attending] in-person hearings in 58 of the nation's 69 immigration courts." Mot. 1 (emphasis added). And the alleged irreparable harm that they would suffer from this *possibility* (which they can avoid by requesting telephonic or VTC hearings, or continuances) is the speculative harm of exposure to COVID-19 or the potential for inadequate assistance of counsel caused by EOIR's and ICE's policies. Plaintiffs' claim of future injury is hypothetical—and unlikely, given the precautions that EOIR and ICE have put into place and the guidance it has issued to its immigration judges allowing for telephonic or VTC hearings, *see* McHenry Decl. ¶¶ 44–100; EOIR Mem. 1–4; ICE Pandemic Response 7–16; Hott Decl. ¶¶ 19–30; Ciliberti Decl. ¶¶ 8–24; Benoit Decl. ¶¶ 13–42; Beckhelm Decl. ¶¶ 10–26; Bretz Decl. ¶¶ 9–23; Simao Decl. ¶¶ 6–15; LaBier Decl. ¶¶ 9–26; Allen Decl. ¶¶ 7–22—and Plaintiffs are not entitled to an immediate shutdown of the immigration court system based on a conjectural injury they have not suffered and may never suffer. *See Clapper*, 568 U.S. at 416 (finding standing based on fear, even one that is reasonable, "improperly waters down the fundamental requirements of Article III."); *see also Las Americas*, 2020 WL 1671584, at *2. Courts considering TRO motions from aliens in immigration detention where there is an absence of specific facts showing that the particular facility had any confirmed cases or was taking inadequate precautions have thus declined to release aliens based on pure speculation about COVID-19. *See Dawson*, 2020 WL 1304557, at *3 ("The 'possibility' of harm is insufficient to warrant the extraordinary relief of a TRO.").

Because Plaintiffs' asserted injuries are highly speculative, they have failed to make the requisite clear showing of "certain and great" irreparable harm necessary to warrant a TRO. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (1985); *Winter*, 555 U.S. at 22.

### C.      Even if This Court Were to Grant a TRO, It Must Be Sharply Limited.

As noted above, this Court is barred from awarding the Organizational Plaintiffs any injunctive relief under section 1252(f)(1).[4] Thus, even if some preliminary relief were warranted here, the indiscriminate nationwide relief that Plaintiffs seek is far too broad. Any TRO that the Court issues must be limited to the Individual Plaintiffs identified in the Complaint. This is especially true where, as here, Plaintiffs' requested relief would cause harm to at least some non-parties by delaying bond hearings and merits hearings for aliens who want those hearings to go forward because they may lead to their release. *See* Mot. 2; McHenry Decl. ¶ 31.

*First*, Plaintiffs seek relief that conflicts with Article III, which requires that a "remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Allowing a party to challenge policies "apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). That rule is especially important where plaintiffs do "not represent a class, so they [can] not seek to enjoin [an agency regulation] on the ground that it might cause harm to other parties." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010).

*Second*, injunctions that go beyond Plaintiffs' own injuries exceed the power of a court sitting in equity, which must limit injunctions to "be no more burdensome to the defendant than

---

[4] Notably, the Organizational Plaintiffs only move for relief on Claim I because they are not party to the claims brought in Claims II and III of the Complaint. Therefore, it is even clearer that should this Court find that any relief is appropriate on either of those Counts, it must be limited to the actual individual Plaintiffs who bring those Counts. *See* Compl. ¶¶ 73–82.

necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). It is well established that the scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999). But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2427–28 (2018) (Thomas, J., concurring) (quoting The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). This Court should tailor any relief to the actual Plaintiffs' injuries.

*Third*, although Plaintiffs attempt to rely (in a footnote) on the All Writs Act for the basis of their injunction, *see* Mot. 29 n.57, their claims are rooted in the APA, and the APA does not authorize universal injunctive relief. The APA provides only that a court may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). Nothing in § 706(2)'s text specifies whether challenged agency action, if found invalid, should be set aside on its *face* or *as applied* to the individuals. In the absence of a clear statement in the APA that it displaces traditional rules of equity, the court should adopt the narrower reading. *See Virginia Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power."). The absence of nationwide injunctions prior to Congress' enactment of the APA in 1946 (and for over fifteen years thereafter) further suggests that the APA was not originally understood to authorize such broad relief. *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 438 & n.121 (2017).

