**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-00852-CJN |
| EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*, | |
| Defendants. | |

**EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-00852-CJN |
| EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*, | |
| Defendants. | |

## <u>DECLARATION OF JAMES MCHENRY, DIRECTOR OF THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW</u>

I, James McHenry, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1.  I am the Director of the Executive Office for Immigration Review (EOIR), a component with the Department of Justice (DOJ).

2.  I have held the position of Director since January 2018. I was previously the Acting Director from May 2017 to January 2018. At EOIR I previously served as an Administrative Law Judge (ALJ) from November 2016 to May 2017 and as a Judicial Law Clerk/Attorney Advisor from October 2003 to September 2005.

3.  Outside of EOIR, I worked for the Office of the Principal Legal Advisor (OPLA), Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS) from October 2005 to August 2014 as an Assistant Chief Counsel and, later, as a Senior Attorney. In that capacity I frequently represented DHS in immigration court proceedings before multiple immigration judges, primarily in an immigration court in Atlanta, Georgia. I also served as a lead attorney for national security, denaturalization, and gang cases, anti-human trafficking operations, and worksite enforcement matters. Between 2010 and 2011, I also served a detail as a Special Assistant United States Attorney for the Criminal Division of the United States Attorney's Office for the Northern District of Georgia.

4.  Between August 2014 and November 2016, I worked as an Administrative Law Judge in the Social Security Administration (SSA).

5.  As the EOIR Director, I manage EOIR and its employees and am responsible for the supervision of each EOIR component in the execution of its respective duties in accordance with the law.

6. My testimony in this declaration is based upon my experience with and personal knowledge of EOIR's operations, information obtained from records and systems maintained by EOIR, and publicly available statements or announcements.

7. I am testifying in this declaration to the best of my knowledge and understand this declaration is for use in the *National Immigration Project of the National Lawyers Guild* (*NIPNLG*) case.

### Background

8. EOIR contains three components responsible for immigration-related administrative adjudicatory proceedings conducted under the Immigration and Nationality Act (INA) and associated regulations.

9. The Office of the Chief Immigration Judge (OCIJ) oversees the operations of EOIR's immigration courts. OCIJ currently operates 69 immigration courts and immigration adjudication centers (IAC) in 29 states, Puerto Rico, and the Northern Mariana Islands.[1]

10. Immigration courts located within a detention center operated or leased by DHS hear exclusively detained cases. A small number of courts located outside a DHS detention facility also hear primarily or exclusively detained cases. A small number of courts hear primarily or exclusively non-detained cases, but may conduct bond hearings as appropriate. The remaining plurality of immigration courts hear primarily non-detained cases but also maintain regularly-scheduled dockets for detained cases. The two IAC hear cases exclusively by video teleconferencing (VTC). All immigration courtrooms are equipped with VTC technology.

11. OCIJ currently employs approximately 460 immigration judges (IJs) authorized to conduct proceedings under the INA and the associated regulations. Over 1200 support staff, including contractors, further support immigration court operations.

---

[1] https://www.justice.gov/eoir/eoir-immigration-court-listing

12. IJs preside over multiple types of proceedings. Among the most common are removal proceedings, custody redetermination proceedings (bond proceedings), and credible fear review proceedings.

13. Removal proceedings are conducted pursuant to section 240 of the INA. As of April 3, 2020, there were 19,518 pending detained cases in removal proceedings and 1,088,785 pending non-detained cases in removal proceedings.

14. All cases in removal proceedings are initiated by DHS, and DHS generally retains prosecutorial discretion in determining whether to place an alien into removal proceedings. For aliens convicted of crimes which render them removable, Congress has directed that DHS "shall begin any removal proceeding as expeditiously as possible after the date of the conviction."[2] DHS initiates removal proceedings by serving a charging document, called a Notice to Appear (NTA), on an alleged alien and then filing the NTA with an immigration court. Once the NTA is filed with an immigration court, court personnel will create a record of proceeding (ROP) for the case. The NTA contains various information, including factual allegations and charges of removability based on alleged violations of either section 212 or 237 of the INA.[3] In some cases, the NTA provides notification of the time and date of the first hearing in removal proceedings, but if it does not, the immigration court provides notice.

15. In removal proceedings, DHS is represented by an attorney within OPLA.  In removal proceedings, an alleged alien has the privilege of being represented by an attorney at no expense to the Government.[4]

---

[2] 8 U.S.C. § 1229(d)(1).
[3] 8 U.S.C. § 1229(a)(1).
[4] 8 U.S.C. § 1362.

3

16. Removal proceedings generally encompass two types of hearings, master calendar hearings and individual, or merits, hearings. Master calendar hearings are typically brief procedural hearings, which are roughly analogous to initial appearances or arraignments in criminal proceedings. At a master calendar hearing, an immigration judge will provide multiple advisals to an alien, apprise the alien of the alien's rights in removal proceedings, go over the contents of the NTA, assess whether an unrepresented alien wishes to seek representation, provide a list of pro bono legal service providers to the alien, assess whether the alien may be eligible for any form of relief or protection from removal, including asylum, and if eligible, provide the alien with an opportunity to apply for such relief.[5] After providing the required advisals and depending on the specific facts of each case and how the alien wishes to proceed, an immigration judge may also take pleadings and determine removability at a master calendar hearing. The immigration judge may also rule on any motions that have been filed. Unless an alien decides to accept an order of removal or voluntary departure at the initial master calendar hearing or unless an immigration judge decides that the proceedings should be terminated, most removal cases encompass multiple master calendar hearings followed by one individual hearing. Once an immigration judge has found an alien removable as charged and determined that the alien is prima facie eligible for a form of relief or protection from removal, the immigration judge will schedule an individual, or merits, hearing on the application for relief or protection. An individual hearing is roughly similar to a bench trial, and the immigration judge will consider the evidence submitted by the parties related to the alien's application. At the conclusion of the individual hearing, the immigration judge will typically render an oral

---

[5] 8 C.F.R. §§ 1240.10(a) and 1240.11(a)(2) and (c).

decision, though in more complex cases, the immigration judge may reserve a decision and issue a written decision at a later date.

17. During removal proceedings, an IJ will first determine removability. If the IJ determines that the alleged alien is not removable as charged, the IJ will terminate the proceedings. If the IJ determines that the alien is removable as charged, then the IJ will consider whether the alien is eligible for any relief or protection from removal. At the conclusion of removal proceedings, if they have not been terminated, an IJ will issue an order of removal, an order of voluntary departure, or an order granting relief or protection. Some orders may be issued in the alternative. Both DHS and the alien may appeal the IJ's decision to the Board of Immigration Appeals (the Board), another component within EOIR.

