**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, *et al.*,<br><br>         Plaintiffs,<br><br>         v.<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW *et al.*,<br><br>         Defendants. | Case No. 1:20-cv-00852 (CJN) |

**BRIEF OF AMICI FORMER FEDERAL IMMIGRATION JUDGES AND MEMBERS OF BOARD OF IMMIGRATION APPEALS IN SUPPORT OF PLAINTIFFS' MOTION FOR AN EMERGENCY ORDER**

TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................................... 1

INTEREST OF AMICI CURIAE............................................................................................ 1

INTRODUCTION ................................................................................................................. 1

ARGUMENT......................................................................................................................... 3

    A.    The Current EOIR Approach to the COVID-19 Pandemic Is Scientifically and
        Legally Inadequate ................................................................................... 3

        1.    EOIR's Lack of Adequate Continuity Planning............................ 4

        2.    The Dire Public Health Concerns Caused by the Failure to Plan
                Appropriately ................................................................... 5

        3.    EOIR's Self-Inflicted Infrastructure Defects Hamper its Ability to
                Appropriately Respond to the Pandemic ........................... 6

    B.    A Better Interim Approach that Protects the Public, Due Process, and Provides an
        Opportunity for the Agency to Develop a Comprehensive Approach ....... 9

        1.    An Interim Categorization of Essential and Non-Essential
                Proceedings ................................................................... 11

        2.    EOIR Should Postpone Non-Essential Hearings Through at Least
                June 1, 2020 ................................................................... 11

        3.    Essential proceedings should continue with additional safeguards
                including a presumption of release from custody ........... 13

    C.    When the Public Health and Due Process are Protected, The Agency Should Use
        Existing Frameworks for Developing a Comprehensive Approach......... 14

CONCLUSION.................................................................................................................... 16

TABLE OF AUTHORITIES

**Cases**

*Rodriguez v. Robbins*
    804 F.3d 1060 (9th Cir. 2015) .............................................................................................. 14

**Statutes**

8 U.S.C. § 1230(c)(4)(B) ............................................................................................................ 8

**Regulations**

8 C.F.R. § 1003.0(b) .................................................................................................................... 1

8 C.F.R. § 1003.19 ...................................................................................................................... 11

8 C.F.R. § 208.4(a)(2) ................................................................................................................. 12

**Other Authorities**

ABA 2019 Update ES-20 ............................................................................................................ 7

DOJ, EOIR Legal Case Study Summary Report 23 (Apr. 6, 2017) ........................................... 8

Ingrid V. Eagly, *Remote Adjudication in Immigration*, 109-4 NW. U. L. Rev. 933, 941,
    994 (2015) ................................................................................................................................ 8

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* are former immigration judges and members of the Board of Immigration Appeals.  They are individuals appearing in their individual capacity.

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are former immigration judges and members of the Board of Immigration Appeals who have spent our careers conducting proceedings in the immigration courts of the United States.  *Amici* have an interest in protecting the full and fair adjudication of cases in the immigration courts and the safety of those who participate in and adjudicate those cases.  *Amici* also seek to offer the Court an understanding of the resources—technological or otherwise— available to immigration court judges and how those resources may best be used to protect the immigration courts in the face of a global pandemic.  A list of *Amici* are attached as Exhibit A.

## INTRODUCTION

We are in the midst of a nationwide pandemic.  From the approach of the Executive Office for Immigration Review (EOIR) headquarters, one would never know that.  Through a series of chaotic and inconsistent announcements, EOIR —the office that manages the procedural components of the immigration court system on behalf of the United States Department of Justice[2]—has continued to schedule non-essential proceedings, requiring judges, court staff and security personnel, litigants and case participants, attorneys, witnesses, interpreters, and interested members of the public to come immigration court, exposing them, their families, and their communities to unnecessary risk of COVID-19.

---

[1] In accordance with Local Rule 7(o), no party's counsel authored this brief in whole or in part, nor did any party or party's counsel, or any other person other than *amici curiae*, contribute money that was intended to fund preparing or submitting this brief.

