**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, et al., |
| *Plaintiffs*, |
| v. |
| EXECUTIVE OFFICE OF IMMIGRATION REVIEW, et al., |
| *Defendants*. |

Civil Action No. 1:20-cv-00852 (CJN)

## MEMORANDUM OPINION

Plaintiffs are five aliens and three organizations whose members represent aliens and other litigants in immigration proceedings.  They challenge immigration court and detention facility policies that the government has implemented in response to the COVID-19 pandemic, *see generally* Compl., ECF No. 1, and have moved for preliminary injunctive relief, *see generally* Emergency Mot. for TRO, ECF No. 7.  For the reasons that follow, the Court denies Plaintiffs' Motion.

### I.    Background

### A.    COVID-19 Pandemic

On March 11, 2020, the World Health Organization (WHO) declared COVID-19, a disease caused by the novel coronavirus SARS-CoV-2, a pandemic.  Decl. of Ashish K. Jha, MD, MPH ¶ 4, ECF No. 7-28.  In the pandemic's wake, governments have declared states of emergency, restricted public gatherings, and imposed other orders to control the spread of the disease.  Compl. ¶ 1.  By early April, forty-two states, the District of Columbia, and Puerto Rico had issued stay-at-home orders.  Marisa Fernandez, *More States Issue Stay-At-Home Orders as*

*Coronavirus Crisis Escalates*, Axios (Apr. 6, 2020), https://www.axios.com/states-shelter-in-place-coronavirus-66e9987a-a674-42bc-8d3f-070a1c0ee1a9.html.  At the federal level, President Trump declared the COVID-19 outbreak a national emergency on March 13, and his Coronavirus Task Force and the Centers for Disease Control and Prevention (CDC) have issued guidance to slow the spread of the disease.  Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337, 15,337–38 (Mar. 13, 2020); *see also* Rebecca Ballhaus et al., *White House Extends Social-Distancing Guidelines Until End of April*, Wall St. J. (Mar. 30, 2020, 6:27 AM), https://www.wsj.com/articles/coronavirus-deaths-top-30-000-as-china-opens-up-province-where-it-began-11585466594.

COVID-19 is highly contagious.  Compl. ¶ 25.  It is known to be transmitted via respiratory droplets, and the transmissivity increases when individuals are within six feet of one another.  *Id.*  Further, individuals can transmit the disease despite appearing asymptomatic.  *Id.* Once contracted, the disease can result in severe symptoms, including respiratory and kidney failure, and in the most severe cases can cause death.  *See id.* ¶ 26.  Some members of the population, including older individuals and those with certain medical conditions, face greater risk of these serious symptoms.  *Id.* ¶ 27.

It appears that, at this point in time, the only effective measures to reduce the spread of COVID-19 are to socially distance and to maintain vigilant hygiene, including regularly washing hands with soap and water and use of hand sanitizer when soap and water is not available.  *See id.* ¶ 31; CDC, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last reviewed Apr. 24, 2020).  The CDC has warned that courthouses, prisons, and detention centers are especially vulnerable to the rapid spread of

COVID-19.  Compl. ¶ 35.  In fact, the virus has already made its way into some detention

facilities and prisons, including those run by Immigration and Customs Enforcement (ICE), as

well as some immigration courts around the country.  *See id.* ¶¶ 32–33.

### B.     Defendants' Response to COVID-19

Defendant Executive Office of Immigration Review ("EOIR") is a component of the

Department of Justice and is responsible for directing and managing the immigration court

system, including sixty-nine immigration courts located across the country.  Decl. of James

McHenry ("McHenry Decl.") ¶¶ 8–9, ECF No. 19-2.  Defendant ICE (specifically an operational

program called Enforcement and Removal Operations ("ERO")) is a component of the

Department of Homeland Security that is responsible for managing the programs that relate to

the supervision, detention, and removal of aliens in the United States.  Decl. of Russell Hott

("Hott Decl.") ¶ 5, ECF No. 19-5.

EOIR's and ICE's responses to the pandemic began in mid-March, shortly after President

Trump declared a national emergency.  *See* Compl. ¶ 36; McHenry Decl. ¶¶ 51–54.  On March

18, 2020, EOIR postponed through April 10 all hearings for non-detained aliens.  McHenry Decl.

¶ 53.  The same day, the Director of EOIR issued a memorandum adopting guidance for all

immigration courts—modeled after similar guidance issued by the federal courts— "[t]o promote

the safety of immigration court personnel, representatives, aliens, attorneys for the Department

of Homeland Security, and the general public" during the pandemic that was "effective

immediately."  James R. McHenry III, Director EOIR, Immigration Court Practices During the

Declared National Emergency Concerning the COVID-19 Outbreak ("McHenry Mem.") at 1

(Mar. 18, 2020), ECF No. 19-3.  The guidance restricts access to EOIR space for individuals at

risk of having COVID-19; encourages immigration judges and parties to resolve cases on the

briefs; establishes policies to maximize the use of remote hearings (via telephone or video

teleconference ("VTC")); and reminds practitioners and immigration judges of steps that would reduce the risk of exposure to COVID-19, "such as waiving appearances, granting continuances, limiting physical presence in the courtroom, issuing standing orders, . . . and conducting hearings by VTC or by telephone." McHenry Decl. ¶ 47 (footnotes omitted) (discussing the McHenry Mem.). Five days later, EOIR postponed all removal hearings involving aliens under the Migrant Protection Protocols ("MPP") program through at least April 22. *Id.* ¶ 54. On March 30, EOIR announced that hearings for all non-detained aliens were further postponed through May 1, 2020, and the next day, EOIR postponed MPP program removal hearings through at least May 1. *Id.* ¶¶ 68–69.