Furthermore, nationwide injunctive relief creates other legal and practical problems— problems which would be acute here, given the variety of different factual circumstances

surrounding each of the 69 immigration courts and the various ICE detention facilities. Plaintiffs want a one-size-fits-all remedy, disregarding the fact that immigration courts and detention centers across the country have responded appropriately, taking local conditions into account and considering the operations of their individual dockets. McHenry Decl. ¶ 46. A nationwide injunction would freeze immigration-court operations everywhere and limit EOIR's and ICE's flexibility to respond to local conditions or issues. Such an injunction circumvents the procedural rules governing class actions, which permit relief to absent parties only if rigorous safeguards are satisfied. *See* Fed. R. Civ. P. 23. Plaintiffs—who do not raise class claims in their complaint and have not moved to certify a class under Rule 23—have made no effort to explain why they should be entitled to such sweeping relief. Nationwide relief also enables forum shopping and effectively nullifies the decisions of other district courts nationwide, including courts who have considered similar requests to the one here. *See DHS v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring); *see also Las Americas*, 2020 WL 1671584 (denying similar relief to that requested here). Nationwide relief would also deprive the judicial system of the benefits that accrue when numerous courts grapple with complex legal questions in a common-law-like fashion.

These principles apply with greater force to TROs and preliminary injunctions, which are equitable tools designed to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "[T]he purpose of" preliminary equitable relief "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. IRAP*, 137 S. Ct. 2080, 2087 (2017). Courts thus "need not grant the total relief sought by the applicant but may mold [their] decree to meet the exigencies of the particular case." *Id.*; *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 126, 129 (D.D.C. 2015), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*,

852 F.3d 1131 (D.C. Cir. 2017) ("the Court has not finally determined that the [action] is unlawful," so "the need for narrow tailoring ... is particularly important," and any "injunction should be limited in scope to protect only" parties); *Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) ("district court should not have enjoined agency from applying challenged regulation to any party when an injunction covering plaintiff alone adequately protects it"); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018).

*Finally*, even if a TRO were appropriate, Plaintiffs have not shown that the nationwide relief they seek is warranted based on the harms alleged, as weighed against a TRO that would irreparably harm the United States and the public. It is always in the public interest to enforce its immigration laws—including through immigration courts conducting its essential functions. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Blackie's House of Beef, Inc.*, 659 F.2d at 1221. Here, the Executive Branch has identified a crisis and is responding appropriately, with due consideration for local circumstances and aliens' rights. *E.g.*, McHenry Decl. ¶¶ 44–46, 97. In contrast, Plaintiffs' alleged injuries are speculative, do not account for recent action that ICE and EOIR have taken to respond to the crisis, and do not outweigh the harm that would be caused by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and would undermine the "efficient administration of the immigration laws," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019).

Under these principles, the proposed nationwide TRO is overbroad and should be rejected. If the Court grants relief, the Court must limit any relief to the Individual Plaintiffs and actual clients of the Organizational Plaintiffs' members whom they can identify as having imminent immigration-court hearings.

## **CONCLUSION**

This Court should deny Plaintiffs' motion for a temporary restraining order,

Dated: April 13, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Assistant Director

LAUREN C. BINGHAM
KATHERINE J. SHINNERS
BRIAN C. WARD
Senior Litigation Counsel

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
WILLIAM C. BATEMAN III
COURTNEY E. MORAN
Trial Attorneys
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

*Counsel for Defendants*

46

## **CERTIFICATE OF SERVICE**

*NIPNLG v. EOIR*, No. 1:20-cv-00852-CJN (D.D.C.)

I certify that on April 13, 2020, I served a copy of the foregoing document and its attachments on all parties of record by causing them to be filed with the Clerk of the Court through the CM/ECF system, which will provide electronic notice to all attorneys of record.

Dated: April 13, 2020                    */s/ Alexander J. Halaska*
                                                            ALEXANDER J. HALASKA
                                                            Trial Attorney
                                                            United States Department of Justice
                                                            Civil Division
                                                            Office of Immigration Litigation
                                                            District Court Section
                                                            P.O. Box 868, Ben Franklin Station
                                                            Washington, D.C. 20044
                                                            Tel: (202) 307-8704 | Fax: (202) 305-7000

                                                            *Counsel for Defendants*