18. By statute, an alien who fails to attend a scheduled hearing shall be ordered removed *in absentia* if DHS establishes both the alien's removability and that the alien received proper notice of the hearing.[6] An *in absentia* order of removal may be rescinded based on a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice or the alien demonstrates that the alien was in state or federal custody.[7] An *in absentia* order of removal may also be rescinded based on a motion to reopen filed within 180 days if the alien demonstrates that the alien's failure to appear was because of exceptional circumstances.[8] Exceptional circumstances "refers to exceptional circumstances (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the alien, or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien."[9]

---

[6] 8 U.S.C. § 1229a(b)(5).
[7] 8 U.S.C. § 1229a(b)(5)(C)(ii).
[8] 8 U.S.C. § 1229a(b)(5)(C)(i).
[9] 8 U.S.C. § 1229a(e)

19. Aliens in the physical custody of DHS do not generally fail to attend hearings of their own volition and, thus, there is rarely, if ever, a basis to support the issuance of an *in absentia* order of removal for an alien in the physical custody of DHS.

20. In addition to statutes, regulations, and case law, removal proceedings are generally conducted in accordance with the Immigration Court Practice Manual (ICPM),[10] though an IJ may direct that the provisions of the ICPM not rooted in statute or regulation do not apply in particular cases.[11]  For non-detained cases, the ICPM sets a general filing deadline of 15 days before a master calendar hearing if the party is requesting a ruling prior to the hearing; otherwise, filings may be made at any time prior to the hearing or in open court during the hearing.[12] For non-detained cases, the ICPM sets a general filing deadline of 15 days before an individual hearing, excluding impeachment or rebuttal evidence, and objections to the evidence may be made at any time.[13] For all detained hearings, the ICPM defers to individual immigration judges to specify deadlines.[14] For all hearings, an IJ retains discretion to set his or her own deadline, and IJs vary in the extent to which they follow the ICPM in non-detained cases.[15]

21. IJs also have the authority to grant extensions of filing deadlines in advance of the deadline or to excuse untimely filings made after a deadline has passed. Untimely filings are not rejected by immigration court staff, and the IJ retains authority for how to deal with untimely filings.[16]

22. Although EOIR does not have experience with delayed filings due to a disease such as COVID-19, it does have significant experience with filings delayed due to comparable situations such as hurricanes or other natural disasters. In those situations, parties should file a motion to accept

---

[10] https://www.justice.gov/eoir/page/file/1258536/download
[11] ICPM, ch. 1.1(b) and (c).
[12] ICPM, ch. 3.1(b)(i)(A).
[13] ICPM, ch. 3.1(b)(ii)(A).
[14] ICPM, ch. 3.1(b)(i)(B) and (b)(ii)(B).
[15] ICPM, ch. 1.1(b) and (c).
[16] ICPM, ch. 3.1(d)(iii) and (iv).

the untimely filing.[17] In my experience, properly filed and supported motions to accept untimely filings due to natural disasters are rarely denied. Similarly, in my experience, properly filed and supported motions to extend a filing deadline due to an impending natural disaster, such as a hurricane, are also rarely denied.

23. In general, in my experience, for untimely filings related to an individual hearing, IJs frequently either excuse the untimeliness of the filing at the hearing or continue the case to another date to allow both the IJ and the opposing party additional time to review the filing.

24. How an IJ addresses an untimely filing will also depend on the specific facts of the case, the nature of the filing, and the extent of its untimeliness. For example, an IJ may not address the timeliness of a filing that is found to be cumulative or irrelevant because such a filing would be excluded from evidence even if it were timely. In my experience, the probative value of the filing, rather than its timeliness, is the most dispositive factor in how an IJ assesses the filing. Based on my experience, as a general—though not universal—proposition, the more probative the filing, the more likely an IJ will overlook its untimely filing.

25. Regulations also provide for the filing of motions for a continuance based upon a showing of good cause, and IJs possess authority to *sua sponte* adjourn cases.[18] Whether good cause exists depends on the specific facts of each case.

26. Deadlines for filing motions to reopen, motions to reconsider, and appeals are generally set by statute or regulation. Although IJs and members of the Board cannot alter those deadlines *per se*, evolving case law has made many of them subject to equitable tolling. Thus, depending on fact-specific circumstances of individual cases and applicable case law, equitable tolling may excuse filings not meeting these deadlines.

---

[17] ICPM, ch. 3.1(d)(iii) and (iv).
[18] 8 C.F.R. §§ 1003.29 and 1240.6.

27. During a bond proceeding for an adult, an IJ determines whether a detained alien is eligible for release from DHS custody and, if so, under what conditions.[19] IJs also have authority to consider requests to ameliorate the conditions of release from custody if the request is filed within 7 days of release.[20] An IJ may consider a request for bond even in cases where DHS has not filed an NTA. Based on evolving case law, an IJ may also have jurisdiction to consider bond requests for aliens whose removal proceedings have concluded but who have not yet been removed. An IJ may not grant bond or redetermine conditions of custody *sua sponte*.[21]

28. Any individual in DHS custody may request a bond hearing prior to the issuance of an administratively final order of removal. The initial request may be in writing or it may be made orally to the IJ during the individual's regularly-scheduled hearing. If requested in writing, the immigration court is supposed to schedule the hearing within three to five days after the request is received.[22] If requested orally, an IJ will typically conduct the bond hearing after concluding the scheduled hearing in order to keep the proceedings separate. Either party may appeal the IJ's bond decision to the Board.