[2] *See* 8 C.F.R. § 1003.0(b) (setting forth the authority of the Director of EOIR).

The madness of EOIR's approach is evident in one example, representative of its approach. Yesterday – April 8 -- the immigration court in Elizabeth, New Jersey was open for business as usual. This court is across the Hudson River from New York City, and is near the epicenter of the largest COVID-19 hotspot on the planet, and is in a jurisdiction that has had a mandatory "shelter-in-place" order since March 21. Yet EOIR insisted that proceedings continue yesterday. Until it was learned that two detainees in the courthouse were positive for COVID-19. Only then did EOIR accede to the obvious, scrambling to order the court to shut the Elizabeth court down. But immigration courts were open in many other jurisdictions yesterday, and are scheduled to be open today and for the foreseeable future.

EOIR's intransigence defies the practice of numerous federal and state courts, the recommendations of public health officials, and the orders of dozens of Governors who have ordered all non-essential business be deferred. As Judge Samuel Cole, a spokesperson for the National Association of Immigration Judges warned, "everyone is being put at risk." *Close immigration courts? Lawyers and judges push to stop in-person hearings amid coronavirus spread*, Fortune (Mar. 26, 2020) (describing how attorneys are wearing swim googles and masks to comply with EOIR orders).

The current EOIR approach manifests this disarray because there was not, and has never been, any meaningful continuity planning by EOIR. EOIR, and therefore the immigration court system itself, has sacrificed due process in favor of rapid removals, leaving the court without any incentive at all to plan to protect the public health or the individuals and participants in the system.

Amici urge the issuance of a temporary restraining order to allow for development of a more comprehensive, systemic, and scientifically sound policy that respects due process and the

public health.  We offer a framework for what a legally and scientifically sound policy could look like and why a court-ordered pause on all non-essential activities for a short 28-day period could allow for such a policy to emerge in deliberations with stakeholder communities.

## ARGUMENT

### A.   The Current EOIR Approach to the COVID-19 Pandemic Is Scientifically and Legally Inadequate

Since it was clear that COVID-19 is a pandemic, EOIR has received universal criticism from the Immigration Judges 'Union, Immigration and Customs Enforcement, stakeholders, members of Congress, and the public.[3]  Such criticism is entirely warranted.  EOIR's approach to operations during the pandemic has been marked by a chaotic, inconsistent and confusing series of pronouncements – some made by order, some by memo, some by email, and some by Tweet—concerning operations of specific courts on particular days (closed one day, open the next) that are not based on conditions in the surrounding communities.  Some of these pronouncements raise serious questions of legality, and none seem to be based on any semblance of an actual plan that accounts for the science of public health, as explained by experts at the Centers for Disease Control & Prevention (CDC).  None of these messages account for the important public trust that the immigration courts should hold.

---

[3] *See, e.g.,* Letter to EOIR Director James McHenry from NAIJ (Mar. 12, 2020), https://www.naij-usa.org/images/uploads/newsroom/NAIJ_Letter_to_EOIR_Director_Re_Coronavirus.pdf; Megan Towey, *Citing Coronavirus Pandemic, Judges and ICE Attorneys Demand Closure of Immigration Courts*, CBS News (Mar. 25, 2020), https://www.cbsnews.com/news/citing-coronavirus-pandemic-judges-and-ice-attorneys-demand-closure-of-immigration-courts/; Letter of Senator Elizabeth Warren to Attorney General Bar and EOIR Director McHenry, Mar. 21, 2020, *available at* https://www.warren.senate.gov/imo/media/doc/DOJ%20and%20EOIR%20letter%20-%20immigration%20court%20closure%20-%203.21.2020.pdf; Letter of Rep. Pamila Jayapal, et al., to EOIR Director McHenry, Mar. 26, 2020, *available at* http://jayapal.house.gov/wp-content/uploads/2020/03/EOIR_SeattleImmigrationCourt_03262020-1.pdf.