EOIR has also established court-specific email addresses to permit for temporary electronic filings at the immigration courts that have not adopted EOIR's new electronic filing system, *see id.* ¶¶ 92–93, as well as email addresses to permit for the electronic filing of briefs at the Board of Immigration Appeals, *id.* ¶ 71. For proceedings that do occur, EOIR has developed court-specific plans to maximize social distancing protocols, which are "tailored to each court's staffing levels, building space, and local conditions, among other factors." Decl. of Christopher A. Santoro ¶ 6, ECF No. 19-6.

ICE has also adjusted the measures it uses at detention centers. Hott Decl. ¶ 20. On March 13, 2020, ICE indefinitely suspended all social visitation to detention facilities. *Id.* ¶ 21. ICE has encouraged the use of communication services, such as teleconferencing, VTC, and email, in lieu of in-person visits. *Id.* On March 18, ICE requested that EOIR suspend the in-person requirements for detainee appearances before immigration judges in removal proceedings. *Id.* ¶ 28. ICE now requires that all visitors provide and wear personal protective

equipment ("PPE") when entering any facility to protect detainees, staff, and visitors,[1] while certain facilities require other screening measures based on local conditions and other contractual requirements. *Id.* ¶ 22.  On April 4, ICE directed the  review of whether detainees in CDC-issued high-risk categories should remain in custody.  Peter B. Berg, COVID-19 Detained Docket Review at 1–3 (Apr. 4, 2020), ECF No. 19-7.  And on April 10, ICE released its COVID-19 Pandemic Response Requirements, outlining various measures in line with CDC guidance to safeguard those in ICE custody.  ERO, COVID-19 Pandemic Response Requirements ("ICE Pandemic Response") at 5–16 (Apr. 10, 2020), ECF No. 19-4.  These requirements include screening and monitoring detainees for COVID-19 symptoms and cohorting detainees who display symptoms or test positive for the disease,[2] among other measures.  *Id.*

With respect to detainees' communication with their legal representatives, ICE "[f]acilities have been instructed that, should it become necessary to suspend in-person legal visitation, they must ensure detainee communication with legal representatives continues unimpeded by leveraging all available forms of video technology, email, and messaging."  Hott Decl. ¶ 24.  ICE has worked with its service providers to increase alternatives to in-person hearings, but it notes that, "consistent with most other detention and corrections systems, [its practices] incorporate time limitations to ensure equal access."  *Id.* ¶ 26.  For example, La Palma Correction Center in Eloy, Arizona, where two Plaintiffs are detained and where one Plaintiff was previously detained, permits in-person and telephonic attorney conferences.  Decl. of Jason

---

[1] ICE notes that it "must be judicious in utilizing" its PPE because, "at this time, ICE does not have on hand enough inventory to offer the public."  Hott Decl. ¶ 23.

[2] ICE defines a cohort as "a group of persons with a similar condition grouped or housed together for observation over a period of time."  ICE Pandemic Response at 4 n.3.

Ciliberti ("Ciliberti Decl.") ¶¶ 25, 27–29, ECF No. 19-8.  Calls with attorneys are not recorded.

*See id.* ¶ 31.  In-person counsel visits have not been suspended altogether but are limited to

Monday through Friday from 8:00 AM to 5:00 PM, on weekends from 8:00 AM to 12:00 PM,

and can be scheduled based on an attorney's request.  *See id.* ¶ 25.  Eloy Detention Center in

Eloy, Arizona, where one Plaintiff is detained, has similar rules for telephonic attorney

conferences, *id.* ¶¶ 27–29, and Eloy also does not record attorney calls, *see id.* ¶ 31.  The facility

permits in-person counsel visitation between 8:00 AM and 5:00 PM daily or outside those hours

if requested.  *Id.* ¶ 25.  Pine Prairie ICE Processing Center in Pine Prairie, Louisiana, where one

Plaintiff is detained, allows for in-person, telephone, and VTC attorney conferences.  Decl. of

Alcide R. Benoit ("Benoit Decl.") ¶¶ 27–38, ECF No. 19-9.  Detainees can request to call their

attorneys through a case manager, who contacts the attorney and schedules a call.  *Id.* ¶ 30.  And

attorneys can schedule telephonic conferences or VTCs with their clients by emailing requests to

a dedicated inbox.  *See id.* ¶ 28.  Pine Prairie permits in-person visits Monday through Friday

from 8:00 AM to 7:00 PM and on weekends and holidays from 8:00 AM to 2:00 PM.  *Id.* ¶ 32.

As described above, none of these three facilities prohibits all in-person visits, but ICE requires

attorneys to wear PPE for in-person visits and screens the attorney's temperature prior to the

visit.  *See* Hott Decl. ¶¶ 21–22.

### C.      Plaintiffs' Claims

Plaintiffs are five detained aliens (together the "Individual Plaintiffs") and three

organizations whose members represent aliens and other litigations in immigration proceedings

(together the "Organizational Plaintiffs").  Compl. ¶¶ 10–18.  Four of the five Individual

Plaintiffs are presently detained in three ICE facilities in two locations, Eloy, Arizona, and Pine

Prairie, Louisiana.  *Id.* ¶¶ 14–18.  Plaintiff Enrique Napoles Vaillant is a Cuban national detained

in Eloy, Arizona at the La Palma Correctional Center.  *Id.* ¶ 14.  He is seeking asylum in the