29. An ROP for a bond proceeding is maintained separately from an ROP for a removal proceeding.[23] In my experience, at least one party typically files documents in a bond proceeding, and in some proceedings both parties file documents. OPLA frequently files a Form I-213, Record of Deportable/Inadmissible Alien, and the alleged alien often, though not always, files documentation to support a bond request. In cases involving detained aliens with criminal convictions, OPLA almost always files conviction records to assist the IJ in

---

[19] 8 C.F.R. §§ 1003.19 and 1236.1(d).
[20] 8 C.F.R. § 1236.1(d); *Matter of Garcia-Garcia*, 25 I&N Dec. 93 (BIA 2009).
[21] *Matter of P-C-M-*, 20 I&N Dec. 432 (BIA 1991).
[22] EOIR Policy Memorandum 20-07, *Case Management and Docketing Practices* (Jan. 31, 2020) at 2, https://www.justice.gov/eoir/page/file/1242501/download
[23] 8 C.F.R. § 1003.19(d).

determining whether the alleged alien is eligible for bond or may be subject to mandatory detention.[24]

30. Administrative support staff for a court are responsible for creating and maintaining the ROP for a bond proceeding, including placing any paper filings in the ROP. IJs do not typically print out filings, assemble the ROP, or maintain physical custody of it. Bond hearings are not required to be recorded, but some IJs do record the hearings. IJs in certain parts of the country are required to record bond hearings in certain types of cases due to court rulings.[25]

31. Some adult aliens are not eligible for a bond from an IJ while their removal proceedings are pending due either to their criminal history or their manner of attempted entry into the United States.[26] Such aliens may nevertheless be released from DHS custody if an IJ terminates their removal proceedings or grants them relief or protection at the conclusion of an individual hearing in their removal proceeding case. For example, an immigration judge generally lacks jurisdiction to grant bond to a detained "arriving alien,"[27] but if the immigration judge grants that alien's asylum application following an individual merits hearing, then in my experience, there is a strong likelihood DHS will release that alien from custody. Similarly, an immigration judge generally lacks jurisdiction to grant bond to a detained lawful permanent resident (LPR) alien convicted of certain crimes,[28] but immigration judges do have authority to cancel the removal of an LPR whose conviction is not an aggravated felony, who meets other criteria, and who warrants a favorable exercise of discretion.[29] In my experience, IJs often grant cancellation of removal to LPR who are statutorily eligible following an individual hearing,

---

[24] 8 U.S.C. § 1226(c);
[25] *Singh v. Holder*, 638 F.3d 1196, 1208 (9th Cir. 2011).
[26] 8 U.S.C. §§ 1225(b), 1226(c); 8 C.F.R. § 1003.19(h)(2)(i).
[27] 8 C.F.R. § 1003.19(h)(2)(i)(B).
[28] 8 U.S.C. §, 1226(c); 8 C.F.R. § 1003.19(h)(2)(i)(D).
[29] 8 U.S.C. 1229b(a).

and upon the granting of such relief, there is also a strong likelihood that DHS will release the LPR from custody. Thus, for detained aliens, both bond proceedings and removal proceedings provide a potential mechanism for release from custody, and the blanket postponement of all detained cases would deprive aliens of the opportunity to avail themselves of that mechanism. Between March 17 and April 9, 2020, for example, IJs either terminated proceedings or granted an application for relief or protection from removal for approximately 334 detained aliens, who may now be amenable to release from detention, but who would not necessarily have had that opportunity if their proceedings had been postponed.

32. Pursuant to paragraph 24A of what is known as the Flores Settlement Agreement (FSA), as interpreted by the Ninth Circuit, EOIR is required to hold bond hearings for any unaccompanied alien child (UAC) detained in the custody of the Department of Health and Human Services (HHS) in a secure or staff-secure facility or for any UAC who has affirmatively requested a hearing, including by requesting a hearing directly from the IJ.[30] During a bond proceeding for a UAC, an IJ determines whether a UAC is a danger to the community or is a flight risk, though HHS may not release a UAC determined to be neither a flight risk nor a danger to the community until a suitable sponsor is located. Either party may appeal the IJ's bond decision to the Board.  Because a UAC may request a bond hearing directly from an IJ during a regularly-scheduled hearing, the blanket postponement of all detained cases would deprive some UAC of the opportunity to request a bond hearing and potentially subject EOIR to liability for violating the FSA and disregarding a district court order.

33. Neither adult nor juvenile aliens are required to file a written motion or request in order to receive an initial bond hearing, and many aliens often request a bond hearing orally during

---

[30] *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017)

their regularly-scheduled hearings. Thus, postponing all regular hearings for detained aliens would necessarily require all such aliens to request a bond hearing in writing which is a requirement not currently imposed by the applicable regulation.[31]

34. Both DHS and HHS have authority to release aliens in their custody separate and apart from the authority of an IJ, though HHS cannot simply release a UAC alone without the availability of a sponsor.[32] The blanket postponement of all detained cases in removal proceedings—and, thus, the elimination of the availability of a detained alien to make an oral bond request in front of an IJ and the elimination of any opportunity for an IJ to terminate proceedings or to grant the alien's application for relief or protection that would make the alien amenable to release— would place extraordinary pressure on both DHS and HHS to release all aliens in their custody to avoid possible constitutional violations or violations of existing federal court orders. The mass release from custody of all detained aliens, including criminal aliens or aliens with national security concerns, in DHS custody and UAC in HHS custody, would have significant, adverse consequences for public safety.

35. Further, the blanket postponement of all detained cases in removal proceedings, including initial master calendar hearings for aliens recently detained by DHS, would make it extremely difficult for DHS to arrest and detain aliens prospectively, even aliens with significant criminal histories or national security concerns, because of the uncertainty of how long an alien would have to remain in custody before being able to obtain a hearing in front of an IJ that may lead to the alien's release.

---

[31] 8 C.F.R. 1003.19(b),
[32] 8 U.S.C. §§ 1182(d)(5), 1226(a), and 1232(c).

36. An alien otherwise subject to expedited removal may avoid removal initially if the alien demonstrates a credible fear of persecution or torture.[33] An alien's claim of a fear of persecution or torture is first reviewed by DHS.[34] If DHS determines that the alien does not have a credible fear of persecution or torture, the alien may seek review of that determination by an IJ.[35] By statute, that review "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the [DHS] determination."[36] If either DHS or an IJ finds that an alien does possess a credible fear of persecution or torture, that alien is placed in removal proceedings for a full consideration of his or her application for asylum.[37]

37. By statute, most aliens are detained during the credible fear review process, and an IJ does not have jurisdiction to grant an alien bond while that process is ongoing.[38] Whether an alien who has been found to have a credible fear and subsequently placed in removal proceedings is eligible for release from custody is the subject of ongoing litigation, and the most recent ruling from the Ninth Circuit on March 27, 2020, affirmed that such aliens who had entered the country illegally are eligible for a bond hearing.[39]  Even if such aliens are ultimately determined not to be eligible for bond, the granting of such an alien's asylum application by an IJ in removal proceedings would typically cause DHS to release the alien from custody. Consequently, the postponement of credible fear review proceedings would effectively preclude aliens in those proceedings from any opportunity to seek release from custody except

---

[33] 8 U.S.C. § 1225(b)(1)(A)(i) and (ii).
[34] 8 U.S.C. §§ 1225(b)(1)(A)(ii) and (b)(1)(B).
[35] 8 U.S.C. § 1225(b)(1)(B)(iii)(III).
[36] 8 U.S.C. § 1225(b)(1)(B)(iii)(III).
[37] 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 1208.30(g)(2)(iv)(B).
[38] 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).
[39] Padilla v. ICE, ---F.3d--- (9th Cir. 2020).

through federal habeas corpus litigation which itself is the subject of a case pending before the Supreme Court.