### 1.      EOIR's Lack of Adequate Continuity Planning

When the COVID-19 outbreak began in the Seattle area, on March 11 and March 12, EOIR announced via Twitter that the Seattle Immigration Court was closed.[4]  On March 12, the Director of EOIR, James McHenry, explained to a key stakeholder, the American Immigration Lawyers Association, that, essentially, there was no plan in place to address the pandemic. Director McHenry explained that

> "[a]ttorneys with cases in immigration court have longstanding information readily available to them about the filing of motions to continue, which immigration judges will adjudicate based on the unique facts of each case and relevant situation to include active illnesses of all varieties. Although the operational situation may change as new information is received, immigration courts will continue to address cases, including any motions to continue, in accordance with the applicable law. Any changes to the operating status of a court will be communicated to staff, respondents, and the public."[5]

As the outbreak spread, the lack of a continuity plan became achingly clear.  From March 13, 2020, to the date of this filing, EOIR issued dozens of different confusing and inconsistent tweets announcing court closures, changed filing deadlines, and changed filing locations.  Early on, EOIR released a statement explaining that it did "not plan any mass closure of immigration courts," that everything would be handled on the "unique facts of each case," and that "employees and stakeholders [should] follow CDC guidance regarding hygiene practices and . . . refrain from spreading rumors or misinformation that may distract us from fulfilling our mission during this challenging time."[6]

---

[4] https://twitter.com/DOJ_EOIR/status/1237906108347531267;
https://twitter.com/DOJ_EOIR/status/1237585757545480192.

[5] https://www.aila.org/advo-media/issues/all/covid-19#eoir.
[6] https://twitter.com/CEDickson/status/1238475261286514688?s=20.

2.      **The Dire Public Health Concerns Caused by the Failure to Plan Appropriately**

The lack of continuity planning has had serious implications for the public health.  For example, as explained in a letter from the New Jersey State Bar Association to the Governor of New Jersey, the dangers of EOIR's approach are manifest.  "[L]iterally thousands of respondents and their family members were required to appear at master calendar[7] and individual hearings [at the Newark immigration court], along with their attorneys, attorneys from the Office of Chief Counsel, court staff, interpreters, security guards and Immigration Judges," even though an attorney exposed to COVID-19 had been present in court experiencing symptoms.  Later, another attorney became quite ill.  There is now a government attorney who "has not only tested positive for COVID-19 but is currently in a medically induced coma in ICU fighting for his life."[8]

Similar chaos has reigned in Seattle, one of the earliest and most concentrated sites of the pandemic.  Due to a report of second-hand coronavirus exposure, EOIR announced at 8:46 PM on March 10, 2020, via Twitter, that the Seattle court would close on March 11.[9]  Subsequent tweets announced continued court closure on a daily basis until, on March 13, EOIR announced

---

[7] Master Calendar hearings, the Immigration Court equivalent of arraignments, typically schedule 50 to 70 respondents in either a morning or afternoon hearing.  The number in attendance is increased by those respondents' attorneys, family members, and others accompanying to interpret or otherwise assist.  As Immigration Court courtrooms typically seat 20 to 25 people, such hearings become extremely crowded.

[8] Letter of Evelyn Padin, President, New Jersey State Bar Association, to Governor Phil Murphy, Mar. 26, 2020, *available at* https://tcms.njsba.com/PersonifyEbusiness/Portals/0/2020%20Miscl/Immigration%20courts%20ltr%20to%20Gov%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.pdf.

[9] https://twitter.com/DOJ_EOIR/status/1237585757545480192.

the court's closure through April 10 "due to the stage of coronavirus outbreak in Seattle."[10]  But on March 24, at 6:23 PM, EOIR announced—yet again, via Twitter—that the Seattle court would reopen the next day and that all filings due during closure were due by March 30.[11]  The announcement was made without explanation, and apparently without consideration of the pandemic's continued strength in Washington State, where residents are subject to a March 23 statewide "stay home, stay healthy" order.[12]  The Seattle court remains open for detained hearings.  And the court located in Tacoma, Washington – just a few miles away – remains open for all hearings.