United States and is currently awaiting resolution of his immigration case.  *Id.*  His next immigration court hearing is currently scheduled for June 22, 2020.  *Id.*; Defs.' Mem. of Law in Opp'n to Pls.' Mot. for TRO ("Defs.' Opp'n") at 15, ECF No. 19; Pls.' Suppl. Br. in Supp. of Emergency Mot. for TRO ("Pls.' Suppl. Br.") at 6, ECF No. 29-1.  Vaillant is not currently represented by counsel despite efforts by nonparty Florence Immigrant and Refugee Rights Project, an immigration advocacy group, to find him pro bono representation.  Compl. ¶ 14. Plaintiffs allege that those efforts had to be suspended because of limits placed on attorney access at La Palma and inadequate, limited telephone access there.  *Id.*

Plaintiff Ernesto Rodriguez Cedeno is married to Vaillant, is also detained at La Palma, and is also a Cuban national seeking asylum.  *Id.* ¶ 15.  Although Cedeno's next hearing was scheduled for April 2, 2020, *id.*, that hearing was continued to August 5, 2020, apparently after the filing of this lawsuit, *see* Defs.' Opp'n at 15; Pls.' Suppl. Br. at 6.  Like Vaillant, Cedeno is not currently represented by counsel; Plaintiffs allege that the Florence Immigrant and Refugee Rights Project has been unable to find him pro bono representation, citing alleged issues with attorney access, whether in-person or via phone, at La Palma.  Compl. ¶ 15.

Plaintiff Arlety Aliaga-Cobas is a Cuban national detained at the Eloy Detention Center. *Id.* ¶ 16.  Aliaga-Cobas's next immigration hearing is scheduled for June 2, 2020.  *Id.*; Pls.' Suppl. Br. at 6.  While Aliaga-Cobas did have counsel for a prior appeal to the Board of Immigration Appeals, she is not currently represented by counsel in connection with her upcoming hearing.  Compl. ¶ 16.  Plaintiffs contend that issues accessing Eloy Detention Center in person as well as inadequate, limited telephone services available there have prevented Aliaga-Cobas from finding counsel.  *Id.*

Plaintiff Roberto Fausto Velasquez Quiala is a Cuban national detained at the Pine Prairie ICE Processing Center.  *Id.* ¶ 18.  Although his next hearing was scheduled for the end of April 2020, *id.*, it was recently rescheduled for May 19, Pls.' Suppl. Br. at 7.  Quiala is currently represented in connection with that hearing, but he alleges that he is unable to meet in-person with his attorney and is limited to making thirty-minute calls per day.  Compl. ¶ 18.

The fifth Individual Plaintiff, Reynaldo Guerrero-Cornejo, is a Mexican national who has been a lawful permanent resident in the United States since 1989.  *Id.* ¶ 17.  He was also detained at La Palma.  *Id.*  Guerrero-Cornejo had a merits hearing on April 24, which was held remotely (Guerrero-Cornejo participated via VTC).  Pls.' Suppl. Br. at 5; Pls.' Reply Suppl. Br. in Supp. of Emergency Mot. for TRO ("Pls.' Reply Suppl. Br.") at 19, ECF No. 36.  At the hearing, the immigration judge cancelled Guerrero-Cornejo's removal and ordered his immediate release from detention.  Pls.' Reply Suppl. Br. at 19.

The three Organizational Plaintiffs are "membership organizations comprised of immigration attorneys and immigrant right advocates."  Compl. ¶ 5.  The members of Plaintiff National Immigration Project of the National Lawyers Guild "provide immigration representation to, among others, detained individuals who are in removal proceedings."  *Id.* ¶ 10. The members of Plaintiff American Immigration Lawyers Association "provide legal representation to, among others, individuals in removal and rescission proceedings, and individuals seeking humanitarian relief under our nation's immigration laws."  *Id.* ¶ 11.  And Plaintiff Immigration Justice Campaign "facilitates pro bono representation for detained individuals by recruiting, training[,] and mentoring those attorneys and connecting them with the individuals who need their legal services."  *Id.* ¶ 12.  Members of each of the Organizational Plaintiffs represent aliens detained around the country.  *See id.* ¶¶ 5, 10–12.

Plaintiffs filed this lawsuit on March 30, 2020, asserting seven causes of action.  *See generally* Compl.  Nine days later, they filed an Emergency Motion for Temporary Restraining Order, requesting temporary prospective relief on three of their claims:  (1) violation of the APA (all Plaintiffs against all Defendants); (2) violation of the Immigration and Nationality Act and the APA (Individual Plaintiffs against all Defendants); and (3) violation of the Fifth Amendment right to procedural due process (access to counsel) (Individual Plaintiffs against all Defendants). *See* Pls.' Mem. of Law in Supp. of Emergency Mot. for TRO ("Pls.' Mot.") at 1–3, ECF No. 7 at 5.  They seek a TRO that would, among other things, require EOIR to "postpone all in-person detained hearings, with the exception of bond hearings, for the longer of the duration of the currently declared National Health Emergency or a Relevant State Emergency" subject to certain provisions; require EOIR to "provide for the automatic adjournment of any scheduled hearing or any court-ordered deadline, including for bond proceedings, for a period of 60 days upon submission by the detained person or the detained person's counsel of a notice"; and require ICE to provide VTC and teleconference capabilities and to take a number of detailed and specific steps relating to counsel communications, the installation of telecommunications and VTC facilities, and the provision of PPE.  Pls.' Proposed TRO ¶¶ 1–3, ECF No. 7-37.  Defendants oppose any injunctive relief, arguing both that Plaintiffs lack standing and are otherwise not entitled to a TRO.  Defs.' Opp'n at 1–4.