38. By regulation, "[i]n deciding the individual cases before them, and subject to the applicable governing standards, immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases."[40]  No employee at EOIR, except members of the Board acting on an appeal from the decision of an immigration judge, possesses the authority to direct the result of an adjudication assigned to an immigration judge.[41]

39. By regulation, as Director, I do not have the authority to adjudicate cases in immigration court or to direct the result of an adjudication assigned to an immigration judge, unless provided for by statute, regulation, or delegation of authority from the Attorney General.[42] No existing statute, regulation, or delegation of authority from the Attorney General provides me authority to adjudicate cases or to direct the result of an adjudication assigned to an immigration judge. Consequently, I do not have authority to direct immigration judges to deny or grant any motion in individual cases or to direct any result in any case in immigration court. If I were to order immigration judges to deny or grant motions in individual cases, I would be infringing on the independence and discretion accorded to immigration judges and potentially violating the regulations.

---

[40] 8 C.F.R. § 1003.10(b).
[41] 8 C.F.R. §§ 1003.0(c), (e)(2), (f), 1003.9(c), and 1003.10(b).
[42] 8 C.F.R. § 1003.0(c).

40. Immigration judges do have the authority to issue standing orders in certain circumstances.[43]

Immigration courts may also adopt local operating procedures.[44] Many courts and IJs hearing

detained cases have done so over the past three weeks in response to the COVID-19 outbreak

and have tailored them to the particular circumstances of their respective dockets.[45]

41. The Board operates as the administrative appellate tribunal for appeals of immigration judge

decisions. It also hears a limited number of appeals of certain types of adjudications initially

conducted by DHS.

42. Like IJs, members of the Board exercise "independent judgment and discretion" in considering

the cases that come before them.[46] No EOIR employee can direct a Board Member to decide a

motion or an appeal to obtain a particular result.[47]

43. The Office of the Chief Administrative Hearing Officer (OCAHO) administers proceedings

conducted by ALJs pursuant to 8 U.S.C. §§ 1324a, 1324b, and 1324c. Within OCAHO, the

Chief Administrative Hearing Officer (CAHO) hears appeals of ALJ decisions in cases heard

under 8 U.S.C. §§ 1324a and 1324c.  No EOIR employee can direct an ALJ to adjudicate a

case in a particular manner, except the CAHO in adjudicating an appeal from an ALJ decision.

**Court Operations in Response to COVID-19**.

44.     COVID-19 has presented challenges to EOIR, as it has to almost every court system in

the United States, in ensuring that critical functions continue while the agency simultaneously

aggressively monitors and works to mitigate risks presented by COVID-19 to those within

EOIR space. As with any type of emergency situation, EOIR is continually assessing how to

---

[43] EOIR Policy Memorandum 20-09 (PM 20-09), *The Immigration Court Practice Manual and Orders* (Feb. 13, 2020), https://www.justice.gov/eoir/page/file/1249276/download .
[44] 8 C.F.R. § 1003.40.
[45] https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic
[46] 8 C.F.R. § 1003.1(d)(1)(ii).
[47] 8 C.F.R. §§ 1003.0(c), (e)(2), (f) and 1003.1(a)(2)(ii) and (d)(1)(ii).

best ensure the safety of employees, respondents, practitioners, and visitors. It continues to closely review and implement guidance from the Department of Justice, the Office of Management and Budget, the Office of Personnel Management, the Centers for Disease Control and Prevention (CDC), and the General Services Administration in responding to issues concerning specific locations or employee situations related to COVID-19. EOIR takes the safety, health, and well-being of its employees respondents, practitioners, and visitors very seriously and will continue to respond to the COVID-19 outbreak accordingly, while also attempting to ensure that its critical and essential judicial functions continue.

45. I have closely observed that many court systems have grappled with the operational challenges posed by the outbreak of COVID-19. I have observed that few courts have closed entirely, but I understand that most federal, state, and administrative courts have scaled back operations to what may be characterized as essential or critical services. I have observed that many courts continue to process filings, including those submitted by mail or electronically. I have observed that many courts continue to adjudicate motions or filings that may be resolved without a hearing. I am aware that many, though not all, courts have also continued to conduct critical hearings of individuals in custody, including detention hearings. I am aware that many, if not most, courts have issued multiple announcements in March and April 2020 regarding their operational statuses and that these announcements are typically posted on the website for each court. I am also aware that the federal courts with social media accounts have also used social media channels to communicate announcements regarding their operational statuses. I am unaware of any legal challenges to the continued operation of other court systems or why the continued operation of those courts on a scaled-down level do not pose the same issues alleged by Plaintiffs regarding EOIR.

46. Because COVID-19 has not affected all communities nationwide in the same manner and because EOIR's dockets vary considerably from court to court, the challenges presented by COVID-19 are not the same for every immigration court. In recognition of these variances and of the fact that local immigration judges and court staff are often in the best position to address challenges tailored to the specifics of their court's practices, EOIR has not adopted a "one size fits all" policy for every immigration court, though it has issued generally-applicable guidance regarding access to EOIR space, the promotion of practices that reduce the need for hearings, and the maximization of the use of telephonic and VTC means through which to hold hearings.

47. Overall, EOIR has followed a path similar to that of other courts.  EOIR has implemented a number of measures to maximize social distancing. For example, on March 18, 2020, I issued EOIR Policy Memorandum (PM) 20-10 restricting access to EOIR space for individuals at risk of having COVID-19; reminding practitioners and IJs of well-established law that could help minimize the risk of exposure to COVID-19 such as waiving appearances,[48] granting continuances,[49] limiting physical presence in the courtroom,[50] issuing standing orders,[51] deviating from the ICPM,[52] and conducting hearings by VTC or by telephone; and, encouraging IJs and the parties to resolve cases through written filings[53] and establishing a policy of conducting hearings through VTC or by telephone[54] to the maximum extent practicable consistent with the law.[55]  PM 20-10 was modeled on similar orders issued by federal district courts.