Seattle and Newark are not alone, as equally chaotic, and dangerous, last-minute orders to close and reopen have occurred in New York; Elizabeth, New Jersey; Denver; Bloomington; and San Francisco, among others.[13]

### 3.     EOIR's Self-Inflicted Infrastructure Defects Hamper its Ability to Appropriately Respond to the Pandemic

There are numerous factors peculiar to EOIR—all of which are of the agency's own making—that have hampered its ability to respond in a sound scientific and legal manner to the pandemic.  First, as explained above, EOIR does not appear to have completed any pre-existing continuity of operations planning.  As a result, EOIR's management is trying to devise a "case by

---

[10] https://twitter.com/DOJ_EOIR/status/1238662057421144064.

[11]https://twitter.com/DOJ_EOIR/status/1238662057421144064.

[12]Proclamation by the Governor Amending Proclamation 20-05, 20-25, Stay Home-Stay Healthy (Mar. 23, 2020), *available at* https://www.governor.wa.gov/sites/default/files/proclamations/20-25%20Coronavirus%20Stay%20Safe-Stay%20Healthy%20%28tmp%29%20%28002%29.pdf.

[13] https://twitter.com/DOJ_EOIR/status/1242282632337068035; https://twitter.com/DOJ_EOIR/status/1242520585420394497; https://twitter.com/DOJ_EOIR/status/1241004808846311425; https://twitter.com/DOJ_EOIR/status/1243336945138311170

case" approach when a systematic response is needed that recognizes the reality of pandemic and how it actually and really impacts society.

Second, EOIR has provisioned the immigration courts with antiquated and inadequate infrastructure for adjudicating cases in a national emergency such as the current COVID-19 pandemic.  There is no fully-functioning electronic case management system like systems that are commonplace in the federal judiciary, such as PACER/CM-ECF, or the state court systems.  Moreover, even the very limited capabilities of EOIR's current proto-electronic case management system do not account for unrepresented individuals, most of whom do not speak English.

Although EOIR "identified the implementation of an e-filing system as a goal in 2001," it has not "fully implemented this system," nor has it "indicated that it has developed" a best-practices plan for implementing an electronic case management system.[14]  "Practitioners, immigration judges, and government officials all agree that electronic case management and filing are key to a more efficient and reliable system. In December 2017, EOIR acknowledged that it had made "little appreciable progress" towards establishing an electronic filing system since 2001.  In July 2018, the agency launched a pilot e-filing and document storage program which has since been rolled out in several immigration courts.[15]  Currently, EOIR allows litigants

---

[14] Statement of Rebecca Gambler, Director, Homeland Security and Justice, Testimony Before the Subcommittee on Border Security and Immigration, Committee on the Judiciary, U.S. Senate, Immigration Courts: Observations on Restructuring Options and Actions Needed to Address Long-Standing Management Challenges 15-16 (Apr, 18, 2018), https://www.gao.gov/assets/700/691343.pdf.

[15] ABA 2019 Update ES-20, https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/2019_reforming_the_immigration_system_volume_2.pdf.

to submit briefs by email.  Yet implementation of the EOIR Courts and Appeals System (ECAS) is stalled, and the courts in which it is in theory operational still experience problems.

EOIR's technology that would facilitate remote adjudications and notifications remains woefully inadequate.  For example, in one Government Accountability Office (GAO) report, all of the courtrooms studied had "challenges related to video teleconferencing (VTC) hearings, including difficulties maintaining connectivity, hearing respondents, exchanging paper documents, conducting accurate foreign language interpretation, and assessing the demeanor and credibility of respondents and witnesses."[16]  Advocates and judges reported that the respondents (many of whom appear pro se) can see only a small portion of the courtroom, are unable to determine who is speaking, and may have little privacy in the facility from which their testimony and argument are being broadcast.  VTC also creates logistical problems for the use and handling of documents; adds a layer of complexity for interpreters who are not in the room with the noncitizen; and keeps noncitizens isolated from friends and family who may appear in the courtroom to support their loved one or offer critical witness testimony.[17]  Such problems undermine due process by negatively affecting a noncitizen respondent's ability to meaningfully and reasonably present his or her defense to removal in accordance with the Immigration and Nationality Act and due process.  8 U.S.C. § 1230(c)(4)(B) ("[T]he alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in

---

[16] *Id.* at 17.