On April 15, the Court held a telephonic hearing on Plaintiffs' Motion.  Five days later, Plaintiffs supplemented their Motion with additional information about the Individual Plaintiffs, the specifics of those Plaintiffs' detention and hearings, and other factual information.  *See generally* Pls.' Suppl. Br.  The government responded to that filing on April 23, and on April 24,

Plaintiffs filed a Reply.  *See generally* Defs.' Resp. to Pls.' Suppl. Br., ECF No. 35; Pls.' Reply Suppl. Br.

## II.      Legal Standard

"A temporary restraining order is an extraordinary remedy, one that should be granted only when the moving party, by a clear showing, carries the burden of persuasion." *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011).  "The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established." *Gomez v. Kelly*, 237 F. Supp. 3d 13, 14 (D.D.C. 2017).  A plaintiff must establish (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that the proposed relief is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Court "must balance the strengths of the requesting party's arguments in each of the four required areas."  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  *Id.*[3]

## III.     Analysis

### A.      Likelihood of Success on the Merits

Plaintiffs are unlikely to succeed on the merits of their claims.  The Individual Plaintiffs and the Organizational Plaintiffs have failed to establish that the Court has jurisdiction over their claims, both because they are unlikely to suffer imminent injury as a result of the challenged

---

[3] As noted by other courts, it is unclear whether this sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.  Banks v. Booth*, No. 20-849, 2020 WL 1914896, at *3 (D.D.C. Apr. 19, 2020).  The D.C. Circuit has yet to explicitly displace this approach.  *See Sherely v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011).

policies and because the jurisdiction-channeling provisions of the Immigration and Nationality

Act (INA) preclude them from pursuing their access-to-counsel and due process claims in this

forum.  And even if this Court had jurisdiction, Plaintiffs are unlikely to succeed on the merits.

Plaintiffs have not pointed to EOIR and ICE actions that are reviewable under the APA, and,

perhaps most important, they also have not demonstrated that EOIR's and ICE's actions are

arbitrary and capricious given the rapidly changing situation relating to the COVID-19

pandemic.

### 1.    Standing

"The first component of the likelihood of success on the merits prong usually examines

whether the plaintiffs have standing in a given case." *Barton v. District of Columbia*, 131 F.

Supp. 2d 236, 243 n.6 (D.D.C. 2001) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

101 (1998)).[4]  "It is well established that the 'irreducible constitutional minimum of standing

contains three elements': (1) injury in fact; (2) causation; and (3) redressability." *Baz v. Dep't*

*of Homeland Sec.*, No. 18-cv-01013, 2019 WL 5102827, at *3 (D.D.C. Oct. 11, 2019) (quoting

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The injury-in-fact element requires an

injury that is "concrete and particularized and actual or imminent, not conjectural or

hypothetical." *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C.

Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).  And where plaintiffs

seek only prospective relief, "past injuries alone are insufficient to establish standing." *Dearth v.*

*Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  Rather, they must "establish an ongoing or future

---

[4] Because courts obviously lack power to issue injunctive relief if they lack jurisdiction, some
courts analyze standing issues outside of the likelihood of success on the merits prong. *E.g.*,
*Banks*, 2020 WL 1914896, at *4–5.  That analytical question has no effect on the ultimate
decision here.

injury that is 'certainly impending.'"  *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016)

(quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)).  Causation requires "that the

injury is fairly traceable to the defendant's challenged conduct."  *Am. Soc'y for Prevention of

Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) (citing *Lujan*, 504 U.S.

at 560–61). And redressability requires that the injury can be remedied "by a favorable decision."

*Arpaio*, 797 F.3d at 19 (quoting *Lujan*, 504 U.S. at 561).

> a.      *Individual Plaintiffs*

The five Individual Plaintiffs argue that they "are suffering two injuries as a result of

Defendants' policies:  (1) the imminent risk of contracting and spreading COVID-19; and

(2) continued violation of the due process and statutory right to counsel."  Pls.' Corrected Reply

Mem. of Law in Further Support of Mot. for TRO ("Pls.' Reply") at 11, ECF No. 26.  They

principally link the risk of contracting and spreading COVID-19 to their being forced to attend

in-person hearings, which EOIR has not suspended across the board (notwithstanding its

guidance to implement other methods, such as teleconferences or VTCs, for conducting

hearings).  And they argue that the policies adopted by ICE, including restricting in-person visits,

requiring attorneys and other legal visitors to provide and wear their own PPE during in-person

visits, and limiting certain telephone and video calls, "functionally bar[] immigration attorneys

from meeting with their clients and . . . depriv[e] detained immigrants of their right to counsel."

Compl. ¶ 4.

The Court agrees that the increased risk of contracting COVID-19 constitutes a

cognizable injury sufficient to satisfy Article III, and also that the risk of contracting COVID-19

will increase as a result of being forced to attend in-person hearings.  *See, e.g.*, *Helling v.*

*McKinney*, 509 U.S. 25, 32–33 (1993).  The government, for its part, does not contend otherwise.

*See* Defs.' Opp'n at 14–16.  But none of the Individual Plaintiffs has an imminent in-person hearing.  Instead, as a result of requests for continuances that have been granted by the immigration judge (Cedeno) or for other reasons (Vaillant, Aliaga-Cobas, and Quiala), none of the Individual Plaintiffs currently has an in-person hearing scheduled in the next month.  In fact, Plaintiff Guerrero-Cornejo did not have to attend his April 24 hearing in person but participated by VTC, and at the end of that hearing the immigration judge granted his petition and ordered him released from detention—thereby mooting his claims altogether.  Pls.' Reply Suppl. Br. at 19.  More generally, there is no evidence in the record that any of the Individual Plaintiffs has been forced to appear, or will be forced to appear, at an in-person hearing over his or her request for either a continuance or some way of attending remotely, such as by VTC or teleconference.  In fact, the evidence is to the contrary.  The Individual Plaintiffs have thus failed to establish that they are likely to suffer an imminent injury to their health that is traceable to EOIR's failure to take different action.