---

[48] 8 C.F.R. § 1003.25(a).
[49] 8 C.F.R. §§ 1003.29 and 1240.6.
[50] 8 C.F.R. § 1003.27(a) and (b).
[51] PM 20-09.
[52] ICPM, ch. 1.1(b) and (c).
[53] 8 C.F.R. § 1003.25(b).
[54] 8 U.S.C. § 1229a(b)(2); 8 C.F.R. § 1003.25(c).
[55] EOIR Policy Memorandum 20-10, Immigration Court Practices During the Declared National Emergency Concerning the COVID-19 Outbreak (Mar. 18, 2020), https://www.justice.gov/eoir/file/1259226/download

48. PM 20-10 also commits EOIR to using alternative hearing mediums—such as hearings by telephone or by VTC—"to the maximum extent practicable in accordance with the law" to further minimize in-person interaction and reduce the risk of the spread of COVID-19. All immigration courts have the equipment to conduct hearings through VTC.  When conducting hearings by video or telephone conference, the IJ, the respondent, the DHS attorney, and the witness do not need to be present in the same location.[56]   For example, some courts use VTC to connect to another courtroom from an IJ's courtroom in the same court. Thus, the detainee is in a separate courtroom. If represented, the attorney could appear by telephone—and in many courts currently, prior approval or the filing of a motion is not required to appear telephonically—or appear in person.

49. Additionally, in master calendar and bond hearings, IJs and immigration courts have curtailed the number of detainees allowed in a courtroom at one time. Courts not located in detention facilities have also used VTC to conduct hearings, and some courts have conducted VTC hearings where the respondent appears in DHS space, rather than in an EOIR courtroom.

50. VTC is commonly used for detained hearings already, and EOIR conducted almost 35,000 hearings by VTC in the first quarter of FY 2020.[57] Aliens may also consent to have their individual hearings occur by telephone, though VTC is more logistically feasible for aliens who are detained.

51. Between March 18 and March 26, 2020, EOIR conducted approximately 81.5% of credible fear reviews by telephone or by VTC.  Excluding removal cases heard by an immigration court physically located inside a DHS detention facility, EOIR conducted approximately 76.4% of removal hearings during that same time period by telephone or by VTC. For cases heard by a

---

[56] ICPM ch. 4.7(b).
[57] https://www.justice.gov/eoir/page/file/1117301/download

court physically located inside a DHS detention facility, no policy or law prevents either party from requesting to follow social distancing guidelines within the courtroom or prevents the IJ from following those guidelines *sua sponte*.

52. OCIJ has further taken specific steps at the 58 immigration courts that maintain dockets of detained cases to minimize risk of exposure to COVID-19 to employees, aliens, and practitioners. These steps include consolidating dockets so that fewer IJs are needed to hear cases; establishing standing orders to allow practitioners to appear telephonically; maintaining social distancing in courtrooms; and, furthering the use of VTC and the telephone for hearings, including utilizing empty courtrooms as needed to avoid the need for a detained alien to appear in person before an IJ, and relocating IJs to nearby courts to hear cases by VTC. As of April 10, 2020, OCIJ has maximized its VTC usage for hearings at all but four of the 58 immigration courts hearing detained cases and is actively working on maximizing the use of VTC at the remaining four.[58]

53. On March 18, 2020, EOIR postponed all removal hearings of non-detained aliens through at least April 10, 2020.

54. On March 23, 2020, EOIR postponed all removal hearings involving aliens placed in removal proceedings under the auspices of DHS's Migrant Protection Protocols (MPP) program through at least April 22, 2020.

55. Although EOIR has completely closed particular immigration courts for a limited period of time and on a court-specific basis for issues related to COVID-19, courts that are open are limited to the performance of essential functions, such as those associated with hearing cases

---

[58] Two of the four courts are awaiting the installation of VTC capability and recording programming on the IJs' computers to allow them to conduct hearings remotely rather than in court. One court is awaiting testing of VTC equipment. The fourth hears only one detained docket per month and is assessing its technological capability to hear that docket by VTC in May if warranted.

of detained individuals or with the processing of mail and filings. At courts without a regular detained docket, EOIR's staff presence is minimal, as is their interaction with the public. Overall, EOIR's current operating posture is similar, though not completely identical, to the one in which it operates during a lapse in appropriations in which only critical functions continue.

56. The impact of postponements and court closures on any filing deadlines varies considerably from case to case and depends on the nature of the filing, the procedural posture of the specific case, and the IJ's specific order on filings, if any. Because filing deadlines are committed by the ICPM to IJs for all detained cases, the impact of any court closures will depend on any specific order issued by an IJ in a particular case.

57. Unless there is a specific IJ order to the contrary, postponements and court closures would not be expected to raise issues regarding filing deadlines for non-detained cases at the master calendar stage because any deadline imposed by the ICPM only applies to a motion and only applies if the party wishes to receive a ruling on the motion prior to the hearing. "Otherwise filings may be made either in advance of the hearing or in open court during the hearing."[59]

58. Similarly, unless there is a specific IJ order to the contrary, postponements and court closures would also not be expected to raise issues regarding filing deadlines for non-detained cases at the individual calendar stage. If the IJ has ordered that the deadlines in the ICPM are applicable, the postponement of the hearing would necessarily postpone the deadline because the ICPM deadline applies in advance of date of the "hearing" which may change if the hearing is postponed.[60] If a court is closed when a deadline occurs, the deadline then becomes the next

---

[59] ICPM, ch. 3.1(b)(i)(A).
[60] ICPM, ch. 3.1(b)(ii)(A).

business day the court is open.[61] These rules are longstanding, and in my experience, most, if not all, practitioners are well aware of them.

59. I understand that on March 24, 2020, EOIR announced via social media the reopening of several immigration courts handling primarily, if not exclusively, non-detained cases and noting that filings due to those courts during the time they were closed would be due the next business day. Although this announcement was consistent with the longstanding rule that filings due when a court is closed become due on the next business day the court is open, it nevertheless caused confusion because it did not account for the fact that all non-detained hearings had been postponed through April 10, 2020. Consequently, the earliest possible due date for a filing in a non-detained case following the ICPM would have been 15 days prior to the earliest possible scheduled non-detained hearing, which would not occur until April 13, 2020. Thus, filings for hearings scheduled on April 13, 2020, were not actually due until March 30, 2020.[62]

60. I did not see or approve the initial announcement on March 24, 2020, before it was posted on social media, and once I became aware of it, I immediately directed that it be changed to reflect that filings would be due by March 30, 2020. Going forward, EOIR has implemented additional internal protocols regarding its messaging on social media, and I have directed that EOIR be more careful in reviewing announcements it makes via social media.