[17] *See* Ingrid V. Eagly, *Remote Adjudication in Immigration*, 109-4 NW. U. L. Rev. 933, 941, 994 (2015).

opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this Act."). These concerns were echoed in the findings of an independent auditor hired by EOIR to study the immigration courts.[18]

Third, EOIR's imposition of Performance Metrics on immigration judges, which penalize them for continuing cases and have particularly pointed consequences for many of the newly-hired immigration judges who are subject to a two-year probationary period, unnecessarily burden the corps. As of the date of this filing, EOIR has not informed judges that the COVID-19 crisis exempts them from meeting their performance metrics, which require all judges to complete 700 cases per year—or roughly three per workday—and to finish 95 percent of cases on the day of their first-scheduled individual hearing. These quotas are applied in a "one-size-fits-all" manner that does not account for the court setting, complexity of cases being heard, likelihood of representation, or, apparently, the impact of forces such as pandemics. Newly-hired judges on probation are therefore forced to choose between their own health and job security and the health and welfare of all those who appear in their courts.

**B.     A Better Interim Approach that Protects the Public, Due Process, and Provides an Opportunity for the Agency to Develop a Comprehensive Approach**

The emergency conditions that have resulted from the spread of the COVID-19 virus continue to impact the nation. Not only does the President's Declaration of National Emergency remain in effect, the President has declared disasters in many states including Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Guam, Hawaii, Iowa, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New

---

[18] DOJ, EOIR Legal Case Study Summary Report 23 (Apr. 6, 2017).

Hampshire, New Jersey, New York, New Mexico, North Dakota, Oklahoma, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and Wisconsin.[19]  Notably, nearly every place where an immigration court is located has some type of shelter-in-place or similar public health order.

EOIR's goal ought to be to continue to provide essential services, consistent with its constitutional and statutory obligations and agency mission, while significantly minimizing the number of judges, staff, litigants and case participants, interpreters, and members of the public who come into the immigration courts.  EOIR should aim to do its part to help slow the spread of the COVID-19 virus and to minimize any health risks to our national community and, of course, the local communities in which each immigration court—detained or nondetained[20]—operates, while meeting its obligations to the public.

That is why we are writing now with this suggested framework based on our experience. This framework would allow for the postponement of non-essential immigration proceedings, protecting both the public health and the lives all parties who appear in immigration court, while also allowing the parties to move forward in urgent and essential cases when remote operations and due process so allow.  Without adoption of this framework, or a similar one, EOIR will continue to risk the lives of its employees, respondents, and stakeholders and will worsen the spread of the coronavirus throughout the country, endangering the general public.

---

[19] A running list of Presidentially-approved disaster sites can be found at the White House website under the HealthCare tag, https://www.whitehouse.gov/issues/healthcare/ (last accessed Mar. 30, 2020).

[20] According to Hon. A. Ashley Tabaddor, President of the National Association of Immigration Judges, Immigration Judges sitting in detained facilities are presently questioning the disparity of their treatment, asking why their safety is not as important at their colleagues at non-detained courts who are presently being allowed to work from home.

1.      **An Interim Categorization of Essential and Non-Essential Proceedings**

In the context of this motion, and with the goal of creating an interim solution for resolving the public health crisis that the immigration courts are causing, we offer here a rubric for EOIR to adopt as an interim measure that places all proceedings into two categories: essential and non-essential. As we elaborate more below, this rapid and brute categorization merits refinement after consultation with stakeholders.  For purposes here, we define *essential proceedings* as generally those proceedings where a serious due process deprivation would result from a delay.  This would include all custody determinations made under 8 C.F.R. § 1003.19 and it could also include credible and reasonable fear reviews under 8.C.F.R. § 1003.42.[21]  All other proceedings would be non-essential.  By categorizing all other proceedings as non-essential, we do not mean to imply that they are unimportant or that meaningful rights are not implicated.

2.      **EOIR Should Postpone Non-Essential Hearings Through at Least June 1, 2020**

For non-essential proceedings, our experience suggests four rules.