The Individual Plaintiffs' second alleged injury—interference with their access to counsel counsel—suffers from similar flaws.  The Court agrees that substantial interference with Plaintiffs' ability to communicate with counsel would constitute a cognizable injury sufficient to satisfy Article III, and the government again does not take a contrary position.  *See* Defs.' Opp'n at 14–16.  But three of the Individual Plaintiffs—Vaillant, Cedeno, and Aliaga-Cobas—are not currently represented.  To be sure, they allege in the Complaint that restrictions put in place at the facilities in which they are detained makes it harder to find counsel.  *See, e.g.*, Compl. ¶ 14 ("[Vaillant] is currently unrepresented . . . due to the significant restrictions Defendants have placed on attorney access to the facility and the highly limited and inadequate telephone access with individuals detained in those facilities.").  But they fail to explain altogether how the

government's policies have caused them to be unable to retain an attorney—especially considering that they had been unable to find counsel even before the pandemic and considering that they were able to retain counsel for this suit.

One of the Individual Plaintiffs, Quiala, does have counsel.  But while Quiala alleges that the restrictions in his facility have prevented him from exercising his right to counsel, he has provided very little, if any, specific evidence about how the permitted methods of communication have actually impeded his ability to communicate with counsel.  *See id.* ¶ 18. Quiala does not allege that telephone access is inadequate to prepare for his upcoming mid-May hearing, just that "he is limited to 30 minutes a day for attorney calls."  *Id.*

Like Quiala, Guerrero-Cornejo is represented by counsel, but prior to his hearing he had not proffered any facts establishing that he had been harmed by telephone access with his counsel, in lieu of in-person meetings, at La Palma.  *See id.* ¶ 17.  And as discussed above, Guerrero-Cornejo actually prevailed at his recent hearing (at which he participated via VTC) and has already been released from detention.  Pls.' Reply Suppl. Br. at 19.

### b.    *Organizational Plaintiffs*

The Organizational Plaintiffs argue that they have associational standing, Pls.' Reply at 13, which requires them to establish "(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit."  *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005).  An organizational plaintiff must "show that they have 'at least one member' who has suffered, or imminently will suffer, an injury-in-fact."  *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1,

32–35 (D.D.C. 2019) (quoting *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815 (D.C. Cir. 2006)).

The Organizational Plaintiffs contend that their members "have suffered concrete and particularized injuries as a result of [Defendants'] policies, which put their health and safety at risk and prevent them from accessing clients and potential clients, and therefore would have standing to sue in their own right."  Pls.' Reply at 14 (footnote omitted).  They claim that "Defendants' practices have prevented them from invoking or utilizing remote proceedings or that remote communications are not safely available." *Id.* (footnote omitted).  In other words, the Organizational Plaintiffs claim injuries similar to those alleged by the Individual Plaintiffs: that their members face the imminent risk of contracting and spreading COVID-19 as a result of Defendants' policies to continue in-person hearings, and also that their ability to communicate with their clients is being hampered.

As noted above, the Court agrees that the increased risk of contracting COVID-19 constitutes a cognizable injury sufficient to satisfy Article III and also that the risk of contracting COVID-19 will increase as a result of being forced to attend in-person hearings.  And again, the government does not contend otherwise. *See* Defs.' Opp'n at 16–18.  But just as with the Individual Plaintiffs, the Organizational Plaintiffs have not demonstrated that immigration judges are regularly refusing to deny requests for continuances or requests for telephonic or VTC hearings.  In fact, although Plaintiffs have submitted a number of declarations from immigration lawyers (some of whom are members of one or more of the Organizational Plaintiffs), no declarant has described a situation in which an immigration judge held an in-person hearing over a detainee's request for a continuance or for the hearing to be conducted remotely, such as by teleconference or VTC.

The closest the Organizational Plaintiffs appear to come is the declaration from Eduardo Beckett, an attorney representing a detainee at Tacoma Northwest Detention Center in Washington.  Decl. of Eduardo Beckett ("Beckett Decl.") ¶ 3, ECF No. 29-3.  Beckett's client was scheduled to have a hearing on April 8, 2020, in Otero Immigration Court in Texas; the client was to appear via VTC from Tacoma.  *Id.* ¶ 4.  A few days before the hearing, Beckett called the immigration judge's clerk and requested to appear telephonically, as permitted by the immigration judge's standing order.  *Id.*  Three days later, the clerk responded that Beckett could not appear telephonically because his client was appearing via VTC, and Beckett would have to go to the Otero facility to attend the hearing.  *Id.* ¶ 5.[5]  Beckett apparently did not request a continuance, nor does it appear that Beckett requested that his client also participate telephonically, and on April 8, Beckett attended the hearing in the same courtroom with the immigration judge.  *See id.* ¶¶ 5–6, 9.  While this specific example presents a close call, even here there is no evidence that the immigrant judge denied a request for a continuance or for Beckett's client to appear telephonically (which may have permitted Beckett to do the same).[6]

## 2.     Jurisdiction under the INA

Even if the Plaintiffs had established Article III standing, the INA likely forecloses at least Plaintiffs' claims based on access-to-counsel and due process injuries.  The INA provides

---

[5] When Beckett arrived at the facility on April 8, he learned that technological limitations were the reason for his having to attend in person.  Beckett Decl. ¶ 6.