61. EOIR has not completely closed—meaning closed even to process mail or receive filings—all immigration courts. The complete closure of all immigration courts would preclude IJs from hearing any cases because IJs do not assemble ROPs themselves, they typically do not print

---

[61] 8 C.F.R. § 1001.(h); ICPM, ch. 3.1(c)(i) and (ii).
[62] Fifteen days prior to April 13, 2020, fell on Sunday March 29. Thus, any filings would have actually been due on Monday March 30.

out electronic filings themselves, and they would have no way of retrieving any relevant filings from a closed court. The complete closure of all immigration courts would also render aliens subject to removal by DHS without an opportunity to file a motion to reopen or to seek a stay of removal.[63] Such an action would be contrary to statutory provisions allowing the filing of a motion to reopen[64] and would likely be viewed as a violation of due process for aliens whose removal is imminent. Accordingly, EOIR is continuing to receive and process filings at all courts, including motions to reopen.

62. EOIR has also not issued a blanket postponement of hearings of detained individuals. To do so would raise serious constitutional and due process concerns, would be contrary to at least one section of the INA, and would subject EOIR to potential litigation risk for violating court orders or failing to follow binding circuit court decisions.

63. A blanket postponement of all hearings of detained individuals would raise constitutional concerns regarding the intentional prolonging of an alien's detention and the functional elimination of an alien's ability to challenge the alien's detention through a proceeding before an IJ.

64. Preventing a detained alien from receiving a review of a negative credible fear determination for an unknown or indefinite period of time would be contrary to 8 U.S.C. § 1225(b)(1)(B)(iii)(III). It would also prevent that alien from potentially obtaining release from custody.

65. Preventing hearings from occurring would prevent DHS from filing an NTA to initiate proceedings with the time and date of the next hearing. Such an action would not only infringe upon DHS's prosecutorial discretion to bring removal proceedings but would also appear to be

---

[63] 8 U.S.C. § 1229a(b)(5)(C); 8 C.F.R. § 1003.23.
[64] 8 U.S.C. § 1229a(c)(7).

contrary to 8 U.S.C. § 1229(d)(1), which directs DHS to initiate removal proceedings against aliens removable due to criminal convictions "as expeditiously as possible after the date of the conviction."

66. In my experience, many, if not most, aliens who are detained do not want any additional delay in their proceedings precisely because they are detained. Moreover, many detained aliens actively seek either an order of removal or an order of voluntary departure because they wish to return to their home countries. Thus, postponing all detained hearings would prolong detention for some aliens against their wishes and would force some aliens to remain detained even though the alien and DHS are in agreement that the alien should return to the alien's home country.

67. EOIR must comply with rulings from multiple federal courts across the country requiring the provision of bond hearings in certain circumstances. For example, based on federal court rulings in some districts or circuits, EOIR is required to hold bond hearings, *inter alia*, for UAC,[65] for aliens detained more than six months,[66] for aliens in withholding-only proceedings,[67] for aliens otherwise subject to the mandatory custody provisions of 8 U.S.C. § 1226(c),[68] for juvenile aliens re-arrested after being released by HHS,[69] and for aliens who have been found to have a credible fear of persecution or torture.[70] The blanket postponement of all detained hearings would place EOIR at serious risk of violating federal court orders or rulings in each of these circumstances because it would prevent EOIR from scheduling and

---

[65] *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017).
[66] *Casas-Castrillon v. DHS*, 535 F.3d 942 (9th Cir. 2008); *Diouf v. Napolitano*, 634 F.3d 1081 (9th Cir. 2010); *Gonzales v. Sessions*, 325 F.R.D. 616 (N.D. Cal. 2018); *Rodriguez v. Marin*, 909 F.3d 252 (9th Cir. 2018).
[67] *Guerra v. Shanahan*, 831 F.3d 59 (2d Cir. 2016); *Martinez Baños v. Asher*, 2018 WL 3244988 (W.D. Wash. 2018); *Diaz v. Hott*, 297 F.Supp. 3d 618 (E.D. Va. 2018).
[68] *Gayle v. Warden, Monmouth Cty. Correctional Inst.*, 2017 WL 5479701 (D.N.J. 2017).
[69] *Saravia v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).
[70] *Padilla v. ICE*, ---F.3d--- (9th Cir. 2020).

holding hearings at which an alien could orally request bond pursuant to some of these decisions, would effectively require each alien to file a written motion for bond in excess of the requirements of either the applicable regulation or the holdings of many of the cases, and would prevent EOIR from holding hearings in which an alien could potentially obtain some form of relief or protection from removal that would render the alien amenable to release.

68. On March 30, 2020, EOIR announced that all non-detained hearings were further postponed through May 1, 2020. For non-detained cases in which the IJ is following the ICPM for filing deadlines, that means that the earliest date filings could be due prior to an individual hearing is April 20, 2020.

69. On April 1, 2020, EOIR postponed all removal hearings involving aliens placed in removal proceedings under the auspices of DHS's MPP program through at least May 1, 2020.

70. EOIR has implemented many suggestions made by its stakeholders in response to the COVID-19 outbreak. For example, it has postponed non-detained hearings and, in practice, differentiated hearings for detained aliens as essential or critical; it has made electronic filing available at every court; it has updated it policies on electronic signatures; and, it has moved further toward a maximized use of VTC and remote methods of hearing cases.

71. On April 7, 2020, EOIR established email boxes for the electronic filing of briefs at the Board similar to the email boxes that were set up to allow for filing by email at every immigration court. Because the Board adjudicates appeals of detained aliens, including appeals of bond decisions by IJs, the same concerns with closing detained courts or postponing detained cases also apply to the Board.

72. On April 9, 2020, EOIR announced that OCAHO will accept new complaints filed by email. OCAHO otherwise continues to receive filings and adjudicate cases, and I am unaware of any complaints or concerns directed at OCAHO's continued operations.

**Notifications**

73. EOIR has maintained a social media Twitter account since 2011 and a social media Facebook account since 2013. The current version of EOIR's website launched in October 2010.

74. EOIR communicates information regarding immigration court operations by placing information on its website and through postings on social media. For each case that is rescheduled, it also provides a new notice of hearing in that case which is mailed to the last address provided by an alien and the alien's representative, if any.

75. EOIR routinely posts announcements of immigration court closures on social media, in addition to posting that information on its website. For example, between January 28, 2019, and March 1, 2020, EOIR made approximately 150 separate announcements via social media and its website regarding the operational status of immigration courts, including many announcements regarding the closure of courts.