First, EOIR should postpone all non-essential proceedings scheduled earlier than June 1, 2020, and no proceeding should be scheduled to begin prior to June 1, 2020.  For purposes of an interim approach, we suggest this date because it is 30 days beyond the date on which the President has set for the expiration of the public health orders and social distancing recommendations.[22]

---

[21] Other proceedings could also be designated as essential on a gradual basis. *See* Chapter 7, Immigration Court Practice Manual (Mar. 30, 2020) (outlining other proceedings before immigration judges).

[22] *See* Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing (Mar. 30, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-14/ ("Therefore, we will be extending our guidelines to April 30th to slow the spread.  On Tuesday, we will be finalizing these plans and providing a summary of our findings, supporting data, and strategy to the American people.  So we'll be having lots of meetings in

Second, all non-statutory filing deadlines associated with these proceedings should be vacated and reset in accordance with a comprehensive policy that would be developed, with all due deliberate speed, in consultation with all relevant stakeholders.  This should include an automatic tolling of the one-year filing deadline applicable to applications for asylum.[23]

Third, notwithstanding this general postponement, parties should be able to seek to have a non-essential proceeding scheduled on a case-by-case basis if, on an adequate showing, the immigration judge determines there are important reasons for proceeding *and* the proceeding can be conducted by remote means that respect due process.  If due process requires that an in-person hearing occur, the proceeding should move forward only if EOIR can respect CDC social distancing and other public health orders and maintain other reasonable precautions to protect the health of case participants, including interpreters and court staff.

Fourth, parties should be able to complete filings, particularly potentially statutorily required filings, in non-essential proceedings.  To accommodate the shelter-in-place rules, an electronic signature similar to the one authorized by U.S. District Court of Oregon Local Rule 11(a) should be adopted; immigration courts can establish email inboxes to receive PDF filings, and the mailbox rule should be adopted for conventional mailings.[24]  These considerations are important because many individuals who appear in the immigration court system are not

---

between, but we'll be having a very important statement made on Tuesday — probably Tuesday evening — on all of the findings, all of the data, and the reasons we're doing things the way we're doing them…We can expect that, by June 1st, we will be well on our way to recovery.  We think, by June 1st, a lot of great things will be happening.")

[23] *See* 8 C.F.R. §§ 208.4(a)(2), 1208.4(a)(2).

[24] On March 31, 2020, EOIR announced that it established temporary email accounts to facilitate electronic filings.  It directed stakeholders to the following website: http://www.justice.gov/eoir/filing-email.  However, unlike federal court systems, there is no filing receipt provided and the email system is not easily accessible by unrepresented respondents, who make up the majority of litigants in immigration court.

represented and therefore, a purely electronic access system is inappropriate.  We assume that
because all hearing-associated filing deadlines and the one-year filing deadline will be
postponed, parties seeking to file during the postponement period would be minimal and should
be encouraged only for important reasons, such as to protect a statutory, regulatory, or
constitutional right.  In addition, with a mailbox rule, not only are unrepresented individuals
accommodated, so too are court staff who can rely on the postmarks to minimize the need for on-
site staffing to process filings.

3.     **Essential proceedings should continue with additional safeguards including a presumption of release from custody**

For essential proceedings, our experience suggests the following.

First, all essential proceedings should continue through June 1, 2020, and proceedings
should be conducted by remote means that comply with due process.  However, if due process
requires that an in-person hearing occur, then EOIR must respect the President's social distancing
and other public health guidelines and EOIR must take and maintain other reasonable
precautions to protect the health of case participants, including interpreters and court staff.

Second, as we explained above, there are serious practical and logistical barriers to
conducting essential proceedings remotely in a scientifically sound manner that also respects the
due process concerns of access to counsel and access to evidence in accordance with all
constitutional, statutory, and regulatory rights.  These hurdles of the agency's making should not
be used against individuals seeking relief from removal.  Yet, we also recognize that EOIR
cannot create a useable electronic case system (a system they have struggled to create for more
than a decade) overnight, nor can it immediately provision immigration judges with the tools
necessary to hear cases remotely.  We also recognize that the conditions of confinement—which
are generally beyond the individual immigration judge's control—inhibit the ability of

respondents to collect evidence, consult with counsel, obtain counsel, prepare for proceedings, and even comply with submission rules, particularly for the many respondents who are pro se or do not speak English fluently.  While those difficulties exist for detained respondents regardless of the pandemic, the pandemic is exacerbating the effect of these existing barriers.