[6] The Organizational Plaintiffs also argue that Defendants' policies hamper their ability to communicate with their clients.  Assuming that this is an injury for Article III purposes, and also assuming that the injury is traceable to Defendants' actions, the Organizational Plaintiffs themselves do not attempt to assert right-to counsel and due process claims (counts II and III) against Defendants—and for good reason.  As they implicitly concede in their Complaint, this right is held by *their clients*, not the attorneys that make up their membership.  And as discussed below, access-to-counsel claims are subject to the INA's jurisdiction-channeling provisions.

that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal," 8 U.S.C. § 1252(a)(5) (2018), and also expressly consolidates "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States" into "judicial review of a final [removal] order," § 1252(b)(9).  While this circuit has not interpreted the scope of § 1252, other courts of appeals have held that "Congress has clearly provided that all claims— whether statutory or constitutional—that 'aris[e] from' immigration removal proceedings can only be brought through the petition for review process in federal courts of appeals." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029 (9th Cir. 2016) (citation omitted).  This includes claims challenging policies-and-practices that are applied during the course of a removal proceeding. *Id.* at 1035. The only exception to this bar that has been recognized in this circuit is if a plaintiff challenges "the validity of a regulation of general applicability based on the administrative record generated in rulemaking." *O.A. v. Trump*, 404 F. Supp. 3d 109, 128 (D.D.C. 2019).

Plaintiffs' access-to-counsel and due process claims arise from the course of removal hearings, placing them within § 1252(b)(9)'s broad jurisdictional bar.  Whether there has been a violation of any immigration petitioner's right to counsel will depend on the specific facts that arise from his or her removal proceedings.  *See J.E.F.M.*, 837 F.3d at 1035 ("Because the children's right-to-counsel claims arise from their removal proceedings, they can only raise those claims through the [petition for review] process" (citation omitted)); *Aguilar v. U.S. Immigration & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 13–14 (1st Cir. 2007) ("Ultimately, allowing aliens to ignore the channeling provisions of section 1252(b)(9) and bring right-to-counsel claims directly in the district court would result in precisely the type of fragmented litigation that Congress sought to forbid.").  In fact, the various declarations

submitted by Plaintiffs illustrate the breadth of factual circumstances that may arise during the course of such proceedings.  *E.g.*, Decl. of Homero López ¶¶ 5–9 (alleging issues with access to counsel at Pine Prairie because of call time limits, the small number of VTC rooms, scheduling issues, and issues reviewing documents with clients, among other reasons), ECF No. 7-5; Aff. of Juliana Manzanarez ¶¶ 13–17 (claiming issues with access to counsel at Eloy and La Palma because of the in-person meeting PPE requirements, the inadequacy of preparing for a hearing via telephone, scheduling issues, clients being charged to make calls, and the lack of call confidentiality, among other reasons), ECF No. 7-18.  Plaintiffs' access-to-counsel and due process claims are therefore reviewable only in the relevant federal court of appeals.  *J.E.F.M.*, 837 F.3d at 1031 ("Taken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the [petition for review] process." (citation omitted)).

Relying on the Supreme Court's plurality decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), Plaintiffs argue that none of their claims here are covered by the INA's jurisdiction-channeling provisions.  Plaintiffs argue that in *Jennings*, "the Supreme Court counseled against reading 'arising from' to include claims where the relief requested would become meaningless if delayed until review of a final deportation order," as they claim is true here.  Pls.' Reply at 7.  In *Jennings*, the Court held that a habeas petition challenging the government's prolonged detention of an immigrant without a bond hearing did not fall within the scope of § 1252(b)(9).  *Id.* at 841 & n.3.  But none of the Individual Plaintiffs' claims here arise out of *bond* determinations, and in *Jennings* the plurality contrasted a bond claim with challenges to "review of an order of removal," "the decision to detain . . . or to seek removal," or "*any part of the process by which . . . removability will be determined*."  *Id.* at 841 (emphasis added).  Relying on *Jennings*, other

district courts have held that they lacked jurisdiction to hear challenges related to the adequacy of representation based on immigration court policies in removal proceedings. *See, e.g.*, *P.L. v. U.S. Immigration & Customs Enf't*, No. 19-cv-01336, 2019 WL 2568648, at *3 (S.D.N.Y. June 21, 2019) (holding that the court lacked jurisdiction to hear challenge to VTC policies because the policies arose from removal proceedings).

So too here. Plaintiffs' access-to-counsel and due process claims arise as a "part of the process by which . . . removability will be determined," *Jennings*, 138 S. Ct. at 841, and this Court thus lacks jurisdiction over them.[7]

### 3. APA claim

For the foregoing reasons, Plaintiffs have failed to establish that the Court has jurisdiction over their claims. But even if the Court did have jurisdiction, Defendants' policies in the wake of the pandemic do not constitute final agency action subject to APA challenge, and in any event, those policies are not arbitrary and capricious.

### a. Final agency action

It is well-established that the APA limits non-statutory judicial review to *final* agency actions. 5 U.S.C. § 704. Although courts have sometimes struggled to define exactly when an agency's action is final, *see Sierra Club v. EPA*, No. 18-1167, 2020 WL 1684036, at *3–7 (D.C. Cir. Apr. 7, 2020), at least two conditions must exist: (1) "the action must mark consummation of agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or

---

[7] The INA, however, does not appear to foreclose Plaintiffs' claims based on the increased risk of contracting COVID-19 as a result of being forced to appear for in-person hearings, which likely could not be remedied through a petition to the relevant court of appeals.

from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations and quotation marks omitted).