76. Prior to March 2020, I am unaware of any complaints EOIR received or concerns raised to EOIR regarding the manner in which operational announcements were communicated, even for announcements that involved the transfer of hearings and filings to a different immigration court. For example, on August 16, 2019, EOIR announced, through social media and on its website, the indefinite suspension of operations at the immigration court in Louisville, Kentucky, due to building safety conditions and the transfer of cases and filings to the immigration court in Memphis, Tennessee. I am unaware of any complaints that EOIR received

regarding the adequacy of that announcement or of any confusion or difficulty in having the cases heard at the Memphis Immigration Court.

77. On March 15, 2020, EOIR established a specific web page, EOIR Operational Status During Coronavirus Pandemic (Operational Status website), which it has updated on almost a daily basis with information regarding hearing status, filings, court operations, and standing orders.[71]

78. In addition to making operational announcements through its website and social media and providing written notice of postponement of hearings, EOIR created a listserv on March 26, 2020, for announcements to practitioners, including announcements of the adoption of standing orders.[72]

79. Multiple stakeholders, including the organizational Plaintiffs, also frequently retweet, forward, or collect and present information that EOIR announces publicly which further amplifies the dissemination of that information.[73] I am aware that Plaintiffs have presented declarations and exhibits indicating that many stakeholders disseminate information EOIR has announced through their own listservs.

80. The three organizational Plaintiff are stakeholders and at least two of them maintain a social media presence, including on Twitter.

81. EOIR has publicly announced through social media and on its website when immigration courts have closed due to an incident related to COVID-19 or as a precautionary measure in situations without a confirmed or verified incident. Federal health and medical privacy laws prevent EOIR from disseminating medical information about particular individuals, including the results of medical tests. Accordingly, EOIR cannot publicly announce the results of an

---

[71] https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic
[72] https://www.aila.org/infonet/eoir-sends-message-to-stakeholders-announcing-new
[73] https://www.aila.org/recent-postings

individual's COVID-19 test, an individual's diagnosis from a doctor, or the identity of an individual involved in an incident.

### Filings and Appearances

82. EOIR has no policy requiring the filing of unclassified documents in person. EOIR's current policy is to encourage filings by mail and through electronic means, including through email or through ECAS, where available.

83. EOIR has allowed filing by mail since its inception, and I am unaware of any systemic problem at EOIR regarding filing by the United States Postal Service (USPS) or by a corporate delivery service. The INA's multiple references to service by mail[74] further indicate that mail is deemed to be a generally reliable vehicle for communications to and from an immigration court. Every court system of which I am aware relies on the mail for filings, and most courts of which I am aware are continuing to receive filings by mail. Although there may be individual instances in which mail is not properly delivered to an immigration court, those are redressable through motion practice or legal argument.

84. EOIR has no policy requiring any attorney to appear in any case in person. The method of an attorney's appearance is subject to the discretion of the IJ.

85. Beginning March 17, 2020, many immigration courts began adopting local operating procedures (LOPs) pursuant to regulation, and many immigration judges began issuing standing orders pursuant to policy. As of April 10, 2020, all immigration judges at 38 immigration courts hearing principally detained cases had adopted LOPs in the form of standing orders. As of the same date, 8 immigration judges hearing principally detained cases had adopted standing orders at courts which have not yet adopted LOPs. Immigration judges

---

[74] 8 U.S.C. §§ 1229(a)(2)(A) and (c).

or immigration courts hearing primarily or exclusively non-detained cases have not generally adopted standing orders or LOPs because non-detained cases are currently postponed through May 1, 2020.

86. Most, if not all, of these LOPs and standing orders allow for the appearance of practitioners by telephone without the need to file a motion. Although a few of them require parties appearing by telephone—meaning both DHS and the alien's representative, if any—to waive objections to a document on the *sole* basis that they could not examine the document in person,  none of the LOPs or standing orders requires parties generally to waive any rights  to object to evidence.

87. All LOPs and standing orders have been posted by EOIR on the website for the relevant court, in the ICPM, and on its Operational Status website.[75] Additionally, all LOPs and standing orders have been noted on EOIR's social media accounts and distributed through its listserv. All of them are designed to protect EOIR employees, aliens, practitioners, and attorneys for DHS while simultaneously maintaining the due process rights for detained aliens.[76]

88. EOIR does not have the authority to direct IJs on how to rule in their cases. Because IJs exercise independence and discretion in deciding individual cases, neither I nor any employee at EOIR—except a member of the Board adjudicating a case appeal—is authorized to require IJs to deny or grant any particular motion. IJs are expected to adhere to the law, and instances in which a party believes an IJ has failed to follow the law may be redressed through an appeal to the Board, including an emergency interlocutory appeal. I am also not aware of IJs or the Board systematically failing to use sound judgment in consideration of motions filed during the current situation related to COVID-19, especially after March 20, 2020.

---

[75] https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic
[76] https://www.justice.gov/eoir/page/file/1259916/download

89. Because IJs exercise independence and discretion in deciding individual cases, neither I nor any employee at EOIR—except a member of the Board adjudicating a case appeal—is authorized to require IJs to extend or restrict a filing deadline, to excuse or apply the statutory one-year deadline for filing an asylum application, to determine whether an alien has or has not demonstrated extraordinary circumstances warranting the excusal of that deadline, or to require an IJ to excuse or follow any established filing deadline. IJs are expected to adhere to all applicable law and to utilize their discretion appropriately. Instances in which a party believes an IJ has failed to follow the law, including where a party believes an IJ has abused his or her discretion, may be redressed through an appeal to the Board. I am not aware of IJs or the Board systematically failing to use sound judgment in consideration of any of these legal issues during the current situation related to COVID-19, especially after March 20, 2020.

90. EOIR does not control detention facilities maintained, operated, or leased by DHS and, accordingly, has no authority to direct DHS operations regarding who may access, and under what conditions, those facilities. I understand that DHS may have recently imposed additional safeguards on visitors to its facilities and that it may have limited avenues of communications between practitioners and detainees. I am not aware of any motions to continue being filed by Plaintiffs based on these circumstances, nor am I aware of any such motions being denied by IJs due to these circumstances. In general, although neither I nor any EOIR employee possess the authority to direct an IJ how to rule in a particular case, I am not aware of IJs systematically failing to use sound judgment in consideration of motions filed during the current situation related to COVID-19, especially for motions alleging that a practitioner was unable to access a facility where an alien is detained.