Therefore, with regard to custody redetermination proceedings, we propose three special rules to facilitate proceedings, minimize the court personnel involved, and achieve public health protections until a comprehensive policy is adopted.  (1) Using resources available from the postponements of the non-essential proceedings to engage in *sua sponte* custody redeterminations for all individuals currently in immigration detention.  At these custody redeterminations, detained respondents should receive (2) a presumption of statutory eligibility for release, and (3) a presumption that they should be released. The immigration judge corps is well-positioned and familiar with these types of presumptions, as they have been used in thousands of hearings.[25]

## C.    When the Public Health and Due Process are Protected, The Agency Should Use Existing Frameworks for Developing a Comprehensive Approach

If all non-essential proceedings are paused, and only essential proceedings under the above framework are pursued when appropriately safe, agency resources can be devoted to developing a comprehensive policy that protects the public health and due process.

Court systems, including the federal courts in District of Columbia, Maryland and Virgina[26] and the federal court system, have developed detailed continuity plans that can be used

---

[25] *See, e.g., Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015), *rev'd and remanded by Jennings v. Rodriguez,* 138 S. Ct. 830 (2018) (requiring immigration judges to presume a respondent should be released after six months of detention unless the government proved dangerousness or flight risk by clear and convincing evidence).
[26] https://www.osbar.org/_docs/resources/CJO20-006-Amended_Order-Imposing-Level-3-Restrictions-on-Court-Operations.pdf.

a resource.  These plans include modern case management systems, well-developed and clear docketing practices, remote facilitation, and electronic signatures and verifications.

The U.S. Department of Justice's Bureau of Justice Assistance, in collaboration with the National Center for State Courts, has developed a comprehensive report called "Continuity of Court Operations: Steps for COOP Planning."[27]  Its preface explains that the "terrorist attacks of 9-11, in combination with natural disasters from wildfires to catastrophic hurricanes, and concerns about a pandemic flu crisis reinforce the critical need for all court to have a plan in place when an emergency strikes.  The ability of courts to perform their statutory mandates and ensure access to justice and the protection of liberties is particularly crucial when society's traditional standards of operation are in disarray."  It contains a five-step planning process that weighs various factors.  It describes the key elements of a plan—all elements that are currently missing in EOIR's approach—such as determining essential functions and prioritizing those, identifying alternate facilities, communication methods, databases and other facets.  It provides worksheets and templates.  Notably, it includes model procedures for a pandemic.[28]

Furthermore, in recognition of the higher prioritization due to detained cases, EOIR might consider assigning all of its judges, whether or not they ordinarily sit in courts hearing detained cases, exclusively to the detained docket for a period following the end of the pandemic emergency  EOIR might also consider allowing judges to hear cases from somewhere other than their courtrooms.

---

[27] https://www.ncsc.org/~/media/Files/PDF/Services%20and%20Experts/Areas%20of%20 expertise/Emergency%20Preparedness/toolkit.ashx.

[28] https://www.ncsc.org/~/media/Files/PDF/Services%20and%20Experts/Areas%20of%20experti se/Emergency%20Preparedness/toolkit.ashx Also, https://fas.org/sgp/crs/secrecy/RL31978.pdf.

## CONCLUSION

For the reasons explained above, the court should grant the temporary restraining order.