Defendants concede the first condition but contest the second.  Defs.' Opp'n at 29–30.  In their view, "the only decision in removal proceedings with actual 'force and effect of law' would be a decision by an immigration judge in an *individual case* and not any decision to adopt or not adopt particular practices for counsel access."  *Id.* at 30 (quoting *Bennett*, 520 U.S. at 177–78) (other citation omitted).  They argue that until an individual immigration judge renders a decision, "[t]here is no way to tell whether, for example, having an attorney visit with a client or attend a hearing telephonically to prevent the spread of COVID-19 will have any effect on the outcome of the proceedings or any legal consequences."  *Id.*

Plaintiffs contest this view.  They argue that "legal consequences flow from the policies that were put in place instead."  Pls.' Reply at 19 (citation omitted).  They contend that "the concrete and real result of EOIR and ICE's policies is that rights of detained persons and their counsel are being infringed upon by endangering their health and well-being along with restricting access to counsel, which limits the ability to properly prepare for and attend important immigration proceedings."  *Id.* (footnote omitted).

The Court agrees that EOIR's policies do not constitute final agency action because they do not determine any rights or obligations, nor do legal consequences flow from those policies.  Instead, legal consequences flow (and rights and obligations are determined) only from the particular decision of an immigration judge implementing EOIR's policies in a specific case.  In fact, until an immigration judge makes such a decision it is unclear what effect, if any, EOIR's policies have had on a specific proceeding or individual.  *See CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 30 (D.C. Cir. 2014) ("When completion of an agency's processes may

obviate the need for judicial review, it is a good sign that an intermediate agency decision is not final." (quoting *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1215 (D.C. Cir. 1996)).  To take Plaintiff Guerrero-Cornejo's case as an example, his hearing went forward, he was permitted to participate via VTC, he won his case, and he was released.  Pls.' Suppl. Br. at 5; Pls.' Reply Suppl. Br. at 19.  Similarly, at least two of the other Individual Defendants have recently had their hearings continued.  *See supra* Section I.C.

As for ICE's policies, they are implemented on a facility-by-facility and individual-by-individual basis, based on the particularized circumstances present at detention centers and the specific requests for attorney-client teleconferences, VTCs, or in-person meetings.  *See* Benoit Decl. ¶¶ 26–38; Ciliberti Decl. ¶¶ 25–33; Hott Decl. ¶¶ 21–24; *see also* ICE Pandemic Response at 5–16.  This includes the facility-by-facility rules regarding how detained aliens, if represented, may contact their attorneys.  *See* Hott Decl. ¶¶ 21–24; *see, e.g.*, Benoit Decl. ¶¶ 26–38; Ciliberti Decl. ¶¶ 25–33.  It is unclear when and what legal consequences would flow from these policies, and Plaintiffs (outside of general accusations of harm) do not point to any.  *See* Pls.' Reply at 19.

Plaintiffs pivot and argue that they have a viable failure-to-act claim.  Pls.' Reply at 22–23.  They argue that "statutory authority requir[es] access to counsel and counsels' ability to provide adequate representation," and that these are "statutory limits on Defendants' discretion." *Id.* at 22.  In their view, the actions that Defendants have taken, including violating the Individual Plaintiffs' right to counsel, is "without question failure to take action."  *Id.* at 23.

To be sure, the APA permits challenges "to compel agency action . . . unreasonably delayed."  5 U.S.C. § 706(1).  But "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2003).  Defendants argue that Plaintiffs have failed

to cite any legal source "requiring the government to take any particular action or that otherwise cabins the agencies' discretionary choices on how to best respond to a pandemic." Defs.' Opp'n at 31. And they claim that even if Plaintiffs could point to a statutory obligation to take some action, Plaintiffs "still could not obtain an order directing agency operations in the particular ways they ask for; under § 706(1) a court can at most compel an agency 'to take action upon a matter, without directing *how* it shall act.'" *Id.* (quoting *Cobell v. Norton*, 392 F.3d 461, 475 (D.C. Cir. 2004)).

The Court agrees. As an initial matter, Plaintiffs' argument is primarily focused on their access-to-counsel and due process injuries and claims; they do not appear to contend that Defendants are required by statute to have issued a specific policy regarding in-person hearings. And as to their access-to-counsel claims, Plaintiffs have failed to point to any statute or other source that requires Defendants to have taken specific and particular steps during the pandemic. Plaintiffs' claims ultimately are not a challenge to Defendants' failure to follow some clear statutory obligation, but instead a challenge to Defendants having exercised their discretion in implementing policies with which Plaintiffs disagree. *See Cobell*, 392 F.3d at 472 ("The APA's requirement of '*discrete* agency action,' *Southern Utah* explained, was 'to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.'" (quoting 542 U.S. at 66)).

b.      *Arbitrary and capricious*

Even if Defendants' policies and guidance constituted final agency action, Plaintiffs would also have to show that they are unlawful. The APA does, of course, prohibit agency action that is arbitrary and capricious, 5 U.S.C. § 706(2)(A), but "[t]he scope of review under the

'arbitrary and capricious' standard is narrow and a court will not substitute its judgment for that of the agency." *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's determination must be upheld "so long as the agency 'engaged in reasoned decisionmaking and its decision is adequately explained and supported by the record.'" *Clark County v. Fed. Aviation Admin.*, 522 F.3d 437, 441 (D.C. Cir. 2008) (quoting *N.Y. Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1181 (D.C. Cir. 2004)) (other citation omitted).

Plaintiffs argue that Defendants' actions are "not reasonable" because they "run[] afoul . . . of statutorily conferred rights to counsel and create[] unwarranted risk to health." Pls.' Reply at 19–20. They claim that EOIR has acted "in such a way that a detained person's right to counsel of choice" is not being preserved. *Id.* at 20. They also contend that ICE has also failed "to meaningfully address the Congressional requirement that persons in immigration detention are afforded meaningful access to counsel." *Id.* at 21. In their view, "Defendants' decisions were not reasonable when looking at the facts before it, and the Court should 'hold unlawful and set aside' their arbitrary and capricious agency actions." *Id.* at 20 (quoting 5 U.S.C. § 706(2)).