91. In response to an inquiry from a stakeholder received on March 19, 2020, EOIR clarified its policy on signatures for filings on March 31, 2020.[77] EOIR will allow the submission of filings with electronic signatures, though the signature may be subject to authentication as warranted by the facts in a particular case.  I issued PM 20-11, *Filings and Signatures*, on April 3, 2020, confirming this updated policy.[78] EOIR will also continue to accept original documents containing wet signatures.  Any type of signature — wet, digital, or electronic — may be subject to a challenge to its authenticity in immigration proceedings, though EOIR expects that any such challenge will be brought only in good faith.

92. The outbreak of COVID-19 has suspended EOIR's rollout of its new electronic adjudication system, the EOIR Courts & Appeals System (ECAS), which includes an electronic filing capability. ECAS has already been deployed to 14 courts, and in courts where ECAS has been deployed, filing may be made electronically through that system. In the other courts, filing by mail remains available and encouraged.

93. Immigration courts and judges may authorize the filing of documents by facsimile or email,[79] and some LOPs and standing orders are allowing the filing of documents through those means.[80] Beginning March 31, 2020, EOIR established court-specific email addresses to be used as temporary electronic failing mailboxes. As of April 9, 2020, 3157 email messages with filings had been received using those addresses.

94. I am aware that several state and local jurisdictions have issued executive orders in response to the COVID-19 situation, though not every state or locality in which an immigration court is present has done so. Although these orders carry different labels and vary considerably in their

---

[77] ICPM, ch. 3.3(b)(i).
[78] https://www.justice.gov/eoir/page/file/1266411/download
[79] ICPM, ch. 3.1(a)(vii).
[80] https://www.justice.gov/eoir/page/file/1263056/download

specifics, they generally order individuals to limit public interactions to essential tasks. Although the precise definition of "essential" varies greatly among the orders, I am not aware of any state or local order that purports to limit or close the functioning of federal government entities such as EOIR. I am also not aware of any such order that deems court operations or the provision of legal services as non-essential, and I am aware of many orders that expressly state that such services are essential.[81] I am also not aware of any such order that considers the mail to be non-essential or that purports to close the operations of the USPS. I am aware that many such orders rely on an advisory list of critical infrastructure workers prepared by DHS's Cybersecurity and Infrastructure Security Agency (CISA) in their assessments of essential work. I am also aware that CISA includes postal, parcel, and courier services, communications and information technology services, and operations of judicial systems among its list of critical infrastructure services.[82]  In short, I am not aware of any state or local order that requires EOIR to cease its operations, especially hearings for detained individuals, or that prohibits legal practitioners from working with clients in conjunction with those operations.

95. The law and any EOIR policies on filing and appearances generally apply equally to both parties in an immigration proceeding. Thus, standards for filing deadlines, filings by mail, and continuances apply equally to both aliens and DHS. I am unaware of any IJ treating these issues differently for DHS than for the aliens in immigration proceedings.

### Assessment of Plaintiffs' Assertions

96.  I understand Plaintiffs' claims related to EOIR to be speculative based primarily on isolated anecdotes related to a small number of EOIR's 69 immigration courts and adjudication centers. I understand Plaintiffs to not have even alleged any concerns with the vast majority of

---

[81] https://files.nc.gov/governor/documents/files/EO121-Stay-at-Home-Order-3.pdf
[82] https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce

immigration courts hearing detained cases. Although I understand Plaintiffs to have raised various hypothetical scenarios stemming from the COVID-19, I am not aware of any scenario that cannot be addressed by extant law or policy.

97. I am not aware of any IJs or Board members systematically failing to account for the operational challenges posed by the outbreak of COVID-19 in Plaintiffs' cases or in any other cases.   To the contrary, I am aware that Plaintiffs have presented declarations and exhibits indicating that immigration court personnel have been accommodating in light of the current environment—*e.g.*, "I would say our court has been very solicitous in granting telephonic hearings and continuances."[83] and "On March 25, 2020, I received a call from the court clerk asking me to email a motion to continue, an extraordinary request since the immigration courts do not allow electronic filings."[84]

98. I understand Plaintiffs formally to seek only the postponement of all in-person hearings before EOIR, but I understand Plaintiffs to appear to mean, instead, the postponement of all *non-bond* hearings. Thus, I understand Plaintiffs to seek the postponement of all detained hearings— including the postponement of credible fear reviews and merits hearings at which an alien may become eligible for release upon the granting of an application by an IJ—except for bond hearings, which I understand Plaintiffs to seek to be conducted only by VTC or telephone.

99. I also understand Plaintiffs to present declarations and exhibits seeking a variety of remedies different from those sought by Plaintiffs, including the closure of all immigration courts and, thus, the postponement of all hearings. For example, I understand Plaintiffs to seek the postponement of all credible fear reviews for detained aliens, though I am aware that Plaintiffs have presented declarations and exhibits which do not seek such postponements. I also

---

[83] ECF 7-4, ¶ 18.
[84] ECF 7-5, ¶ 25.

understand Plaintiffs to present declarations and exhibits seeking mutually exclusive actions—

*i.e.* closing courts but continuing to hear certain types of cases.

100.    EOIR has already adopted a policy of maximizing the use of VTC or a telephone for

conducting hearings, especially detained hearings, and it has adopted many of the suggestions

put forth in the declarations and exhibits submitted by Plaintiffs. It has declined, however, to

cease all hearings for detained aliens. Plaintiffs' claims, if accepted, would require EOIR to

postpone credible fear reviews and other hearings for detained aliens at which the aliens may

either orally request bond from an IJ or receive a favorable adjudication on an application from

an IJ that would warrant their release from custody.  I am not aware of any other court system

in the United States completely ceasing to hear cases of detained individuals, nor am I aware

of any other lawsuit seeking such cessation from any court system in the United States at the

current time. Stopping all detained hearings for an unknown or indefinite amount of time would

place EOIR at serious risk of failing to comply with district court orders and circuit court

decisions related to hearings for detained aliens, would effectively invalidate various statutory

provisions, and would eviscerate the independence and discretion of immigration judges and

Board members in their consideration of the individual circumstances of each case. Such a

shutdown would further place significant pressure on DHS and HHS to release all aliens in

their custody in order to avoid constitutional issues associated with potentially indefinite

detention without recourse to a hearing, which would raise additional issues of public safety.

Such a shutdown would also cause significant harm to aliens in detention who may utilize their

hearings to become amenable to release from detention and to aliens seeking to file motions to

reopen or to stay removal.

Executed on April 13, 2020.

JAMES
MCHENRY

Digitally signed by JAMES
MCHENRY
Date: 2020.04.13 14:53:49
-04'00'

James McHenry