April 9, 2020

ARNOLD & PORTER KAYE SCHOLER LLP

By:  *s/ John A. Freedman*
     John A. Freedman (D.C. Bar 453075)
     601 Massachusetts Avenue, N.W.
     Washington, D.C.  20001
     (202) 942-5000
     John.Freedman@arnoldporter.com

Attorneys for *Amici* Former Federal Immigration Judges &
Members of Board of Immigration Appeals

# APPENDIX

## LIST OF AMICI

1. Steven Abrams was an Immigration Judge in New York City from 1997 to 2013

2. Silvia Arellano was appointed as an Immigration Judge in Florence, Arizona in 2010.

3. Terry A. Bain was an Immigration Judge in New York City from 1994 to 2019.

4. Sarah Burr was an Immigration Judge in New York City from 1994 to 2012.  She was an Assistant Chief Immigration Judge in 2006 to 2011.

5. Esmeralda Cabrera Immigration Judge in New York, Newark, and Elizabeth, 1994-2005.

6. Teofilo Chapa was an Immigration Judge in Miami, Florida from 1995 to 2018.

7. Jeffrey Chase was an Immigration Judge in New York City from 1995 to 2007 and an attorney advisor and senior legal advisor at the Board of Immigration Appeals from 2007 to 2017.

8. George Chew was an Immigration Judge in New York from 1995 to 2017.

9. Bruce J. Einhorn was an Immigration Judge in Los Angeles, California from 1990 to 2007.

10. Cecelia M. Espenoza was a Member of the Board of Immigration Appeals from 2000 to 2003 and served in the Office of the General Counsel from 2003 to 2017.

11. Noel Ferris was an Immigration Judge in New York from 1994 to 2013 and an attorney advisor to the Board of Immigration Appeals from 2013 to 2016.

12. James Fujimoto was an Immigration Judge in Chicago, Illinois from 1990 to 2019.

13. Thaddeus Gembacz was an Immigration Judge in Los Angeles from 1996 to 2008.

14. Jennie Giambastiani was an Immigration Judge in Chicago, Illinois from 2002 to 2019.

15. John Gossart was an Immigration Judge in Baltimore, Maryland from 1982 to 2013.

16. Paul Grussendorf was an Immigration Judge in Philadelphia, Pennsylvania and San Francisco, California from 1997 to 2004.

17. Miriam Hayward was an Immigration Judge in San Francisco, California from 1997 to 2018.

18. Charles Honeyman was an Immigration Judge in Philadelphia, Pennsylvania and New York from 1995 to 2020.

19. Rebecca Bowen Jamil was an Immigration Judge in San Francisco, California from 2016 to 2018.

20. William Joyce was an Immigration Judge in Boston, Massachusetts from 1996 to 2002.

21. Carol King was an Immigration Judge in San Francisco, California from 1995 to 2017.

22. Elizabeth Lamb was an Immigration Judge in New York City from 1995 to 2018.

23. Margaret McManus was an Immigration Judge in New York City from 1991 to 2018.

24. Charles Pazar was an Immigration Judge in Memphis, Tennessee from 1998 to 2017.

25. George Proctor was an Immigration Judge in Los Angeles and San Francisco from 2003 to 2012.

26. Laura Ramirez was an Immigration Judge in San Francisco from 1997 to 2018.

27. John Richardson was an Immigration Judge in Phoenix, Arizona from 1990 to 2018.

28. Lory Rosenberg was a Member of the Board of Immigration Appeals from 1995 to 2002.

29. Susan Roy was an Immigration Judge in Newark, New Jersey from 2008 to 2010.

30. Paul Schmidt was an Immigration Judge in Arlington, Virginia from 2003 to 2016.

31. Ilyce Shugall was an Immigration Judge in San Francisco, California from 2017 to 2019.

32. Andrea H. Sloan was an Immigration Judge in Portland, Oregon from 2010 to 2017.

33. Gustavo Villageliu was a member of the Board of Immigration Appeals from 1995 to 2003. He served as Senior Associate General Counsel for EOIR from 2003 to 2011.  He was an Immigration Judge in Miami from 1990 to 1995.

34. Polly Webber was an Immigration Judge in San Francisco, California from 1995 to 2016.

35. Robert Weisel was an Immigration Judge in New York from 1989 to 2016.

CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2020, copies of the foregoing will be served by electronic

notice through the Court's ECF system on all counsel of record.

*/s/ John A. Freedman*
John A. Freedman