The Court disagrees. Based on the present record, Defendants have reasonably exercised their discretion and authority in response to the COVID-19 pandemic. Less than a week after President Trump declared the COVID-19 pandemic a national emergency, EOIR issued a policy memorandum laying out the threats caused by the pandemic and responding in kind with solutions to prevent the spread of the disease. *See generally* McHenry Mem. That memorandum delays certain types of hearings, restricts access to immigration courts, and notes that the agency will continue to evaluate whether additional steps are needed to respond to the outbreak. *See id.* at 1–4. The memorandum also issued guidance to all immigration courts reminding them of

"well-established authorities which may be utilized for preventative purposes to minimize contact among individuals involved in immigration proceedings." *Id.* at 2–3. ICE has responded similarly, adopting policies to restrict unnecessary access to their facilities, test individuals for signs of fever before permitting entry, and testing detainees for COVID-19 before admitting them to facilities. *See* Benoit Decl. ¶¶ 27–38; Ciliberti Decl. ¶¶ 25–33; Hott Decl. ¶¶ 21–22; *see also* ICE Pandemic Response at 5–16.

Both Defendants also have adopted new policies to prevent the spread of COVID-19 by maintaining or expanding options for remote attorney conferencing, requiring PPE for necessary in-person meetings, and instituting more rigorous cleaning procedures. *E.g.*, Hott Decl. ¶¶ 21–22; ICE Pandemic Response at 9–10; McHenry Decl. ¶¶ 47–48; McHenry Mem. at 1–4. In the wake of the first pandemic the United States has faced since the early twentieth century and the rapidly changing facts and circumstances relating to it, the Court cannot say that Defendants' policies and practices are arbitrary and capricious or otherwise reviewable. *See, e.g.*, *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007) ("While [an agency's] conclusion may be debatable as a policy matter, mere policy disagreement is not a basis for a reviewing court to declare agency action unlawful." (citing *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004)).[8]

## B.    Irreparable Injury

For the foregoing reasons, Plaintiffs have failed to establish that they have a likelihood of success on the merits. That would end the matter if, as has been suggested, a likelihood of success is now a free-standing prerequisite for preliminary injunctive relief. *Davis v. Pension*

---

[8] Because they are foreclosed by the INA, *see* Section III.A.2, the Court does not discuss the substance of Plaintiffs' access-to-counsel and due process claims again here.

*Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (stating that the Supreme Court's decisions have "made clear that a likelihood of success is an independent, free-standing requirement for a preliminary injunction"). In any event, Plaintiffs also have not established that they will suffer imminent irreparable injury. "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is '*certain, great*[,] *and actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

As discussed above, none of the Individual Plaintiffs currently has an in-person hearing scheduled in the next month, and there is no evidence in the record that any of the Individual Plaintiffs has been or will be forced to appear at an in-person hearing over his or her request for a remote hearing or a continuance. Plaintiffs also have not demonstrated that immigration judges are regularly refusing requests for continuances or requests for telephonic or VTC hearings despite submitting declarations from a number of immigration attorneys from around the country. In these circumstances, Plaintiffs have not established that they are "certain" to suffer an "imminent" injury, especially when weighed against their chances of prevailing on the merits.

The Court does note that the EOIR guidance leaves open the *possibility* that an individual immigration judge might require, in an individual case, a detainee or her counsel to appear in-person for a hearing, over a request to continue the hearing or to participate in some other manner (such as via teleconference or VTC). But there is no actual evidence in the record of that having occurred, and the possibility of such hearings does not, in the Court's view, justify the broad relief sought by Plaintiffs. The Court also expects that in those circumstances, the affected

individual could seek relief in either the Board of Immigration Appeals or the local federal district court.

### C.      Balance of Equities and the Public Interest

Finally, the balance of the equities and public interest do not tip in favor of preliminary injunctive relief.  When the government is a party, these two factors merge and "are one and the same, because the government's interest *is* the public interest."  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).  Plaintiffs argue that "Defendants would suffer no harm from the cessation of unlawful practices that endanger public health, and any theoretical costs Defendants might incur would be significantly outweighed by the likelihood of irreparable harm to Plaintiffs (and the public)."  Pls.' Mot. at 41.  Plaintiffs also argue that the public interest favors granting preliminary injunctive relief.  In their view, the public interest is best served by promoting public health policies that reduce the spread of COVID-19.  Pls.' Reply at 34.

The Court does not agree that these factors tip so decidedly in favor of the relief Plaintiffs seek.  It goes almost without saying, of course, that promoting public health—especially during a pandemic—is in the public interest.  But the government has already changed its policies to attempt to minimize any harm to Plaintiffs and others in the immigration system and is making daily and case-by-case determinations about health and safety issues.  Plaintiffs' proposed relief, in contrast, would require this Court to impose a one-size-fits-all approach on all (or most) of the nation's immigration courts and their specific cases, as well as on all (or most) of the nation's immigration detention facilities and their unique circumstances.  Where, as here, the government has taken steps to craft policies to address the public health issues associated with COVID-19 while continuing to enforce the immigration laws, and where the Court is not certainly not well-positioned to second-guess those health and safety determinations, the public interest does not point in favor of granting injunctive relief.

### IV.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Temporary Restraining Order is

**DENIED**.  An Order will be entered contemporaneously with this Memorandum Opinion.


DATE:  April 28, 2020

_____
CARL J. NICHOLS
United States District Judge